IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AMANDA GERACI** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| v. | : | **NO. 14-5264** |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| **Defendants.** | : | |
| **RICHARD FIELDS** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| v. | : | **NO. 14-4424** |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| **Defendants.** | : | |

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**

**Relevant Police Department Policies and Training of Philadelphia Police Officers**

1. The Philadelphia Police Department (PPD) policy on recording and photographing police officers in the exercise of their duties is the result of a proactive effort to address a national policing issue. Exhibit 3, Deposition of Captain Fran Healy, November 26, 2013 at 46:20-47:15 (hereafter "2013 Healy Dep"); JointAppx0090.

2. In late summer 2011, Police Commissioner Ramsey attended a conference on policing in major American cities. Id. at 50:4-16; JointAppx0091.

3. One of the issues that was discussed at the conference was the newly developing issue of police officers being videotaped. Id.

4. Upon returning from the conference, Commissioner Ramsey requested the development of a policy on this issue as soon as possible. Id.

5. In response to this request, Commissioner's Memorandum 11-01 was drafted from July to September of 2011. Id. at 50:4-24; JointAppx0091.

6. On September 23, 2011, PPD issued Memorandum 11-01, stating its official policy on the public recording of police officers. Id. at 49:19-50:1; JointAppx0091.

7. Memorandum 11-01 specified that "[a]ll police personnel, while conducting official business or while acting in an official capacity in any public space, should reasonably anticipate and expect to be photographed, videotaped and/or be audibly recorded by members of the general public." It was issued with the stated purpose of "remov[ing] any confusion as to the duties and responsibilities of sworn personnel when being photographed, videotaped or audibly recorded." Exhibit 11, PPD Memorandum (11-01); JointAppx1156-1157.

8. Memorandum 11-01 instructs officers to follow Directive 83 (Accidental and/or Intentional Destruction to Private Property During the Course of Official Police Actions) and Directive 91 (Property Taken into Custody) and specifically instructs Philadelphia police officers not to interfere with recording activities, not to intentionally damage or confiscate recording devices, and not to delete recorded material. Id.

9. When Memorandum 11-01 was published, it was distributed to supervisors and read verbatim to officers during roll call. Ex.1 at 80:19-81:16; JointAppx0098-0099.

10. In May 2012, the Department of Justice wrote a Statement of Interest Letter for the case Sharp v. Baltimore, Civ. No. 1:11-ev-02888-BEL (U.S. Dist. Ct. Md.). Shortly thereafter, Commissioner Ramsey called upon the PPD's Research and Planning Unit to rewrite

    Memorandum 11-01 into a department Directive,[1] which would incorporate the DOJ recommendations regarding the recording of police. Id. at 19:13-20:12, 93:9-94:2. JointAppx0083, 0102.

11. From May to November of 2012, the Directive went through multiple drafts and edits before being submitted to the commissioner for final approval. Id. at 20:21-21:21, 89:3-91:9. JointAppx0083, 0101.

12. The final version of Directive 145 incorporates attempts to mirror language used by the Department of Justice in their recommendations. Id. at 95:10-24; JointAppx0102.

13. On November 9, 2012 the Philadelphia Police Department issued Directive 145 (Pictures, Video, and Audio Recordings of Police Officers While Performing Official Functions in Public Spaces). Directive 145 superseded Memorandum 11-01 immediately upon publication. Id. at 18:19-19:1; JointAppx0083.

14. While the First Amendment right of individuals to record police had not been established in the Third Circuit, the Police Department's official policy through Directive 145 specified that "[p]rivate individuals have a First Amendment right to observe and record police officers engaged in the public discharge of their duties" and that police "should reasonably anticipate and expect to be photographed, videotaped and/or audibly recorded by members of the general public." Exhibit 12, PPD Directive 145 at 1-2; JointAppx1158-1159.

15. Directive 145 was issued with the stated purpose of "protect[ing] the constitutional rights of individuals to record police officers engaged in the public discharge of their duties."

---

[1] There is no significant difference between the effects of a Memorandum and a Directive. Both equally establish official police policy. 2013 Healy Dep. at 91:10-15.

<u>Id.</u> at 1. It specifically instructs Philadelphia police officers not to "block[], obstruct[], or otherwise hinder[]" recording activities "unless the person making such recording engages in actions that jeopardize the safety of the officer, any suspects or other individuals in the immediate vicinity, violate the law, incite others to violate, or actually obstructs an officer from performing any official duty." <u>Id.</u> at 2; JointAppx1159.

16. Directive 145 also instructs police about recording activities that occur on private property, prohibits discouragement of recording via coercive means, and clarifies that "press credentials" are not necessary to record police. <u>Id.</u>

17. Directive 145 reaffirms that police seizure of recordings or recording devices "shall comply with the standard search and seizure principals of the Pennsylvania and United States Constitutions." <u>Id.</u>

18. Directive 145 additionally describes patrol procedures, supervisory procedures, and detective supervisory responsibilities regarding the recording of police. <u>Id.</u> at 3-8; JointAppx1160-1165.

