**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RICHARD FIELDS, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | No. 14cv4424 |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA et al., | : | |
| Defendants. | : | |
| ———————————————— | : | |
| | : | |
| | : | |
| AMANDA GERACI, | : | CIVIL ACTION |
| Plaintiff, | : | No. 14cv5264 |
| | : | |
| v. | : | |
| | :: | |
| CITY OF PHILADELPHIA et al., | : | |
| Defendants. | : | |
| ———————————————— | : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ........................................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

I.      Standard of Review ............................................................................................................ 2

II.     The Claims Defendants Do Not Challenge ........................................................................ 2

III.    The City Is Not Entitled to Summary Judgment on Plaintiffs' Claims ............................. 2

      A.    Plaintiffs Have Adduced Ample Evidence of an Unconstitutional Custom Within
         the PPD of Retaliating Against Individuals Who Record the Police. ..................... 4

      B.    Plaintiffs Have Adduced Ample Evidence that PPD Policymakers Were
         Deliberately Indifferent to the Need for Better Training and Supervision for PPD
         Officers on the Public's Right to Record. ............................................................... 7

      C.    Plaintiffs Have Adduced Ample Evidence that the City's Failures Caused the
         Violation of Their First Amendment Right to Record. .........................................11

IV.     The Individual Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' First
      Amendment Claims (Count I) .......................................................................................... 12

      A.    Because These Cases Present a Recurrent and Important Constitutional Issue,  the
         Court Should Follow the *Saucier* Procedure. ....................................................... 13

      B.    Defendants Violated the First Amendment by Arresting Plaintiffs for
         Recording or Observing Public Police Activities. ................................................. 15

      C.    The First Amendment Right to Record Public Police Activities Was Clearly
         Established at the Time of Plaintiffs' Arrests......................................................... 18

V.      Defendant Sisca Is Not Entitled to Summary Judgment on Richard Field's Claims for
      Unreasonable Search (Count II) and Malicious Prosecution (Count III) ......................... 21

VI.     Defendants Barrow, Jones, and Smith Are Not Entitled to Summary Judgment on
      Amanda Geraci's Excessive Force Claim (Count II) ....................................................... 22

CONCLUSION .............................................................................................................................. 23

# TABLE OF AUTHORITIES

**Cases**

*A.M. ex rel. J.M.K. v. Luzerne Cty Juvenile Detention Center*, 372 F.3d 572 (3d Cir. 2004)....... 12

*ACLU of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ........................................................ 15

*Adkins v. Limitiaco,* 537 Fed. App'x 721 (9th Cir. 2013) ........................................................... 15

*Alliance to End Repression v. City of Chicago*, Civ. No. 74 C 3268, 2000 WL 562480 (N.D. Ill. May 8, 2000) ............................................................................................................................... 16

*Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074 (2011) ........................................................ 19

*Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996) ..........................................................4, 11

*Berg v. County of Allegheny*, 219 F.3d 261 (3d Cir. 2000) ........................................................ 21

*Bielevicz v. Dubinon*, 915 F.2d 845 (3d Cir. 1990) ..................................................................... 4

*Blue Auctions v. Foster,* 528 Fed. App'x 190 (3d Cir. 2013) ...................................................... 20

*Brower v. County of Inyo*, 489 U.S. 593 (1989) ......................................................................... 21

*Buehler v. City of Austin*, No. A-13-CV-1100-ML, 2015 WL 737031 (W.D. Tex. Feb. 20, 2015) ................................................................................................................................... 16, 19

*Camreta v. Greene*, 563 U.S. 692, 131 S. Ct. 2020 (2011) ................................................... 13, 14

*Carter v. City of Philadelphia*, 181 F.3d 339 (3d Cir. 1999) ....................................................... 8

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ............................................................................ 2

*Channel 10, Inc. v. Gunnarson*, 337 F. Supp. 634 (D. Minn. 1972) ........................................... 16

*City of Houston v. Hill*, 482 U.S. 451 (1987) ............................................................................. 17

*Connell v. Hudson*, 733 F. Supp. 465 (D.N.H. 1990) ................................................................. 16

*Crawford v. Geiger*, No. 3:13CV1883, 2015 WL 5569007 (N.D. Ohio Sept. 22, 2015) ....... 15, 16

*DiBella v. Borough of Beachwood*, 407 F.3d 599 (3d Cir. 2005) ................................................ 22

*Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995) .............................................................. 15

*Garrison v. Louisiana*, 379 U.S. 64 (1964) ............................................................................... 16

*Gaymon v. Borough of Collingdale*, No. CIV.A. 14-5454, 2015 WL 4389585 (E.D. Pa. July 17, 2015) ................................................................................................................................. 16

*Gericke v. Begin*, 753 F.3d 1 (1st Cir. 2014) ................................................................................. 15

*Gilles v. Davis*, 427 F.3d 197 (3d Cir. 2005) ............................................................................... 17

*Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011) ....................................................................... 15, 18

*Higginbotham v. City of New York*, 105 F. Supp. 3d 369 (S.D.N.Y. 2015) ..................... 16, 19, 21

*Hope v. Pelzer*, 536 U.S. 730 (2002) ........................................................................................... 18

*Iacobucci v. Boulter*, 193 F.3d 14 (1st Cir. 1999) ....................................................................... 15

*Kelly v. Borough of Carlisle*, 622 F.3d 248 (3d Cir. 2010) ................................................... 17, 19

*Lambert v. Polk County*, 723 F. Supp. 128 (S.D. Iowa 1989) ..................................................... 16

*Mills v. Alabama*, 384 U.S. 214 (1966) ....................................................................................... 16

*Montgomery v. Killingsworth*, No. 13CV256, 2015 WL 289934 (E.D. Pa. Jan. 22, 2015) .... 17, 20

*Owen v. City of Independence*, 445 U.S. 622 (1980) .................................................................... 12

*Pearson v. Callahan*, 555 U.S. 223 (2009) ........................................................................... 13, 14

*Pomykacz v. Borough of W. Wildwood*, 438 F. Supp. 2d 504 (D.N.J. 2006) ................................ 18

*Riley v. California*, 134 S. Ct. 2473 (2014) ................................................................................. 13