19. Captain Healy was selected to sit on the International Association of Chiefs of Police's ("ICP") panel on public recording of police because of his role in developing this Directive.  The ICP is creating a model policy for the rest of the country on this issue which is based in large part upon the policy developed and implemented by the Philadelphia Police Department.  Exhibit 4, 2015 Deposition of Captain Fran Healy at 36:19-37:2 ("2015 Healy Dep"); JointAppx0198-0199.

20. Upon publication, Directive 145 was issued via teletype notice and read to police officers during roll call. Ex. 3 at 22:4-11; JointAppx0084.

21. Copies were sent to each district and unit, and each police officer and supervisor received a copy of Directive 145 and was required to verify their receipt by signature. Id. at 106:16-107:5, 107:6-108:3; JointAppx0105.

22. After being notified of the new directive, each officer was then responsible for knowing and following the directive. Id. at 108:4-109:2; JointAppx0105-0106.

23. Additionally, any officers who have received Crisis Intervention Training since 2013 have received as part of that training, a reminder on Directive 145 and its implications. Ex. 4 at 38:11-39:15; JointAppx0200-0201.

24. In December of 2013, in response to issues that had arisen in the press and the filing of three lawsuits by the American Civil Liberties Union, Captain Healy recognized that the training provided to officers on Directive 145 had not been as effective as the police department would have liked. Id. at 19:3-17, 46:13-24; JointAppx0181, 0208.

25. In response, the Police Department developed advance training on Directive 145 which was given to every one of the more that 6500 PPD officers as part of their annual Municipal Police Officer training in 2014. Id. at 22:18-24:2; JointAppx0184-0186.

26. The goal of the advanced training was to emphasize to the officers that like the ability to protest, the ability to record police was a First Amendment right that they had sworn to protect. Id. at 42:9-46:24; JointAppx0204-0208.

27. The training was developed as a 45 minute to 1 hour module that began with a lecture on the policy and why it was a protected right and continued with a question and answer session that allowed officers to ask hypotheticals and clarify their understanding of the contours of the right. Id. at 24:17- 33:20; JointAppx0186-0195.

**The Richard Fields Incident**

28. On September 28, 2013, Plaintiff Fields was walking down the street and came across a house that was having a party. A large number of Philadelphia police officers were outside. Exhibit 2, Deposition of Richard Fields at 7:2-8:20; JointAppx0031.

29. Plaintiff Fields took a picture of the officers. Id. at 8:18-20; JointAppx0032.

30. Plaintiff Fields was placed in handcuffs by a police officer, and his pockets were emptied onto a nearby stoop. Id. at 9:16-22; JointAppx0033.

31. Plaintiff Fields was placed in a police car while a police officer wrote a citation. Id. at 19:9-20:9; JointAppx0043-0044.

32. Plaintiff Fields did not see anyone actually going through his phone. Id. at 21:19-22, 22:24-23:10; JointAppx0045-0046.

33. Plaintiff Fields bases his claim that his phone was illegally searched on the sole assertion that when he received his phone back, some apps were open that he did not believe he had previously had open. Id. at 21:7-18; JointAppx0045.

34. After Plaintiff Fields was issued a citation, he was released from police custody. Id. at 20:16-21:4, 24:8-12; JointAppx0044, 0048

**The Amanda Geraci Incident**

35. Plaintiff Geraci considers herself a "legal observer" who witnesses interactions between police and civilians during acts of civil disobedience or protests. Ex. 1, Deposition of Amanda Geraci at 9:20-10:9; JointAppx0003-0004

36. On September 21, 2012, Amanda Geraci attended a protest at the Pennsylvania Convention Center called Shell Gas Outrage. Id. at 25:3-18; JointAppx0007.

37. Plaintiff was carrying a camera with her to videotape. Id. at 40:23-41:13; JointAppx0011.

38. At some point in time, Philadelphia Police attempted to make an arrest of one of the protesters. Id. at 32:17-1; JointAppx0009.

39. Plaintiff Geraci did not see why the individual was being arrested. Id.

40. Upon discovering that an individual was being arrested, Plaintiff approached the location where the arrest was taking place to get a better view. Id. at 34:6-19; JointAppx0010.

41. Plaintiff was attempting to videotape the incident. Id. at 40:11-13; JointAppx0011.

42. Plaintiff had been a legal observer in incidents involving the Philadelphia Police Department on at least 20 other occasions. Id. at 43:6-10; JointAppx0012.

43. Plaintiff had been recording police during all of those other interactions. Id. at 43:16-21; JointAppx0012.

44. The September 21, 2012 Shell Gas Outrage protest was the only occurrence of those 20 or more interactions during which Plaintiff had a confrontation with police. Id. at 43:11-15; JointAppx0012.

45. Plaintiff was not arrested or cited. Id. at 39:21-24; JointAppx0011.

46. Other than Police Officer Brown, no other officer made any physical contact with Plaintiff. Id. at 52:14-17; JointAppx0014; Ex. 6: Deposition of Officer Brown at 74:16-75:19; JointAppx0554-0555.