*Robinson v. Fetterman*, 378 F. Supp. 2d 534 (E.D. Pa. 2005) ............................................... 18, 20

*Saucier v. Katz*, 533 U.S. 194 (2001) ..................................................................................... 14, 18

*Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000) ........................................................ 18

*Smith v. Mensinger*, 293 F.3d 641 (3d Cir. 2002) ....................................................................... 23

*Terry v. Ohio*, 392 U.S. 1 (1968) ................................................................................................. 21

*Thomas v. Cumberland County*, 749 F.3d 217 (3d Cir. N.J. 2014). ............................................... 3

*Williams v. Guard Bryant Fields*, 535 F. App'x 205 (3d Cir. 2013) ............................................ 23

*Williamson v. Mills*, 65 F.3d 155 (11th Cir. 1995) ...................................................................... 15

**Other Authorities**

Model Civ. Jury Instructions, § 4.6.2 (3d Cir. 2014) .................................................................. 23

Model Civ. Jury Instructions, § 4.6.6 (3d Cir. 2014) .................................................................. 3

Model Civ. Jury Instructions, § 4.6.7 (3d Cir. 2014) .................................................................. 3

**Rules**

Fed. R. Evid. 407 ....................................................................................................................... 8

## INTRODUCTION

For years the policymakers of the Philadelphia Police Department ("PPD") disregarded steadily mounting evidence that, as a matter of routine, PPD officers retaliated against citizens who recorded police activities with detention, arrest, false charges and inappropriate use of force. The City's failure to implement any form of training, supervision, or discipline to change this police culture resulted in violations of the Plaintiffs' constitutional rights. It was not until 2014, after commencement of this litigation, that the PPD finally created substantive training to address this problem. A PPD policymaker has conceded that the PPD should have done more to ensure that PPD officers followed the law and the PPD policies that protect the right of citizens to record police activities.

Plaintiffs seek redress for the violations of their rights, and seek to hold the City liable for its deliberate indifference in failing to take any action in the face of overwhelming evidence of an unconstitutional custom and practice within the PPD of retaliating against people who recorded police activities. Defendants' motion for summary judgment should be denied and all of Plaintiffs' claims should proceed to trial.

## FACTUAL BACKGROUND

On September 13, 2013, Richard Fields was arrested and then cited for photographing police activity from a distance while standing on a public sidewalk. Pls.' Facts ¶¶ 28, 34. On September 21, 2012, Amanda Geraci was observing a demonstration outside the Philadelphia Convention Center when she saw police arrest a protester. Pls.' Facts ¶¶ 36, 40. She moved closer so she could photograph the arrest, but was abruptly pushed up against a pillar and restrained across the neck by an officer who sought to prevent her from photographing the arrest. Pls.' Facts ¶¶ 41, 45. Both Plaintiffs allege that their incidents are not isolated, but resulted from

a custom and practice of PPD officers, who frequently use detention, arrest, and other actions to retaliate against citizens who attempt to record their actions. Plaintiffs rely upon their detailed Statement of Facts, as cited below.

## ARGUMENT

### I.    Standard of Review

A court should grant summary judgment only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The party seeking summary judgment must identify those portions of the record that it believes demonstrate the absence of material fact disputes. *Id.* at 323. Defendants' cursory and conclusory motion does not meet this burden.

### II.    The Claims Defendants Do Not Challenge

Defendants do not claim that there is insufficient evidence to support Plaintiffs' core factual contention – that they were arrested, in the case of Richard Fields, and subjected to excessive force, in the case of Amanda Geraci, in retaliation for their efforts to observe and record police activity. Defendants do not seek dismissal of Mr. Fields' claim for false arrest or Ms. Geraci's claim of excessive force. Those claims will proceed to trial.

Instead, Defendants argue for dismissal of Count I of the respective complaints on legal grounds. Those arguments fail.

### III.    The City Is Not Entitled to Summary Judgment on Plaintiffs' *Monell* Claims

Plaintiffs allege that the City is liable for their injuries under two distinct theories of municipal liability: first, that their injuries resulted from the unconstitutional custom and practice

of PPD officers, who regularly use detention, arrest, and other actions to retaliate against citizens who attempt to record their actions; and, second, that their injuries resulted from the failure of policymakers within the PPD to implement training, discipline, or supervisory protocols to prevent this type of officer misconduct, with deliberate indifference to the demonstrated probability that their failure would result in continued constitutional violations.

The first theory of liability requires evidence of a custom that was so widespread that PPD policymaking officials either knew of it or should have known of it. *See* Model Civ. Jury Instructions, § 4.6.6 (3d Cir. 2014). The second theory of liability does not require proof of such a widespread practice, but does require "deliberate indifference" – proof that PPD policymakers knew their officers would encounter the situation, knew that their officers had a history of mishandling such situations and that their mistakes would likely lead to a violation of constitutional rights, yet failed to implement the training or supervisory changes that would have reduced that risk. *See* Model Civ. Jury Instructions, § 4.6.7 (3d Cir. 2014); *Thomas v. Cumberland County*, 749 F.3d 217, 223-24 (3d Cir. N.J. 2014).

The City's summary judgment submissions do not even reference the undisputed evidence of numerous complaints and reports by Plaintiffs and others alleging that PPD officers retaliated against them for recording the police. News articles, other public sources, and Internal Affairs complaints put PPD officials on notice of at least 19 incidents prior to Ms. Geraci's restraint and detention and an additional two incidents prior to Mr. Fields' arrest in which Philadelphia police officers retaliated against civilians for recording the police.  Pls.' Facts ¶ 71. And the Police Advisory Commission wrote to the Commissioner in early 2013 to bring a pattern of such complaints to the PPD's attention and to recommend more training for officers. Pls.' Facts ¶ 141.

Instead of addressing these facts, the City merely asserts that the PPD was "proactive" in adopting written policies prohibiting retaliation when it issued Commissioner's Memorandum 11-01 in September 2011 and followed that with Directive 145 in November 2012. Merely adopting a precatory policy is not sufficient to avoid liability, however, where the policy is routinely disregarded. It is substance, not form, that determines liability. *Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir. 1996) ("We reject the district court's suggestion that mere Department procedures to receive and investigate complaints shield the City from liability…. Protection of citizens' rights and liberties depends upon the substance of the OPS investigatory procedures."). Plaintiffs have more than sufficient evidence to take both of their theories of municipal liability to the jury.

### A. Plaintiffs Have Adduced Ample Evidence of an Unconstitutional Custom Within the PPD of Retaliating Against Individuals Who Record the Police

"Custom . . . can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). A pattern of similar incidents and inadequate responses to those incidents – including incidents that post-date the plaintiffs' experiences – may demonstrate custom through municipal acquiescence. *See Beck*, 89 F.3d at 972 ("These complaints include the Debold incident, which, although it occurred after Beck's experience, may have evidentiary value for a jury's consideration whether the City and policymakers had a pattern of tacitly approving the use of excessive force."). The "acquiescence" of policymakers can be shown through their direct knowledge of this pattern of similar incidents, or by evidence that policymakers should have known of the pattern. *Bielevicz*, 914 F.2d at 850.

4

The undisputed record in this case shows a long-standing pattern of retaliatory actions by PPD officers against people who recorded police activity, incidents that were brought to the attention of PPD policymakers through press reports, citizen complaints, and/or lawsuits.

First, there were official complaints investigated by the PPD's Internal Affairs Division (IAD). Each of those investigations resulted in a memorandum directed to Police Commissioner Ramsey. There was a persistent stream of IAD investigations of allegations that PPD officers had retaliated against people who recorded them, beginning in 2010 and continuing through 2013 – at least 20 such complaints, most of them dating from after the PPD's adoption of written policy forbidding these actions. Pls.' Facts ¶¶ 91, 111, 113, 139.

Second, there were numerous press reports of such retaliation. Pls.' Facts ¶¶ 81-90, 108, 147. As Captain Healy testified, the Commissioner and his top staff routinely used media reports to identify potential areas of PPD officer misconduct. Pls.' Facts ¶69. Captain Healy acknowledged that he was aware of numerous press reports of PPD officers retaliating against people who recorded police activity beginning in early 2011. Pls.' Facts ¶¶ 81-86, 110, 112.

In addition, the Police Advisory Commission took the unusual step of writing to the Commissioner in March 2013 about the problem that PPD officers were continuing to interfere with the right of the public to record police activity:

> [r]ecent news accounts indicate that Philadelphia Police officers are not adhering to Philadelphia Police Department Memorandum 11-01 . . . . Additionally, the internal affairs database shows at least eight citizen complaints where people were allegedly retaliated against for videotaping police. Six of those incidents occurred AFTER the directive was issued in September 2011. One of the more serious cases involving the videotaping of police from 2012 resulted in partially sustained charges against two officers, who received training and counseling.

The letter went on to state that the Commission "recommends that all police personnel be reminded, in writing, of the existing recommendation and that department action be instituted

against any member of the PPD not adhering to the recommendation." Pls.' Facts ¶ 141. Notably, the City admits it did nothing in response to this memorandum. Pls.' Facts ¶ 143. Also during the first half of 2013, the PPD was sued by Plaintiffs' counsel over three different incidents in which PPD officers had arrested members of the public who sought to observe and/or record them. Each of those complaints described many similar incidents. Pls.' Facts ¶¶ 140, 147.

Finally, Captain Healy had direct knowledge that PPD officers did not believe the public had a right to record their activities. In fact, Captain Healy testified that he knew the PPD needed to provide better training on the public's right to record based on his observations that Philadelphia police officers did not understand PPD policies on the subject, did not understand why there was a First Amendment right to record the police, or believed it was "crap," and that a "cultural change" was thus needed to bring about compliance with the policy. Pls.' Facts ¶ 26 (JointAppx 0203-07 (2015 Healy Dep. Tr. 41:7-45:6)). Captain Healy heard these things directly from officers prior to the issuance of Memorandum 11-01, which convinced him that corrective action – in his view, adoption of explicit policy – was urgently needed. Pls.' Facts ¶¶ 92, 93. Captain Healy continued to hear that officers disagreed about the right to record and of violations of Directive 145 at least through 2013. Pls.' Facts ¶¶ 129-130.

The City makes no effort to rebut this evidence of custom, of which Commissioner Ramsey and Captain Healy, as PPD policymakers, were or should have been aware. The evidence that establishes a custom of unconstitutional behavior is also sufficient to bring the question of causation to the jury. *See infra* at section C. Plaintiffs are entitled to proceed to a jury on their custom and practice claim.

**B. Plaintiffs Have Adduced Ample Evidence that PPD Policymakers Were Deliberately Indifferent to the Need for Better Training and Supervision for PPD Officers on the Public's Right to Record.**

The only reference the City makes to the factual record in its brief is to contend that the facts reveal a "continued effort" by the PPD to "develop training and reinforce training … on the rights of individuals to record police." Defs.' Mem. Law 12-13, ECF No. 24 (citing Defs.' Statement of Undisputed Facts ¶¶ 1-27, ECF No. 24-1). But the only force-wide "training" identified by the City relating to violation of Plaintiffs' rights is the manifestly ineffective distribution of Memorandum 11-01 and Directive 145 at roll call. *See* Defs.' Statement of Undisputed Facts ¶ 23, ECF No. 24-1.

The City notes that it finally provided force-wide, in-depth training on the public's right to record in 2014, long after both Plaintiffs' incidents. *Id.* ¶¶ 25-27. As Captain Healy explained, he requested the development of the 2014 training after being confronted with the Department's history of inaction at his deposition *and admitting that the existing training was inadequate*. Pls.' Facts ¶¶ 127, 150-153. Captain Healy testified that "as a result of the issues that had come up in the press and I do believe as a result of our previous deposition . . . I realized there was a weakness that needed to be addressed. So I petitioned the commissioner to – actually through Deputy Commissioner Joyce that additional training be implemented." He also testified that "after we had met, I saw a failing. I said yes, this is a very complicated issue that needs more training than we would do normally." Captain Healy drafted a memorandum to Deputy Commissioner Joyce on December 18, 2013, requesting additional training, in which he stated, "it became very clear that the PPD could have done more training when the policy was initially implemented. It appears the only training that was provided was roll call training." Pls.' Facts ¶ 24. The City makes no effort to claim that it provided appropriate supervision, discipline, or

7

training in light of the evidence of widespread officer disregard for, and confusion regarding, Memorandum 11-01 and Directive 145.

Plaintiffs have amassed extensive evidence that PPD policymakers were deliberately indifferent to the need for training and supervision to change police culture to protect the right of the public to record police activity. The Third Circuit applies a three-part test to determine whether a municipality's failure to train or supervise amounts to deliberate indifference: "it must be shown that (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves . . . a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999).

PPD policymakers clearly knew that officers would encounter individuals who sought to record them with increasing frequency – that is why PPD policymakers wanted policies in place, and Captain Healy testified that this remained a "hot button" issue with the officers well after the adoption of Directive 145. Pls.' Facts ¶¶ 92-93, 99, JointAppx 0217 (2015 Healy Dep. Tr. 55:11-23). And, as set forth in detail above, PPD policymakers also knew or should have known, long before they instituted new training in 2014, that PPD officers had a history of gravely mishandling situations in which people tried to record police activity. *See infra* Section III.A [1]

Indeed, there was ample reason for PPD policymakers to know, even before the accumulation of complaints and warnings from the PAC and others, that the mere distribution of

---

[1]      The City's additional training in 2014 and Captain Healy's statements about the need for that training are admissible to rebut the City's claim that "municipal policymakers were actively attempting to train Philadelphia Police Department officers on the rights of individuals to record police," (*see* ECF No. 24 at 13) and to illustrate the feasibility of providing effective training on the subject. Fed. R. Evid. 407 advisory committee's note (Rule 407 does not bar evidence of subsequent remedial measures to show the feasibility of precautionary measures and for impeachment).

a written policy alone would not be sufficient to protect the public's right to record. Captain Healy knew, even before the adoption of Memorandum 11-01, that officers did not think the public had a right to record them. Pls.' Facts ¶¶ 26, 92, 93. He heard the same position again after the introduction of Directive 145. Pls.' Facts ¶¶ 129, 130. And he knew that handing out copies of a written policy to police officers does not change culture or ingrained patterns of behavior. Pls.' Facts ¶¶ 74, 128; JointAppx 0084 (2013 Healy Dep. Tr. 22:23-23:2) ("When there is a cultural change behind the policy, that's when there's usually a need for training to make sure everybody gets on board before you put the policy out there."). Captain Healy testified that introducing a new constitutional concept should have been accompanied by additional training. Pls.' Facts ¶¶ 74, 150; JointAppx 0207-08 (2015 Healy Dep. Tr. 45:5-46:17) ("So it's a cultural change on how we do bus[iness]. . . . [The First Amendment right to record the police] is a very complicated issue that needs more training than we would do normally."); JointAppx 0237 (2015 Healy Dep. Tr. 75:7-17) (the "intensity" of Directive 145 and the announcement of a constitutional right "should deserve more attention than what I do believe a [roll] call training normally gives."). The PPD was able to develop and implement a robust training program on the right to record within a couple of months of Captain Healy's request that it do so. As Plaintiffs' expert noted, what the PPD did in 2014 it could and obviously should have done in 2012 or 2011. JointAppx 1677 (McCauley Report at 18).[2]

---

[2]   Plaintiffs, like Defendants, believe that Captain Healy was a policymaker with respect to the issue of protecting the public's right to record. *See* ECF No. 24 at 13 (discussing "municipal policymakers'" efforts to train PPD "officers on the rights of individuals to record police" and citing to actions taken by Captain Healy); *see also* Defs.' Statement of Undisputed Facts ¶¶ 1-27, ECF No. 24-1. Captain Healy was Commissioner's Ramsey's designated point person on this issue: he oversaw creation of both Memorandum 11-01 and Directive 145; took initiative to discuss these issues with officers; and had the authority to order additional training on this issue, which he ultimately did. Pls.' Facts ¶ 79.

All of this is echoed by Plaintiffs' expert, who explains that dissemination of a written policy, without more, is never sufficient to change ingrained police behavior or overcome police resistance to change. Pls.' Facts ¶¶ 162-163, 167. And, as he wrote in his report and as he would testify, the PPD's reliance on line supervisors to ensure that officers understood and followed the new policies was meaningless because the PPD took no steps to make sure that those supervisors understood the policy and the reasons for it and were monitoring their officers for compliance. Pls.' Facts ¶¶ 164-165.

There is also substantial evidence that PPD policymakers were deliberately indifferent to the fact that without better supervision, PPD officers would likely continue to violate the rights of people who recorded police activity. To begin with, despite knowing that PPD officers did not believe that the public had a right to record police activity, the PPD set up no system to supervise officers with respect to this issue when it adopted Memorandum 11-01. Pls.' Facts ¶¶ 106-107. A year later, despite having announced a role for supervisors in Directive 145, the Department made no effort to ensure that supervisors were trained or that the supervisor protocols were followed. Pls.' Facts ¶¶ 132-138. There was, quite simply, no effort beyond the adoption of paper policies to ensure protection of the public's right to record. *See* Pls.' Facts ¶ 99 (The Commissioner just 'wanted a policy out' fast.) The mere adoption of a policy does not amount to adequate supervision:

> Formalism is often the last refuge of scoundrels; history teaches us that the most tyrannical regimes, from Pinochet's Chile to Stalin's Soviet Union, are theoretically those with the most developed legal procedures. The point is obviously not to tar the Police Department's good name with disreputable associations, but only to illustrate that we cannot look to the mere existence of superficial grievance procedures as a guarantee that citizens' constitutional liberties are secure. Protection of citizens' rights and liberties depends upon the substance of the OPS investigatory procedures. Whether those procedures had substance was for the jury's consideration.

10

*Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (3d Cir. 1996). *See also id.* ("Because there is no formalized tracking of complaints for individual officers, a jury could find that officers are guaranteed repeated impunity, so long as they do not put themselves in a position to be observed by someone other than another police officer.").

As Plaintiffs' expert explains, there was far more that the PPD should have done to educate and supervise its officers.  The PPD should have begun by gathering data from Internal Affairs and line supervisors about known incidents or complaints of police interfering with recording; continued with the dissemination of policy coupled with substantive training for both line officers and their direct supervisors; and then evaluated the effectiveness of that training through periodic surveys of officers and supervisors, as well as review of Internal Affairs records.  JointAppx 1676 (McCauley Report at 17).  The City did none of that.

This evidence would support a finding that PPD policymakers were deliberately indifferent to the need for additional training and supervision.

### C. Plaintiffs Have Adduced Ample Evidence that the City's Failures Caused the Violation of Their First Amendment Right to Record.

Plaintiffs have alleged that they were retaliated against in the same ways as many other citizens. Their rights were violated in the middle of the time period during which the PPD received numerous complaints, press reports, and other warnings that officers were regularly retaliating against other people who recorded police activity, and before the PPD finally took corrective action. That is sufficient to take the issue of causation to a jury.

"As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Bielevicz*, 915 F.2d at 851. "A sufficiently close causal link between . . . a known but uncorrected custom or usage and a specific violation is established if occurrence of the specific violation was made

reasonably probable by permitted continuation of the custom." *Id.*; *see also A.M. ex rel. J.M.K. v. Luzerne Cty Juvenile Detention Center*, 372 F.3d 572, 582 (3d Cir. 2004) ("The deficiency of a municipality's training program must be closely related to the plaintiff's ultimate injuries.").

Plaintiffs have additional causation evidence in the statement of Captain Healy that he saw improvement in officers' view of recording after the new training provided in 2014. Pls.' Facts ¶¶ 155, 156. If the jury finds that the individual defendant officers acted to retaliate against the Plaintiffs, they may properly infer that the officers would not have done so had they received proper training and supervision.

## IV.    The Individual Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' First Amendment Claims.

The individual Defendants' sole argument for dismissal of Plaintiffs' First Amendment claims is that Plaintiffs' right to record police activity was not clearly established at the time of Ms. Geraci's detention in 2012 or Mr. Fields' arrest in 2013. Defendants do not deny that Plaintiffs have such a right. Indeed, PPD policy has specifically acknowledged a First Amendment right to record police activity since 2012. Pls.' Facts ¶ 14. Rather in support of their argument on individual liability, Defendants mischaracterize the alleged uncertainty of the state of the law on the right to record police and rely on the fact that courts of this Circuit have previously avoided answering that substantive question.

In this case, of course, the Court must address the contours of the First Amendment right to record in order to address Plaintiffs' claims against the City. Under longstanding precedent, alleged legal uncertainty provides no defense against municipal liability. *Owen v. City of Independence*, 445 U.S. 622, 651 (1980).

In light of that – and in light of the growing frequency with which this issue arises[3] – Plaintiffs respectfully urge the Court to address the same question with respect to the individual Defendants by performing the full qualified immunity analysis. This Court should hold (1) that there is a First Amendment right to record police activities; and (2) that this right was clearly established at the time of the events that a gave rise to each of the Plaintiffs' claims.

**A. Because These Cases Present a Recurrent and Important Constitutional Issue, the Court Should Follow the *Saucier* Procedure.**

By asking the Court simply to find that the First Amendment right in question was not "clearly established," Defendants ask the Court to reinforce and perpetuate the constitutional ambiguity they claim protects them against liability for violating plaintiffs' rights:

> Consider a plausible but unsettled constitutional claim asserted against a government official in a suit for money damages. The court does not resolve the claim because the official has immunity. He thus persists in the challenged practice; he knows that he can avoid liability in any future damages action, because the law has still not been clearly established. Another plaintiff brings suit, and another court both awards immunity and bypasses the claim. And again, and again, and again. So the moment of decision does not arrive. Courts fail to clarify uncertain questions, fail to address novel claims, fail to give guidance to officials about how to comply with legal requirements. See, *e.g., ibid.; Wilson v. Layne,* 526 U.S. 603, 609, 119 S. Ct. 1692, 143 L.Ed.2d 818 (1999). Qualified immunity thus may frustrate "the development of constitutional precedent" and the promotion of law-abiding behavior. *Pearson v. Callahan,* 555 U.S. 223, 237, 129 S. Ct. 808, 172 L.Ed.2d 565 (2009).

*Camreta v. Greene*, 563 U.S. 692, 131 S. Ct. 2020, 2031 (2011).

---

[3] "This principle is particularly important in the current age where widespread access to recording devices and online media have provided private individuals with the capacity to gather and disseminate newsworthy information with an ease that rivals that of the traditional news media." JointAppx 1657 (May 14, 2012 U.S. Department of Justice Letter Re: *Christopher Sharp v. Baltimore City Police Department* at 10). *See also Riley v. California*, 134 S. Ct. 2473, 2484 (2014) ("cell phones . . . are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy.").

In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that courts have discretion to decide whether a constitutional right is violation is "clearly established" first, but stressed that the protocol outlined in *Saucier v. Katz*, 533 U.S. 194 (2001) – in which a court first decides if the defendant's actions violated the Constitution, and then if the violated right was clearly established – is "often beneficial" and "promotes the development of constitutional precedent." *Pearson*, 555 U.S. at 236. *See also Camreta*, 131 S. Ct. at 2032 ("[W]e have long recognized that . . . that our regular policy of avoidance sometimes does not fit the qualified immunity situation because it threatens to leave standards of official conduct permanently in limbo.").

The Defendants' argument that they are not bound by any First Amendment right to record their activity is inconsistent with the PPD's 2012 policy statement acknowledging the First Amendment protects the recording of police activity. The Court should not condone the City's effort to preserve its right to say one thing and do another.

Because these cases raise a First Amendment issue with significance beyond Plaintiffs' individual circumstances, the Court should follow the *Saucier* protocol and reaffirm the existence of a First Amendment right to observe and record public police activities, whether or not the Court then concludes that the right was clearly established at the time of Plaintiffs' incidents. As the District Court wrote in a similar case:

> I am firmly persuaded the First Amendment shields citizens against detention or arrest merely for making a photographic, video or sound recording, or immutable record of what those citizens lawfully see or hear of police activity within public view. To allow the fog of denial and acquiescence to envelop and conceal police misconduct is, under a regimen where citizen recording of such misconduct could lead to arrest, to endorse the "Nacht und Nebel" mindset and methodology of the police state. No law enforcement officer who is enforcing the law lawfully can or should fear citizen recording, as the recording will vindicate the lawfulness of his or her actions, and protect, rather than endanger, him or her in the face of bogus misconduct allegations.

*Crawford v. Geiger*, No. 3:13CV1883, 2015 WL 5569007, at *14 and n.5 (N.D. Ohio Sept. 22, 2015) (holding that there is a First Amendment right to record, but finding qualified immunity because that right was not clearly established).

> **B.** **Defendants Violated the First Amendment by Arresting Plaintiffs for Recording or Observing Public Police Activities.**

The ability to scrutinize the actions of public servants lies at the core of the First Amendment. For this reason, every Court of Appeals to address the issue on the merits in the last decade and a half has recognized that the First Amendment protects video recording of public official activity. *See, e.g.*, *Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014) ("the Constitution protects the right of individuals to videotape police officers performing their duties in public"); *Adkins v. Limitiaco,* 537 Fed. App'x 721, 722 (9th Cir. 2013) (holding that allegations that plaintiff was arrested in retaliation for taking photos of the police in public stated a claim for First Amendment retaliation); *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 599-600 (7th Cir. 2012) (holding that a statute that would prohibit recording police officers with a cell phone violated the First Amendment); *Glik v. Cunniffe*, 655 F.3d 78, 79 (1st Cir. 2011) (holding "unambiguous" the constitutional right to videotape police activity); *Cumming*, 212 F.3d at 1333 (11th Cir. 2000) (finding "a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct"); *Iacobucci v. Boulter*, 193 F.3d 14, 25 (1st Cir. 1999) (holding that filming public officials in a public area "was done in the exercise of [Plaintiff's] First Amendment Rights"); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (holding that recording of police conduct fell within the "First Amendment right to film matters of public interest"); *Williamson v. Mills*, 65 F.3d 155, 157-59 (11th Cir. 1995) (reversing the district court's grant of qualified immunity to a police officer who arrested and seized the film of a political

demonstration participant).[4] *See also* JointAppx 1719 (Statement of Interest of the United States, R.24, *Sharp v. Baltimore,* No. 11-2888, at 1 (D. Md. Jan. 10, 2012)) ("[The] right to record police officers while performing duties in a public place, as well as the right to be protected from the warrantless seizure and destruction of those recordings, are not only required by the Constitution . . . [t]hey are constituent with our fundamental notions of liberty, promote the accountability of our government officers, and instill public confidence in the police officers who serve us daily.").

These decisions are in keeping with decades of Supreme Court jurisprudence emphasizing "the paramount public interest in a free flow of information to the people concerning public officials." *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964). The ability of both the press and of individuals to freely gather information ensures "free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). The ability to obtain and report information regarding alleged government misconduct is particularly important when such

---

[4]     *See also Crawford v. Geiger*, 2015 WL 5569007, at *14 and n.5; *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 380 (S.D.N.Y. 2015); *Buehler v. City of Austin*, No. A-13-CV-1100-ML, 2015 WL 737031, at *9 (W.D. Tex. Feb. 20, 2015) ("In light of the existing Fifth Circuit precedent and the robust consensus among circuit courts of appeals, the Court concludes that the right to photograph and videotape police officers as they perform their official duties was clearly established at the time of Buehler's arrests."); *Alliance to End Repression v. City of Chicago*, Civ. No. 74 C 3268, 2000 WL 562480, at *21 (N.D. Ill. May 8, 2000) (recognizing "taking photographs of the police" as protected by the First Amendment); *Connell v. Hudson*, 733 F. Supp. 465, 470-71 (D.N.H. 1990) ("According to principles of jurisprudence long respected in this nation, Chief Brackett could not lawfully interfere with Nick Connell's picture-taking activities unless Connell unreasonably interfered with police and emergency functions."); *Lambert v. Polk County*, 723 F. Supp. 128, 133 (S.D. Iowa 1989) ("It is not just news organizations... who have First Amendment rights to make and display videotapes of events – all of us ... have that right."); *Channel 10, Inc. v. Gunnarson*, 337 F. Supp. 634, 638 (D. Minn. 1972) (recognizing "constitutional right to have access to and to make use of the public streets, roads and highways ... for the purpose of observing and recording in writing and photographically the events which occur therein"). *Cf. Gaymon v. Borough of Collingdale*, No. CIV.A. 14-5454, 2015 WL 4389585, at *9 n.9 (E.D. Pa. July 17, 2015) ("federal case law has overwhelmingly held that citizens do indeed have a right to record officers in their official capacity so long as they do not interfere with an officer's ability to do his or her job").

information involves the misconduct of police officers. *City of Houston v. Hill*, 482 U.S. 451, 462-63 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.").

There is no modern dissent on this point. There are some court decisions – most relevant here, the Third Circuit's 2010 decision in *Kelly v. Borough of Carlisle*, 622 F.3d 248 (3d Cir. 2010) – that have found police officers entitled to qualified immunity on claims they retaliated against people who recorded them. But the Third Circuit's holding was limited both to its facts and to the second prong of the qualified immunity analysis: "[W]e hold that the right to videotape police officers during traffic stops was not clearly established and Officer Rogers was entitled to qualified immunity on Kelly's First Amendment claim." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 263 (3d Cir. 2010). District courts in this Circuit have followed *Kelly's* analysis and dismissed First Amendment claims against individual officers on qualified immunity grounds. *See, e.g., Montgomery v. Killingsworth*, No. 13CV256, 2015 WL 289934, at *15 (E.D. Pa. Jan. 22, 2015). These decisions do not address whether the First Amendment protects the right to record the police, only whether such a right is "clearly established" for qualified immunity purposes.

Prior to the *Kelly* decision, the Third Circuit had refused to rule out First Amendment protections for recording the police in the performance of their duties on public property. *Gilles v. Davis*, 427 F.3d 197, 212 n.12 (3d Cir. 2005) ("The District Court suggested that even if Heck did not bar Petit's claim, the First Amendment claim would fail nonetheless because videotaping does not constitute a protected First Amendment activity. But videotaping or photographing the police in the performance of their duties on public property may be a protected activity.") (citing

17

*Smith v. City of Cumming,* 212 F.3d 1332, 1333 (11th Cir. 2000)). And, before *Kelly*, this Court

and the District of New Jersey had held that the First Amendment protects this activity. *Robinson*

*v. Fetterman*, 378 F. Supp. 2d 534 (E.D. Pa. 2005); *Pomykacz v. Borough of W. Wildwood*, 438 F.

Supp. 2d 504 (D.N.J. 2006). The *Kelly* court did not overrule these cases, but distinguished them

on their facts, in light of the particular danger associated with traffic stops. *Kelly,* 622 F.3d at 262

("Our decision on the First Amendment question is further supported by the fact that none of the

precedents upon which Kelly relies involved traffic stops, which the Supreme Court has

recognized as inherently dangerous situations."). As the First Circuit has held, an arrest in a

public forum is "worlds apart" from the traffic stop at issue in *Kelly*. *Glik*, 655 F.3d at 85.

Mr. Fields was arrested for photographing police activity from a distance while standing

on a public sidewalk. Ms. Geraci was subjected to excessive force for attempting to photograph

an arrest taking place inside a building while she stood outside. The situations here are like the

facts in *Gilles* and *Robinson* and *Pomykacz*, as well as many decisions from other Circuits that

have upheld the right of the public to photograph and videotape police. This Court should hold

that Plaintiffs had a First Amendment right to photograph and record the police.

### C.  The First Amendment Right To Record Public Police Activities Was Clearly Established At The Time of Plaintiffs' Arrests.

In determining whether a constitutional right is "clearly established," the "dispositive

inquiry" is "whether it would be clear to a reasonable officer that his conduct was unlawful in the

situation he confronted." *Saucier*, 533 U.S. at 202. This means that "a general constitutional rule

already identified in the decisional law may apply with obvious clarity to the specific conduct in

question, even though the very action in question has [not] previously been held unlawful." *Hope*

*v. Pelzer*, 536 U.S. 730, 741 (2002) (internal quotation marks and citation omitted)). Indeed,

"officials can still be on notice that their conduct violates established law even in novel factual

circumstances." *Id*. As Defendants themselves acknowledge, the Court may look to other circuits (ECF No. 24 at 7) (citing *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)). And the requisite clarity can be established by a "robust consensus of persuasive authority" from other circuits and courts. *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2084 (2011); *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 380 (S.D.N.Y. 2015); *Buehler v. City of Austin*, No. A-13-CV-1100-ML, 2015 WL 737031, at *9 (W.D. Tex. Feb. 20, 2015) ("In light of the existing Fifth Circuit precedent and the robust consensus among circuit courts of appeals, the Court concludes that the right to photograph and videotape police officers as they perform their official duties was clearly established at the time of Buehler's arrests.").

Here, the circumstances were not novel and any reasonable officer would have known that he or she may not arrest an individual for recording the officer's public, professional behavior. At the time of these Plaintiffs' incidents – in the latter half of 2013 (in Mr. Fields' case) and in the middle of 2012 (as to Ms. Geraci) – four Circuits and numerous lower courts had held that there is a First Amendment right to record public officials. *See* Section B, *supra*. No circuit had rejected that right, and no lower court had done so since the advent of widely available cell phone cameras.

Defendants ignore this precedent and rely instead on the Third Circuit's decision in *Kelly v. Borough of Carlisle*, 622 F.3d 248 (3d Cir. 2010), which held that an officer who arrested a man for recording him during a traffic stop was entitled to qualified immunity on the man's First Amendment claim because there was, at the time, no clearly established right for a passenger in a car stopped by police to record the stop. Defendants' reliance is misplaced because—as numerous courts have recognized—the *Kelly* court carefully confined its decision to the uniquely dangerous circumstances of a traffic stop. *See id*. at 262 ("none of the precedents upon which

Kelly relies involved traffic stops, which the Supreme Court has recognized as inherently dangerous situations"). By its own intentionally limited terms, *Kelly* did not excuse the arrests of Plaintiffs, which did not take place during a traffic stop. As the First Circuit has held, an arrest in a public forum is "worlds apart" from the traffic stop at issue in *Kelly*. *Glik*, 655 F.3d at 85; *see also Higginbotham*, 105 F. Supp. 3d at 381.

In addition, as set forth above, there has been a "growing trend" of decisions from other Circuits since *Kelly*. *See Montgomery*, 2015 WL 289934, at *15 n.7. Before Amanda Geraci's detention, the First, Seventh, Ninth, and Eleventh Circuits had held that there is a First Amendment right to photograph or videotape police conduct. Ms. Geraci's unlawful detention also came after the Department of Justice announced the United States' view that recording an arrest of another citizen "is unquestionably protected by the First Amendment." JointAppx 1722-1723 (Statement of Interest of the United States, R.24, *Sharp*, No. 11-2888, at 4-5 (D. Md. Jan. 10, 2012)). Even more law supported the right to photograph police before Mr. Fields' arrest for doing so in September 2013.

The violations of Plaintiffs' rights did not occur during a traffic stop, nor in any other circumstance that suggests a special need for concern for the safety of police. Their claims are far closer to the numerous cases cited above, in which the courts have held, like this Court, that "there can be no doubt that the free speech clause of the Constitution protected Robinson as he videotaped the defendants." *Robinson*, 378 F. Supp. 2d 541.[5] As the *Higginbotham* court held:

> Certainly, the right to record police activity in a public space is not without limits, and some uncertainty may exist on its outer bounds. For instance, it may not apply

---

[5]     The Court should not consider the unpublished decision *Blue Auctions v. Foster* as the panel specifically noted that it was writing "solely for the parties." 528 Fed. App'x 190, 191 (3d Cir. 2013). As an unpublished decision, it does not have precedential value. *See* 3rd Cir. LAR, App. I, IOP 5.7. The decision neither cites nor analyzes the wealth of authority confirming a First Amendment right to observe and record public police activity.

in particularly dangerous situations, if the recording interferes with the police activity, if it is surreptitious, if it is done by the subject of the police activity, or if the police activity is part of an undercover investigation. As alleged, however, Higginbotham's conduct falls comfortably within the zone protected by the First Amendment.

*Higginbotham*, 105 F. Supp. 3d at 381.

Given the clear and consistent precedent that existed at the time of the arrests, the First Amendment right to observe and document matters of public concern in a public place was clearly established at the time of Plaintiffs' arrests.

**V.      Defendant Sisca Is Not Entitled To Summary Judgment On Richard Field's Claims For Unreasonable Search (Count II) And Malicious Prosecution (Count III)**

Defendant Sisca's additional arguments for summary judgment misstate the factual record. Both claims should proceed to trial.

First, the undisputed facts – as well as the law – establish that Plaintiff Fields suffered a Fourth Amendment "seizure" sufficient to state a claim for malicious prosecution. Defendant's own Statement of Undisputed Fact admits that Mr. Fields was not merely issued a citation: he was handcuffed and held in a police car prior to being issued a citation. Defs.' Statement of Undisputed Facts ¶¶ 30, 31, ECF No. 24-1. At his deposition, Defendant Sisca admitted that Mr. Fields was held in this manner for 20-30 minutes and repeatedly characterized what he did to Mr. Fields as an "arrest". Pls.' Facts ¶¶ 49-53.

A "seizure" occurs when a government official has, "by means of physical force or show of authority, . . . in some way restrained [the person's] liberty." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968); *see also Brower v. County of Inyo*, 489 U.S. 593, 596 (1989); *Berg v. County of Allegheny*, 219 F.3d 261, 269 (3d Cir. 2000) (per curiam) ("A person is seized for Fourth Amendment purposes only if he is detained by means intentionally applied to terminate his

freedom of movement."). Defendants rely upon *DiBella v. Borough of Beachwood*, 407 F.3d 599 (3d Cir. 2005), but in *DiBella*, the court expressly distinguished circumstances, like here, in which the plaintiff had been arrested. *DiBella*, 407 F.3d at 603 ("DiBella and McLaughlin were only issued a summons; they were never arrested; they never posted bail; they were free to travel; and they did not have to report to Pretrial Services.").

Second, Defendant Sisca contends that the Court should dismiss Fields' claim for the illegal search of his phone because there is no direct evidence that Sisca searched the phone. But there is more than enough evidence for the jury to infer that Defendant Sisca did so. Defendant Sisca is the only one who is known to have had custody of the phone between the time that he took it from Mr. Fields and the time that he returned it to Mr. Fields. Pls.' Facts ¶¶ 61-68. There is ample evidence that the phone was searched while it was out of Mr. Fields' possession – and that it was searched by someone looking for evidence of recording. Pls.' Facts ¶¶ 64-66. That is more than sufficient evidence for the jury to infer that it was Defendant Sisca who searched the phone.

## VI. Defendants Barrow, Jones, and Smith Are Not Entitled To Summary Judgment On Amanda Geraci's Excessive Force Claim (Count II)

The lone fact Defendants cite as a basis for granting summary judgment on Plaintiff's claims against Officers Barrow, Jones, and Smith is that only Officer Brown made physical contact with Ms. Geraci. Defs.' Statement of Undisputed Facts ¶ 46, ECF No. 24-1. Defendants' argument that they cannot be found liable for excessive force against Ms. Geraci because they did not personally assault her ignores the law. A police officer has a duty to intervene to prevent excessive force by another officer where the defendant officer is aware of the use of excessive force and has a reasonable opportunity to intervene to prevent or halt it, but fails to do so. *See*

*e.g., Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002) (holding that "a corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so," and that "a corrections officer cannot escape liability by relying upon his inferior or non supervisory rank vis a vis the other officers"); *Williams v. Guard Bryant Fields*, 535 F. App'x 205, 210 (3d Cir. 2013) (reversing grant of judgment as a matter of law because jury could have "reasonably inferred" that officer "must have seen" the beating by other officers "and declined to intervene"). *See also* Model Civ. Jury Instructions, § 4.6.2 (3d Cir. 2014) ("I instruct you that [police officers] [corrections officers] have a duty to intervene to prevent the use of excessive force by a fellow officer.").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendants' motions for summary judgment be denied in their entirety.

January 7, 2016

Respectfully submitted,

*/s/ Mary Catherine Roper*
MARY CATHERINE ROPER
MOLLY TACK-HOOPER
American Civil Liberties Union of Pennsylvania
P.O. Box 60173
Philadelphia, PA 19102
Tel: (215) 592-1513 ext. 113
Fax: (215) 592-1343
mtack-hooper@aclupa.org
mroper@aclupa.org

JONATHAN H. FEINBERG
Kairys, Rudovsky, Messing, & Feinberg
718 Arch Street, Suite 501 South

Philadelphia, PA 19106
Tel: (215) 925-4400
Fax: (215) 925-5365
jfeinberg@krlawphila.com

JOHN J. GROGAN
PETER LECKMAN
Langer & Grogan, P.C.
The Bell Atlantic Tower
1717 Arch Street, Suite 4130
Philadelphia, Pa. 19103
215.320.5662  Tel.
215.320.5703  Fax.
jgrogan@langergrogan.com
pleckman@langergrogan.com

SETH KREIMER
PA ID No. 26102
3400 Chestnut Street
Philadelphia, PA 19104
Tel: (215) 898-7447
skreimer@law.upenn.edu

*Counsel for Plaintiff*

CERTIFICATE OF SERVICE

I, Mary Catherine Roper, certify that the foregoing Memorandum Of Law In Opposition
To Defendants' Motion For Summary Judgment was filed via the Court's ECF System and, as
such, was served by ECF notification upon the below counsel:

John Coyle
City of Philadelphia Law Department
Civil Rights Unit
1515 Arch Street, 14th Floor
Philadelphia, PA 19102


Dated: January 7, 2016.                    *Mary Catherine Roper*
                                           Mary Catherine Roper
                                           P.O. Box 60173
                                           Philadelphia, PA 19102
                                           Tel.: (215) 592-1513 ext. 116
                                           Fax: (215) 592-1343
                                           Email: mroper@aclupa.org