**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RICHARD FIELDS, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | No. 14cv4424 |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA et al., | : | |
| Defendants. | : | |
| ——————————————— | : | |
| | : | |
| | : | |
| AMANDA GERACI, | : | CIVIL ACTION |
| Plaintiff, | : | No. 14cv5264 |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA et al., | : | |
| Defendants. | : | |
| ——————————————— | : | |

**PLAINTIFFS' STATEMENT OF FACTS IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, by and through the undersigned counsel, hereby submit a Statement of Facts in Opposition to Defendants' Motion for Summary Judgment. Plaintiffs begin by responding to the numbered paragraphs in the Defendants' Statement of Undisputed Facts (¶¶ 1-46). Plaintiffs thereafter set forth additional facts that preclude the grant of summary judgment to Defendants (¶¶ 47-168).

**Relevant Police Department Policies and Training of Philadelphia Police Officers**

1.      "The Philadelphia Police Department (PPD) policy on recording and photographing police officers in the exercise of their duties is the result of a proactive effort to address a national policing issue. Exhibit 3, Deposition of Captain Fran Healy, November 26, 2013 at 46:20-47:15 (hereinafter "2013 Healy Dep."); JointAppx0090."

Plaintiffs' Response: Admitted that Captain Healy so testified.

2.      "In late summer 2011, Police Commissioner Ramsey attended a conference on policing in major American cities. *Id.* at 50:4-16; JointAppx0091."

Plaintiffs' Response: Admitted that Captain Healy so testified.

3.      "One of the issues that was discussed at the conference was the newly developing issue of police officers being videotaped. *Id.*"

Plaintiffs' Response: Admitted that Captain Healy so testified.

4.      "Upon returning from the conference, Commissioner Ramsey requested the development of a policy on this issue as soon as possible. *Id.*"

Plaintiffs' Response: Admitted that Captain Healy so testified. By way of further response, Commission Ramsey "tasked [Captain Healy] with the assignment of getting together a policy for the Philadelphia police department on this issue." JointAppx 0082 (2013 Healy Dep. Tr. 13:6-8). *See also* JointAppx 1648-58 (May 14, 2012 U.S. Department of Justice Letter Re: *Sharp v. Baltimore City Police Dep't*).

5.      "In response to this request, Commissioner's Memorandum 11-01 was drafted from July to September of 2011. *Id.* at 50:4-24; JointAppx0091."

Plaintiffs' Response: Admitted that Captain Healy so testified.  By way of further response, Captain Healy drafted Memorandum 11-01 at the request of Commissioner Ramsey. *E.g.*, JointAppx 0084 (2013 Healy Dep. Tr. 13:6-13).

6.      "On September 23, 2011, PPD issued Memorandum 11-01, stating its official policy on the public recording of police officers. *Id.* at 49:19-50:1; JointAppx0091."

Plaintiffs' Response: Admitted that Captain Healy so testified.

7.      "Memorandum 11-01 specified that 'all police personnel, while conducting official business or while acting in an official capacity in any public space, should reasonably anticipate and expect to be photographed, videotaped and/or be audibly recorded by members of the general public.' It was issued with the stated purpose of 'remov[ing] any confusion as to the duties and responsibilities of sworn personnel when being photographed, videotaped or audibly recorded.' Exhibit 11, PPD Memorandum (11-01); JointAppx1156-1157."

Plaintiffs' Response: Admitted that the document referenced includes the language quoted. In all other respects, the document referenced speaks for itself.

8.      "Memorandum 11-01 instructs officers to follow Directive 83 (Accidental and/or Intentional Destruction to Private Property During the Course of Official Police Actions) and Directive 91 (Property Taken into Custody) and specifically instructs Philadelphia police officers not to interfere with recording activities, not to intentionally damage or confiscate recording devices, and not to delete recorded material. *Id.*"

Plaintiffs' Response: Admitted that the document referenced includes references to Directives 83 and 91. In all other respects, the document referenced speaks for itself.

9.      "When Memorandum 11-01 was published, it was distributed to supervisors and read verbatim to officers during roll call. Ex. 1 at 80:19-81:16; JointAppx0098-0099."

Plaintiffs' Response: Admitted that Captain Healy so testified.

10.     "In May 2012, the Department of Justice wrote a Statement of Interest Letter for the case *Sharp v. Baltimore*, Civ. No. 1:11-ev-02888-BEL (U.S. Dist. Ct. Md.). Shortly thereafter, Commissioner Ramsey called upon the PPD's Research and Planning Unit to rewrite

Memorandum 11-01 into a department Directive,[1] which would incorporate the DOJ recommendations regarding the recording of police. *Id.* at 19:13-20:12, 93:9-94:2. JointAppx 0083, 0102."

Plaintiffs' Response: Admitted that Captain Healy so testified. By way of further response, Captain Healy "was the one that told [the research and planning unit] what to write" while the research and planning officer "basically typed up what I told him to write up." JointAppx 0083 (2013 Healy Dep. Tr. 20:13-20).

11.    "From May to November of 2012, the Directive went through multiple drafts and edits before being submitted to the commissioner for final approval. *Id.* at 20:21-21:21, 89:3-91:9. JointAppx0083, 0101."

Plaintiffs' Response: Admitted that Captain Healy so testified.

12.    "The final version of Directive 145 incorporates attempts to mirror language used by the Department of Justice in their recommendations. *Id.* at 95:10-24; JointAppx0102."

Plaintiffs' Response: Admitted that Captain Healy so testified.

13.    "On November 9, 2012 the Philadelphia Police Department issued Directive 145 (Pictures, Video, and Audio Recordings of Police Officers While Performing Official Functions in Public Spaces). Directive 145 superseded Memorandum 11-01 immediately upon publication. *Id.* at 18:19-19:1; JointAppx0083."

Plaintiffs' Response: Admitted that Captain Healy so testified.

14.    "While the First Amendment right of individuals to record police had not been established in the Third Circuit, the Police Department's official policy through Directive 145 specified that '[p]rivate individuals have a First Amendment right to observe and record police

---

[1]    "There is no significant difference between the effects of a Memorandum and a Directive. Both equally establish official police policy. 2013 Healy Dep. at 91:10-15."

officers engaged in the public discharge of their duties' and that police 'should reasonably anticipate and expect to be photographed, videotaped and/or audibly recorded by members of the general public.' Exhibit 12, PPD Directive 145 at 1-2; JointAppx1158-1159."

Plaintiffs' Response: Denied in part and admitted in part. Denied as to the legal assertion that the First Amendment right to record the police has not been established in the Third Circuit. Admitted that Directive 145 contains the language quoted. In all other respects, the document referenced speaks for itself.

15.     "Directive 145 was issued with the stated purpose of 'protect[ing] the constitutional rights of individuals to record police officers engaged in the public discharge of their duties.' *Id.* at 1. It specifically instructs Philadelphia police officers not to 'block[], obstruct[], or otherwise hinder[]' recording activities 'unless the person making such recording engages in actions that jeopardize the safety of the officer, any suspects or other individuals in the immediate vicinity, violate the law, incite others to violate, or actually obstructs an officer from performing any official duty.' *Id.* at 2; JointAppx1159."

Plaintiffs' Response: Admitted that the document referenced includes the language quoted. In all other respects, the document referenced speaks for itself.

16.     "Directive 145 also instructs police about recording activities that occur on private property, prohibits discouragement of recording via coercive means, and clarifies that 'press credentials' are not necessary to record police. *Id.*"

Plaintiffs' Response: Admitted that Directive 145 refers to recording activities that occur on private property (§ III(F)), prohibits discouragement of recording via coercive means (§ III(E)), and states that an individual does not need "press credentials" to record police (§ III(G)). In all other respects, the document referenced speaks for itself.

5

17.     "Directive 145 reaffirms that police seizure of recordings or recording devices 'shall comply with the standard search and seizure principals [sic] of the Pennsylvania and United States Constitutions.' *Id.*"

Plaintiffs' Response: Admitted that the document referenced includes the language quoted. In all other respects, the document referenced speaks for itself.

18.     "Directive 145 additionally describes patrol procedures, supervisory procedures, and detective supervisory responsibilities regarding the recording of police. *Id.* at 3-8; JointAppx1160-1165."

Plaintiffs' Response: Admitted.

19.     "Captain Healy was selected to sit on the International Association of Chiefs of Police's ('ICP') panel on public recording of police because of his role in developing this Directive. The ICP is creating a model policy for the rest of the country on this issue which is based in large part upon the policy developed and implemented by the Philadelphia Police Department. Exhibit 4, 2015 Deposition of Captain Fran Healy at 36:19-37:2 ("2015 Healy Dep"); JointAppx0198-0199."

Plaintiffs' Response: Admitted that Captain Healy testified that he sits on the ICP panel on public recording of police and that the ICP is developing "a model policy for the rest of the country." Denied that Captain Healy testified that the ICP policy is "based in large part" on the Philadelphia policy; rather, he testified in the cited portion of the deposition that the ICP policy "incorporates a lot of the stuff that we have in our policy." Denied that the Philadelphia Police Department "implemented" its own policy.

20.     "Upon publication, Directive 145 was issued via teletype notice and read to police officers during roll call. Ex. 3 at 22:4-11; JointAppx0084."

<u>Plaintiffs' Response</u>: Denied in that Captain Healy did not testify from personal knowledge that the actions referenced had, in fact, occurred. Rather, he testified from his experience generally as to how such actions "would have been" handled in the regular course of department business. By way of further response, Captain Healy testified that each sergeant determined how much of Directive 145 to read out loud during roll call and did not necessarily read the entire directive out loud. JointAppx 0105-06 (2013 Healy Dep. Tr. 108:4-109:5); JointAppx 0177-78 (2015 Healy Dep. Tr. 15:20-16:24). He further testified that, given the length of the directive, it is unlikely that Directive 145 was read in its entirety to police officers during roll call. JointAppx 0179 (2015 Healy Dep. Tr. 17:11-23).

21.     "Copies were sent to each district and unit, and each police officer and supervisor received a copy of Directive 145 and was required to verify their receipt by signature. *Id.* at 106:16-107:5, 107:6-108:3; JointAppx0105."

<u>Plaintiffs' Response</u>: Denied in that Captain Healy did not testify from personal knowledge that the actions referenced had, in fact, occurred. Rather, he testified from his experience generally as to how such actions "would have been" handled in the regular course of Department business.

22.     "After being notified of the new directive, each officer was then responsible for knowing and following the directive. *Id.* at 108:4-109:2; JointAppx0105-0106."

<u>Plaintiffs' Response</u>: Admitted.

23.     "Additionally, any officers who have received Crisis Intervention Training since 2013 have received as part of that training, a reminder on Directive 145 and its implications. Ex. 4 at 38:11-39:15; JointAppx0200-0201."

Plaintiffs' Response: Denied. Captain Healy testified in the cited portion of the deposition only that "I coordinate the crisis intervention training program for Philadelphia" and that the training "touch[es] upon" the subject of recording the police and some of the language of Directive 145.

24.     "In December of 2013, in response to issues that had arisen in the press and the filing of three lawsuits by the American Civil Liberties Union, Captain Healy recognized that the training provided to officers on Directive 145 had not been as effective as the police department would have liked. *Id.* at 19:3-17, 46:13-24; JointAppx0181, 0208."

Plaintiffs' Response: Denied. Rather, Captain Healy testified that "as a result of the issues that had come up in the press and I do believe as a result of our previous deposition . . . I realized there was a weakness that needed to be addressed. So I petitioned the commissioner to – actually through Deputy Comissioner Joyce that additional training be implemented." JointAppx 0181 (2015 Healy Dep. Tr. 19:3-15). He also testified that "after we had met, I saw a failing. I said yes, this is a very complicated issue that needs more training than we would do normally." JointAppx 0208 (2015 Healy Dep. Tr. 46:13-17). He further testified that he drafted a memorandum to Deputy Commissioner Joyce on December 18, 2013 requesting additional training. JointAppx 0182 (2015 Healy Dep. Tr. 20:2-5). Captain Healy's memorandum to Deputy Commissioner Joyce states that "it became very clear that the PPD could have done more training when the policy was initially implemented. It appears the only training that was provided was roll call training." JointAppx 1351 (Dec. 18, 2013 Memorandum).

25.     "In response, the Police Department developed advance training on Directive 145 which was given to every one of the more than 6500 PPD officers as part of their annual Municipal Police Officer training in 2014. *Id.* at 22:18-24:2; JointAppx0184-0186."

Plaintiffs' Response: Admitted that Captain Healy so testified.

26.    "The goal of the advanced training was to emphasize to the officers that like the ability to protest, the ability to record police was a First Amendment right that they had sworn to protect. *Id.* at 42:9-46:24; JointAppx0204-0208."

Plaintiffs' Response: Denied. Captain Healy did not testify as to "the goal" of the 2014 training. Rather, in the cited testimony, Captain Healy testified that he knew advanced training was necessary based on his observations that Philadelphia police officers did not understand the policy, did not understand why there was a First Amendment right to record the police, or believed it was "crap," and that a "cultural change" was thus needed to bring about compliance with the policy. JointAppx 0203-07 (2015 Healy Dep. Tr. 41:7-45:6).

27.    "The training was developed as a 45 minute to 1 hour module that began with a lecture on the policy and why it was a protected right and continued with a question and answer session that allowed officers to ask hypotheticals and clarify their understanding of the contours of the right. *Id.* at 24:17-33:20; JointAppx0186-0195."

Plaintiffs' Response: Admitted that Captain Healy so testified.

**The Richard Fields Incident**

28.    "On September 28, 2013, Plaintiff Fields was walking down the street and came across a house that was having a party. A large number of Philadelphia police officers were outside. Exhibit 2, Deposition of Richard Fields at 7:2-8:20; JointAppx0031."

Plaintiffs' Response: Admitted, except as to the date of the incident, which was September 13, 2013. *See* JointAppx 1263-64 (citation).

29.    "Plaintiff Fields took a picture of the officers. *Id.* at 8:18-20; JointAppx0032."

Plaintiffs' Response: Admitted.

30.     "Plaintiff Fields was placed in handcuffs by a police officer, and his pockets were emptied onto a nearby stoop. *Id.* at 9:16-22; JointAppx0033."

Plaintiffs' Response: Admitted. By way of further detail, it was Officer Sisca who handcuffed and searched him and emptied Plaintiff's pockets onto a stoop. JointAppx 0041 (Fields Dep. Tr. 17:2-12); JointAppx 1031 (Sisca Dep. Tr. 82:5-19).

31.     "Plaintiff Fields was placed in a police car while a police officer wrote a citation. *Id.* at 19:9-20:9; JointAppx0043-0044."

Plaintiffs' Response: Admitted that Plaintiff was placed in a police vehicle. By way of further response, the vehicle was a "police van." JointAppx 0033 (Fields Dep. Tr. 9:19-22); JointAppx 0043 (Fields Dep. Tr. 19:5-6).

32.     "Plaintiff Fields did not see anyone actually going through his phone. *Id.* at 21:19-22, 22:24-23:10; JointAppx0045-0046."

Plaintiffs' Response: Admitted. By way of further response, Officer Sisca confiscated Plaintiff's phone and then detained Plaintiff in the back of a police van where Plaintiff was unable to see what was happening to his phone while it was in Officer Sisca's custody. JointAppx 0041 (Fields Dep. Tr. 17:4-12); JointAppx 0045 (Fields Dep. Tr. 21:19-22); JointAppx 1031 (Sisca Dep. Tr. 82:5-16); JointAppx 1063-64 (Sisca Dep. Tr. 114:22-115:2).

33.     "Plaintiff Fields bases his claim that his phone was illegally searched on the sole assertion that when he received his phone back, some apps were open that he did not believe he had previously had open. *Id.* at 21:7-18; JointAppx0045."

Plaintiffs' Response: Admitted that Plaintiff Fields testified regarding his observations that his phone had been tampered with. However, as stated, ¶ 33 omits pertinent information and is misleading to the extent that it suggests that Mr. Fields was uncertain whether the apps in

10

question were open before Officer Sisca confiscated his phone. Plaintiff testified that, after

Officer Sisca returned his phone, "there were several apps opened on my phone that I did not

open or had even used at that time. Several video recording apps that were opened that I would

have no reason to open. So it seemed like it was evident that someone was going through them to

try and find whatever it was that I was doing on my phone." JointAppx 0045 (Fields Dep. Tr.

21:12-18). Plaintiff further testified that one of the open apps that had not been open before

Officer Sisca confiscated his phone was a video recording app, and another app was a timer for a

picture app, which had a logo that resembled a camera. JointAppx 0046 (Fields Dep. Tr. 22:13-

17).

34.     "After Plaintiff Fields was issued a citation, he was released from police custody. *Id.* at

20:16-21:4; 24:8-12; JointAppx0044, 0048."

Plaintiffs' Response: Admitted. By way of further response, the citation issued to Plaintiff Fields

required him to attend court proceedings. JointAppx 1264 (Fields citation stating "YOU ARE

REQUIRED BY LAW TO APPEAR ON THE FOLLOWING ARRAIGNMENT OR TRIAL

DATE" and setting court date of Sep. 30, 2013).

## The Amanda Geraci Incident

35.     "Plaintiff Geraci considers herself a 'legal observer' who witnesses interactions between

police and civilians during acts of civil disobedience or protests. Ex. 1, Deposition of Amanda

Geraci at 9:20-10:9, JointAppx0003-0004."

Plaintiffs' Response: Admitted that Ms. Geraci regularly serves as a legal observer to witness

interactions between police and civilians during acts of civil disobedience or protests. By way of

further response, Ms. Geraci serves as a legal observer on behalf of the "Up Against the Law"

legal collective in Philadelphia. JointAppx 0003 (Geraci Dep. Tr. 9:19-21); JointAppx 0012

(Geraci Dep. Tr. 44:4-7). Ms. Geraci first received training as a legal observer in 2006 from an organization in Oakland, California dedicated to legal observing, and regularly receives additional training from the legal collective. JointAppx 0004 (Geraci Dep. Tr. 10:10-11:4).

36.     "On September 21, 2012, Amanda Geraci attended a protest at the Pennsylvania Convention Center called Shell Gas Outrage. *Id.* at 25:3-18; JointAppx0007."

Plaintiffs' Response: Admitted that Ms. Geraci was present at the protest.  Denied that it was called the "Shell Gas Outrage."  By way of further response, on September 21, 2012, Ms. Geraci was serving as a legal observer to the "Shale Gas Outrage" protest on behalf of the legal collective. JointAppx 0003 (Geraci Dep. Tr. 9:19-21); JointAppx 1710 (Geraci Errata sheet noting correction of "Shell" to "Shale").

37.     "Plaintiff was carrying a camera with her to videotape. *Id.* at 40:23-41:13; JointAppx0011."

Plaintiffs' Response: Admitted.

38.     "At some point in time, Philadelphia Police attempted to make an arrest of one of the protestors. *Id.* at 32:17-1; JointAppx0009."

Plaintiffs' Response: Admitted. By way of further response, Philadelphia Police succeeded in arresting one of the protestors. *E.g.*, JointAppx 0009 (Geraci Dep. Tr. 32:21 ("There was an arrest"); *id.* at 33:16-23 (details of the arrest)).

39.     "Plaintiff Geraci did not see why the individual was being arrested. *Id.*"

Plaintiffs' Response: Admitted.

40.     "Upon discovering that an individual was being arrested, Plaintiff approached the location where the arrest was taking place to get a better view. *Id.* at 34:5-19; JointAppx0010."

Plaintiffs' Response: Denied. Upon discovering that an individual was being arrested, Plaintiff walked towards a *pillar off to the side* of the doors to the Convention Center where the arrest was taking place. JointAppx 0010 (Geraci Dep. Tr. 34:12-19) ("I walked towards the pillar thing so I could get a better line of sight."); JointAppx 0009 (Geraci Dep. Tr. 33:16-18) ("Q: And the arrest was at the front doors of the convention center? A: Those main middle doors, yes."); JointAppx 1512 (photo showing location of pillars relative to main middle doors of the convention center); JointAppx 1513-1515 (photos showing location where Ms. Geraci was restrained).

41.     "Plaintiff was attempting to videotape the incident. *Id.* at 40:11-13; JointAppx0011."

Plaintiffs' Response: Admitted (although denied that the cited portion of the deposition supports that fact).

42.     "Plaintiff had been a legal observer in incidents involving the Philadelphia Police Department on at least 20 other occasions. *Id.* at 43:6-10; JointAppx0012."

Plaintiffs' Response: Admitted.

43.     "Plaintiff had been recording police during all of those other interactions. *Id.* at 43:16-21; JointAppx0012."

Plaintiffs' Response: Denied. Rather, in the cited portion of the deposition, Plaintiff testified that she "always" brought her camera with her when serving as a legal observer, and that she "generally" would "record or take pictures of what's going on." JointAppx 0012 (Geraci Dep. Tr. 43:16-21).

44.     "The September 21, 2012 Shell Gas Outrage protest was the only occurrence of those 20 or more interactions during which Plaintiff had a confrontation with police. *Id.* at 43:11-15; JointAppx0012."

Plaintiffs' Response: Admitted in part. In the cited portion of the deposition, Plaintiff testified that she believes that the September 21, 2012 protest was the only occasion on which she was legal observing when she had a "physical interaction" with the Philadelphia police. JointAppx 0012 (Geraci Dep. Tr. 43:6-15).

45.     "Plaintiff was not arrested or cited. *Id.* at 39:21-24; JointAppx0011."

Plaintiffs' Response: Admitted. By way of further response, Officer Brown restrained Ms. Geraci against a pillar and held her in that position for one to three minutes. JointAppx 0011 (Geraci Dep. Tr. 39:13-16) ("about one to two minutes"); JointAppx 1168 (witness statement that Officer Brown held Ms. Geraci for "approximately three minutes").

46.     "Other than Police Officer Brown, no other officer made any physical contact with Plaintiff. *Id.* at 52:14-17; JointAppx0014; Ex.6: Deposition of Officer Brown at 74:16-74:19; JointAppx0554-0555."

Plaintiffs' Response: Admitted. By way of further response, Plaintiff's excessive force claims against Officers Barrow, Jones, and Smith are based on their failure to intervene in Officer Brown's use of excessive force. Compl., *Geraci v. City of Phila.*, No. 14-cv-5264, ECF No. 1, at ¶¶ 43, 111.

<u>Additional Facts That Preclude Summary Judgment</u>

**Restraint on Mr. Fields' Liberty**

47.     Officer Sisca ordered Mr. Fields to leave the spot where he had stopped to take a picture. JointAppx0033 (Fields Dep. Tr. 9:5-15), JointAppx0037 (Fields Dep. Tr. 13:8-15); JointAppx 1022-23 (Sisca Dep. Tr. 73:9-74:12); JointAppx 1024-25 (Sisca Dep. Tr. 75:22-76:12).

48.     While ordering him to leave, Officer Sisca was standing within one to three feet of Mr. Fields. JointAppx 0059 (Fields Dep. Tr. 35:4-8); JointAppx 1025-26 (Sisca Dep. Tr. 76:19-77:7).

49.     Officer Sisca then arrested Mr. Fields. JointAppx 1264 (citation stating "Male arrested and cited on street."); *see also* JointAppx 1036 (Sisca Dep. Tr. 87:1-23) (referring three times to "my arrest" of Mr. Fields); JointAppx 1038 (Sisca Dep. Tr. 89:14-24) (referring to twice to the "arrest" of Mr. Fields); JointAppx 1040 (Sisca Dep. Tr. 91:13-14) (referring to passersby watching his interaction with Mr. Fields because "You know, it's someone being arrested by a cop."); JointAppx 1042 (Sisca Dep. Tr. 93:18) (referring to Mr. Fields' paperwork as "that form that I did for the arrest"); JointAppx 1042 (Sisca Dep. Tr. 93:22) (referring to Mr. Fields as "a prisoner"); JointAppx 1043 (Sisca Dep. Tr. 94:19-20) (referring to Mr. Fields as "under arrest"); JointAppx 1050-51 (Sisca Dep. Tr. 101:13-102:2) (opining that Mr. Fields committed disorderly conduct by arguing with a police officer "[d]uring an arrest."); JointAppx 1063-64 (Sisca Dep. Tr. 114:22-115:2) (explaining that Mr. Fields did not have custody of his iPhone while he was in the police wagon because "[n]o one gets their property inside … any kind of police vehicle if they're under arrest.").

50.     Officer Sisca grabbed Mr. Fields' arm and placed Mr. Fields in handcuffs. JointAppx 0041 (Fields Dep. Tr. 17:1-5); *see also* JointAppx 1009 (Sisca Dep. Tr. 60:1-2) ("I had to walk up to him and, you know, place him in handcuffs.").

51.     Officer Sisca performed a "search incident to arrest," searching Mr. Fields' pockets, and confiscating all of Mr. Fields' property. JointAppx 1030 (Sisca Dep. Tr. 81:16-24); JointAppx 1031 (Sisca Dep. Tr. 82:5-19); *see also* JointAppx 0041 (Fields Dep. Tr. 17:1-12).

52.     Defendant Sisca placed Mr. Fields in the back of a police van and detained Mr. Fields in the van for approximately 20 to 30 minutes. JointAppx 0033 (Fields Dep. Tr. 9:19-22); JointAppx 0043 (Fields Dep. Tr. 19:5-6); JointAppx 0044-45 (Fields Dep. Tr. 20:24-21:4); JointAppx 1042 (Sisca Dep. Tr. 93:1-3).

53.     Mr. Fields remained in handcuffs the entire time he was detained in the van. JointAppx 1062 (Sisca Dep. Tr. 113:11-18).

54.     Mr. Fields did not have access to any of his belongings while he was under arrest and being detained in the van. JointAppx 1063-64 (Sisca Dep. Tr. 114:22-115:2) ("No one gets their property inside … any kind of police vehicle if they're under arrest.").

55.     After Officer Sisca finally removed Mr. Fields from the van, he handed Mr. Fields a citation for the summary offense of Obstructing Highway and Other Public Passages under 18 Pa. C.S. § 5507. JointAppx 0044 (Fields Dep. Tr. 20:5-14); JointAppx 1264 (citation).

56.     The citation issued to Mr. Fields states that he was observed "standing in the area of a police invest[igation] videotapping [sic] w phone," and that Mr. Fields was arrested. JointAppx 1264 (citation).

57.     On October 31, 2013, Mr. Fields appeared for trial in the Philadelphia Municipal Court. JointAppx 1529 (Fields court summary). Officer Sisca did not appear for the trial. JointAppx 0047 (Fields Dep. Tr. 23:22-24:2). All charges were withdrawn on the prosecution's motion. JointAppx 1529 (Fields court summary).

58.     Under Directive 145, if individuals recording the police become "<u>confrontational, provoking, or otherwise antagonistic</u>" towards a police officer, the officer is supposed to "<u>call for a supervisor</u> to the location <u>BEFORE</u> any restrictive police actions are taken." JointAppx 1160 (§ V(D) of Directive 145) (emphasis in original).

59.     Even ordering someone who is recording the police to move back is considered a "restrictive action" under Directive 145. JointAppx 0121 (2013 Healy Dep. Tr. 169:6-170:2); *see also* JointAppx 1160 (reference to "restrictive" action in § V(D) of Directive 145); JointAppx 1163 (reference to "restrictive" action in § VI(B)(3)).

60.     Officer Sisca did not call a supervisor before ordering Mr. Fields to move back, arresting him, handcuffing him, searching him and confiscating his belongings, detaining him in a police van, or issuing him a criminal citation. *See* JointAppx 1030 (Sisca Dep. Tr. 81:9-12).

### Custody of Mr. Fields' iPhone

61.     Officer Sisca confiscated all of Mr. Fields' property, including his iPhone. JointAppx 1031 (Sisca Dep. Tr. 82:5-16); JointAppx 1063 (Sisca Dep. Tr. 114:22-115:2); *see also* JointAppx 0041 (Fields Dep. Tr. 17:1-12).

62.     Defendant Sisca dropped the iPhone onto a concrete stoop a few feet away. JointAppx 0041-42 (Fields Dep. Tr. 17:6-18:7); JointAppx 0059-60 (Fields Dep. Tr. 35:13-36:2); JointAppx 1031-32 (Sisca Dep. Tr. 82:17-83:8).

63.     Officer Sisca returned Mr. Fields' iPhone to him after releasing Mr. Fields from the police van. JointAppx 0045 (Fields Dep. Tr. 21:5-7); JointAppx 1067-68 (Sisca Dep. Tr. 118:19-119:10).

64.     Mr. Fields testified that after he was released, his iPhone had several photography and recording "apps" open that were not open before police confiscated the phone, including apps that Mr. Fields never used, indicating that while the phone was in police custody, someone had searched through the phone in a manner consistent with an effort to locate the photo that Mr. Fields had taken. JointAppx 0045 (Fields Dep. Tr. 21:7-18); JointAppx 0046 (Fields Dep. Tr. 22:4-7).

65.     One of the apps opened in police custody was a video recording app, and another app was a self-timer app that had an icon resembling a camera. JointAppx 0046 (Fields Dep. Tr. 22:13-17).

66.     Mr. Fields' iPhone was not password-protected at the time. JointAppx 1046 (Fields Dep. Tr. 22:1-3).

67.     Officer Sisca did not leave Mr. Fields' belongings unattended, so Mr. Fields' iPhone was in police custody and control the entire time that Mr. Fields was being arrested and detained. JointAppx 1067-70 (Sisca Dep. Tr. 118:19-121:3).

68.     Officer Sisca cannot identify any other police officer who had custody of Mr. Fields' iPhone. JointAppx 1068 (Sisca Dep. Tr. 119:11-15); *see also* JointAppx 1277 (Sisca Interrogatory Response No. 12. stating "Officer Sisca does not have statements regarding the identity of any other potential witness at this time[.]"); JointAppx 1269 (Interrogatory No. 12 to Sisca).

**The City's Policies, Practices, and Customs With Respect to the Right to Record the Police**

<u>Overview</u>

69.     The Philadelphia Police Department relies on newspaper articles, social media, and other public, external sources to glean information about widespread police problems that indicate a need for additional training. JointAppx 0222-23 (2015 Healy Dep. Tr. 60:19-61:19); JointAppx 0090 (2013 Healy Dep. Tr. 45:7-22) (Philadelphia Police Department policymakers "do, in fact, read the newspaper"); *see also*, *e.g.*, JointAppx 0286 (2015 Healy Dep. Tr.  124:3-8) (Healy learned about Fiorino incident through "some form of social media"); JointAppx 0287-88 (2015 Healy Dep. Tr.  125:19-126:18) (Healy learned about Fiorino "when it hit the media that he had been arrested" from a "public source").

70.     Complaints against police investigated by the PPD's Internal Affairs Division are another available source of information to PPD officials about alleged interference with people who are recording the police. *See infra* ¶¶ 91 n.5, 133.

71.     Despite news articles and other public sources and Internal Affairs complaints putting
PPD officials on notice of at least 19 incidents prior to Ms. Geraci's incident,[2] and an additional
2 incidents prior to Mr. Fields' arrest,[3] in which Philadelphia police officers retaliated against
civilians for recording the police, at no point did the Philadelphia Police Department initiate any
internal investigations into the practice. *See* JointAppx 0090 (2013 Healy Dep. Tr. 47:16-48:10);
JointAppx 0108 (2013 Healy Dep. Tr. 118:19-24); JointAppx 0109 (2013 Healy Dep. Tr.
122:12-20).[4]

72.     The Philadelphia Police Department considered itself "ahead of the curve" and
"proactive" in adopting a written memorandum and later a formal directive about the right to
record the police. JointAppx 0090 (2013 Healy Dep. Tr. 47:4-9) ("I believe we were attempting
to be ahead of the cur[ve] and be proactive in this issue."); JointAppx 0194 (2015 Healy Dep. Tr.
32:4-8) ("And that was the reason why I drafted the initial memorandum, so we'd be ahead of
the curve on this issue."); JointAppx 1339 (Mar. 23, 2012 Letter from Ramsey to National Press

---

[2]     These incidents involved Shakir Riley and Melissa Hurling (*infra* at ¶ 88), Zanberle
Sheppard (*infra* at ¶ 89), Jamal Holloway (*infra* at ¶ 90), Joyce Yancey Hannibal (*infra* at
¶ 91(a)), Chris Montgomery (*infra* at ¶¶ 82, 83, 140), Mark Fiorino (*infra* at ¶¶ 84-86), Jeremy
Clark (*infra* at ¶ 91(b)), Alexine Fleck (*infra* at ¶ 147), Coulter Loeb (*infra* at ¶ 147), John
Wilder (*infra* at ¶ 91(c)), Margaret Alletto (*infra* at ¶ 91(d)); Temesgen Girata (*infra* at ¶ 113(a)),
Alan S. Roseboro (*infra* at ¶ 113(b)), Bruce Kennedy-Clark (*infra* at ¶ 113(c)), Belton Lomax
and Marie Bell (*infra* at ¶ 113(d)), Rashad Fickling (*infra* at ¶ 113(e)), Ian Van Kuyk and
Meghan Feighan (*infra* at ¶¶ 108-10), Monesha Hovington and Devon Cephas (*infra* at ¶ 113(f)),
and Ronald Humphrey (*infra* at ¶ 113(g)).

[3]     These incidents involved Tarik Hooks (*infra* at ¶ 139(a)) and Ahmadu Sesay (*infra* at
¶ 139(b)).

[4]     Commissioner Ramsey did not direct any investigations into reported incidents of
violations of Memorandum 11-01 or Directive 145, although he had previously called for
internal investigations into other incidents of police misconduct reported in the news. JointAppx
0108 (2013 Healy Dep. Tr. 119:10-120:6).

Photographers Association, Inc., stating "the issue of police officers being photographed in public has become a nationwide issue, but one that I proactively addressed in Philadelphia.").

73.     Policymakers knew that "complex directives or radical changes in [police] policy" or policies intended to effect a "cultural change" sometimes required advanced training beyond roll call readings. JointAppx 0082 (2013 Healy Dep. Tr. 15:7-20); JointAppx 0084 (2013 Healy Dep. Tr. 22:12-23:2).

74.     The City's policies on recording the police represented a "cultural change" for the Philadelphia Police Department. JointAppx 0207-08 (2015 Healy Dep. Tr. 45:5-46:17) ("So it's a cultural change on how we do bus[iness]. . . . [The First Amendment right to record the police] is a very complicated issue that needs more training than we would do normally."); JointAppx 0269 (2015 Healy Dep. Tr.107:7-15) (testifying that it is "not normal" that "a new right, constitutional right, is basically imposed on the police officers to enforce that they did not otherwise know.  So in that regard, I don't think there is standard operating procedure.").

75.     Nonetheless, the City introduced both Memorandum 11-01 and Directive 145 to both supervisors and patrol officers with only a roll call reading of a teletype (an electronic communication issued to PPD command staff) about the policies. *See infra* ¶¶ 100, 120-22.

76.     The City also failed to implement any system for monitoring compliance with the policies on recording. *See infra* ¶¶ 106-07, 131-38.

Policymakers

77.     At all times relevant to these cases, Commissioner Charles Ramsey and Captain Fran Healy were official policymakers for the Philadelphia Police Department. *See infra* ¶¶ 78-80.

78.     Commissioner Ramsey twice gave orders to develop written policies on recording the police.  *See supra* ¶¶ 4, 10 (Plaintiffs' Responses).

79.     Commissioner Ramsey delegated to Captain Healy primary authority for the City's policies on recording, including:

a.      The authority to determine what the policies should include. *See supra* ¶ 10 (Plaintiffs' Response); *infra* ¶ 97.

b.      The authority to draft the policies. *See supra* ¶¶ 4, 5 (Plaintiffs' Responses).

c.      The authority to order training on those policies. *See* JointAppx 0220 (2015 Healy Dep. Tr. 58:5-9) (Healy had the authority to order training without speaking to Commissioner Ramsey); JointAppx 0218 (2015 Healy Dep. Tr. 56:6-15) (Healy addressed a Memorandum recommending advanced training on Directive 145 to Deputy Commissioner Joyce "[a]s a matter of respect and courtesy" since "she is the number two to the deputy.").

80.     Captain Healy is the police official the City twice designated as the individual most knowledgeable about the City's policies regarding the right to record the police and the City's training, monitoring, and supervision of Philadelphia police officers to ensure compliance with those policies. JointAppx 0080 (2013 Healy Dep. Tr. 6:16-20); JointAppx 0172 (2015 Healy Dep. Tr. 10:1-6); JointAppx 1532-33 (topics for 2013 deposition of 30(b)(6) corporate designee in related cases); JointAppx 1537-40 (topics for 2015 deposition of 30(b)(6) corporate designee in *Fields* and *Geraci*).

<u>Notice in 2011</u>

81.     Prior to September 2011, news coverage put Philadelphia Police Department policymakers on notice of several incidents in which civilians were detained, arrested, or charged with crimes in retaliation for recording Philadelphia police officers. *See generally* Joint Appx1501-11 (news articles); JointAppx 0097 (2013 Healy Dep. Tr. 73:7-74:1) (testifying that

he recalled two specific news stories about officers interfering with people recording them prior to September 2011).

82.     On January 23, 2011, Chris Montgomery was arrested for using his iPhone to record a Philadelphia police officer making an arrest in Center City. The officer ordered Mr. Montgomery to stop recording and put the phone away and then arrested him and deleted the recording of the arrest. JointAppx 1395 (Montgomery Complaint ¶¶ 15-20).

83.     Captain Healy read about Mr. Montgomery's arrest in the newspaper. JointAppx 0283 (2015 Healy Dep. Tr. 121:20-7); JointAppx 0285 (2015 Healy Dep. Tr. 123:1-5).

84.     Another high-profile incident involved Mark Fiorino, who was stopped and threatened on February 13, 2011 by a Philadelphia police officer for openly carrying his licensed firearm. According to a PPD spokesperson quoted in a May 16, 2011 Philly.com article, the Department decided to "take a second look" at Mr. Fiorino after learning that he had posted an audio recording of the February 13 incident on YouTube. The detective assigned to investigate criminal charges against Mr. Fiorino believed that the audio recording prompted the reopening of Fiorino's case. As a result of this "re-investigation," on April 15, 2011—two months after the incident—a PPD detective initiated charges against Mr. Fiorino based on his simultaneous possession of a licensed firearm and an audio recorder. JointAppx 1501-03; JointAppx 1463-77 (Fiorino civil complaint at ¶¶ 65-87). Mr. Fiorino was ultimately found not guilty of all charges. JointAppx 1480-83 (Fiorino civil complaint at ¶¶ 103-15).

85.     The retaliatory charges against Mr. Fiorino for recording the police were covered by the Philadelphia Daily News, the Associated Press, NBC Philadelphia, ABC Philadelphia, and the Daily Local in Chester County. JointAppx 1481 (Fiorino civil complaint at ¶ 107); *see also*

JointAppx 1501-03 (David Gambacorta, "Man who clashed with cops over legal gun was also armed with audio recorder," Philly.com (May 18, 2011)).

86.     Captain Healy learned about the Fiorino incident through social media and public sources around the time that Mr. Fiorino was arrested. JointAppx 0286 (2015 Healy Dep. Tr. 124:3-8); JointAppx 0287-88 (2015 Healy Dep. Tr. 125:19-126:6); JointAppx 0288 (2015 Healy Dep. Tr. 126:13-18).

87.     A September 3, 2011 article highlighted the discrepancy between the PPD's official position on the right to record the police and the actual conduct of Philadelphia police officers, detailing several incidents in which Philadelphia police officers retaliated against civilians for recording them. JointAppx 1504 (Jan Ransom, "Even a top cop concedes a right to video arrests – but the street tells a different story," Philly.com (Sep. 3, 2011)).

88.     The Jan Ransom article described a July 2010 incident in which Melissa Hurling and Shakir Riley were assaulted by PPD officers and charged criminally when they attempted to use their cellphones to record what they considered to be a violent arrest. *Id*. Riley and Hurling were charged with disorderly conduct, but the charges were dismissed at a summary trial in March 2011. JointAppx 1415-16 (Hurling court docket); JointAppx 1418-19 (Riley court docket).

89.     In addition, the Ransom article described a July 2010 incident in which Philadelphia police officers beat Zanberle Sheppard, dragged her by her hair, arrested her for disorderly conduct, and destroyed her phone after officers saw her filming the arrest and beating of her boyfriend by Philadelphia police officers. JointAppx 1504 (Jan Ransom, "Even a top cop concedes a right to video arrests – but the street tells a different story," Philly.com (Sep. 3, 2011)). *See also* JointAppx 1582-89 (Internal Affairs Complaint).

90.     The Ransom article also described an August 2010 incident in West Philadelphia in which Jamal Holloway was arrested when officers spotted him filming the police beating his legally blind cousin. Police detained him and transported him to the station, and then told him they would release him if he erased the video, which he did. JointAppx 1504 (Jan Ransom, "Even a top cop concedes a right to video arrests – but the street tells a different story," Philly.com (Sep. 3, 2011)).

91.     In addition, in 2010 and 2011, civilian complaints referred to the Internal Affairs Department (IAD) contained allegations that PPD officers had interfered with other individuals who attempted to record police activity:

a.      IAD 10-615, Joyce Yancey Hannibal (Oct. 18, 2010 complaint, resulting in Dec. 10, 2010 Commissioner's Memorandum[5]) (*see* JointAppx 1551-59);

b.      IAD 11-0154, Jeremy Clark (Mar. 23, 2011 complaint) (*see* JointAppx 1615);

c.      IAD 11-433, John Wilder (July 21, 2011 complaint, resulting in Sep. 20, 2011 Commissioner's Memorandum) (*see* JointAppx 1560-63);

d.      IAD 11-0468, Margaret Alletto (Aug. 11, 2011 complaint, resulting in Mar. 19, 2013 Commissioner's Memorandum) (*see* JointAppx 1564-81).

92.     By September 2011, it was "very clear" to Captain Healy that some Philadelphia police officers were confused about the existence of civilians' right to record the police and that "[t]he officers did need some clarification." JointAppx 0092-93 (2013 Healy Dep. Tr. 55:19-57:17).

93.     Captain Healy believed that there was a "pressing need," a "definite need" for a policy on the issue to "remove that confusion." JointAppx 0093 (2013 Healy Dep. Tr. 59:8-24); JointAppx 0094 (2013 Healy Dep. Tr. 62:14-20); *see also* JointAppx 0100 (2013 Healy Dep. Tr. 85:12-13)

---

[5]     Every Internal Affairs investigation—into any kind of alleged police misconduct—results in a memorandum to the Commissioner.

("I felt that there was some confusion with the officers I spoke to.  The purpose was very clear, to remove that confusion.").

94.     Captain Healy did not discuss these officers' confusion with their supervisors. JointAppx 0095 (2013 Healy Dep. Tr. 68:9-17).

95.     Despite his knowledge of police officers' confusion on the issue, Captain Healy did not think that officers needed training about the right to record police. He believed that issuing a written policy would suffice. *See* JointAppx 0093-94 (2013 Healy Dep. Tr. 60:21-61:5) ("Q: . . . you believed that these officers needed training in order to understand how they should interact with the public when the public is recording them, correct?  A: No, I said we needed a policy. We needed the policy.  Training was done through roll call.  I didn't say we needed training, we needed a policy.").

## Memorandum 11-01

96.     On September 23, 2011, to "remove any confusion as to the duties and responsibilities of sworn personnel when being photographed, videotaped or audibly recorded while conducting official business or while acting in official capacity in any public space," the Philadelphia Police Department issued Memorandum 11-01. JointAppx 1158 (Memorandum 11-01).

97.     Captain Healy decided what to include in the Memorandum based on his conversations with police officers. JointAppx 0099-0100 (2013 Healy Dep. Tr. 84:13-85:14). However, he did not address all of the areas of police confusion he was aware of, such as when officers can tell civilians with recording devices to back up. JointAppx 0100 (2013 Healy Dep. Tr. 85:15-86:13).

98.     Memorandum 11-01 also did not explain why the Department had decided to issue the policy, despite Captain Healy's knowledge that explaining the reason for a policy makes officers

more accepting of policy changes and more likely to comply. *See* JointAppx 0102 (2013 Healy Dep. Tr. 96:6-22); JointAppx 0103 (2013 Healy Dep. Tr. 97:16-21).

99.     Commissioner Ramsey "didn't really care" what his police officers' views were with respect to the right to record the police or what they were confused about. He just "wanted a policy out" fast.  JointAppx 0093 (2013 Healy Dep. Tr. 58:16-59:7); *see also* JointAppx 0100 (2013 Healy Dep. Tr. 86:7-12) ("[W]e wanted to get something on the books out there to the officers as quickly as possible. The discussion with the commissioner wasn't about whether the officers were confused or not or when and how.").

<u>Training on Memorandum 11-01</u>

100.    The City introduced Memorandum 11-01 with only a teletype reading at roll call.[6] JointAppx 0082 (2013 Healy Dep. Tr. 14:6-16); JointAppx 0173 (2015 Healy Dep. Tr. 11:2-12); JointAppx 1351 (Healy letter to Joyce, Dec. 18, 2013) ("It appears the only training that was provided was roll call training.").

101.    The Commissioner and deputy commissioners meet every morning, which provides an opportunity to discuss whether a new policy or policy change requires "in-depth training." JointAppx 0082 (2013 Healy Dep. Tr. 16:6-19). But the Commissioner and his deputies did not discuss whether training beyond roll-call training was necessary on Memorandum 11-01. The Commissioner was "more concerned [about] getting the policy out" and did not evaluate whether

---

[6]     A teletype regarding Memorandum 11-01 was read at roll call for three days. New policies are scheduled to be read at roll call for three days in a row because officers are usually off two days in a row. JointAppx 0099 (2013 Healy Dep. Tr. 81:8-10). New policies are not read to the same group of officers three times; the second and third days target officers who have not previously been present for the roll call reading. JointAppx 0099 (2013 Healy Dep. Tr. 81:10-16).

additional training beyond roll call training was needed. JointAppx 0083 (2013 Healy Dep. Tr. 17:5-19).

102.    City policymakers did not make any effort to ask officers whether they understood Memorandum 11-01 after it was sent out. JointAppx 0099 (2013 Healy Dep. Tr. 83:7-23).

103.    The City delegated to the first line supervisors the responsibility for making sure that police officers understood and were very clear on what their duties and responsibilities are under the recording policies. JointAppx 0099 (2013 Healy Dep. Tr. 83:16-84:4).

104.    The Philadelphia Police Department did not offer any meaningful training on the right to record police until 2014. *See infra* at ¶¶ 154-57.

Oversight and Compliance with Memorandum 11-01

105.    Policymakers contemplated that if a supervisor witnessed a police officer violating the directive, the officer's supervisor could resolve the problem with a counselling session without ever raising the issue up the chain of command. JointAppx 0108 (2013 Healy Dep. Tr. 118:2-13) ("All the hundreds of sergeants out there, if they saw something incorrect, they could have handled it and resolved it via a counselling session. That would be the end of it. There would be no further discussion or talk about it.").

106.    The Philadelphia Police Department had no system for monitoring compliance with Memorandum 11-01 or tracking alleged violations of the memorandum and policymakers made no efforts to monitor compliance with the memorandum. JointAppx 0084 (2013 Healy Dep. Tr. 23:14-24:9); JointAppx 0085 (2013 Healy Dep. Tr. 25:18-27:11); JointAppx 0174 (2015 Healy Dep. Tr. 12:4-13); JointAppx 0175 (2015 Healy Dep. Tr. 13:15-20).

107.    There was no system for ensuring that civilian complaints that involved alleged violations of the policy were brought to the attention of the involved officers' supervisors. JointAppx 0089 (2013 Healy Dep. Tr. 43:20-44:22).

Notice in 2012

108.    News articles in March 2012 highlighted yet another incident in which Philadelphia police officers retaliated against a civilian for recording the police. *See* JointAppx 1506-11 (news articles). This March 14, 2012 incident involved a Philadelphia police officer ordering Ian Van Kuyk, a photojournalism student, to stop taking photos of the police and ultimately arresting the student for taking photos. *E.g.*, JointAppx 1335-36; *see also* JointAppx 1598-1613 (Internal Affairs report).

109.    On March 22, 2012, the National Press Photographers Association, Inc. (NPPA), also wrote a letter to Commissioner Ramsey bringing to his attention the incident involving Ian Van Kuyk. JointAppx 1335-38.

110.    Captain Healy learned about Mr. Van Kuyk's arrest through some external sources, such as the news or the NPPA letter, rather than from police sources. JointAppx 0289-90 (2015 Healy Dep. Tr. 127:18-128:13).

111.    On September 21, 2012, Philadelphia police officer restrained and detained one of the plaintiffs in this case, Amanda Geraci, when she attempted to photograph the police arresting a protestor. Within days, Ms. Geraci and two witnesses filed Internal Affairs complaints about the incident. *See* JointAppx 1166-1260 (Internal Affairs paperwork).

112.    Captain Healy learned of Ms. Geraci's incident through the newspapers. JointAppx 0295 (2015 Healy Dep. Tr. 133:10-18). He did not make any inquiries or initiate any investigations in response to this news. JointAppx 0296 (2015 Healy Dep. Tr. 134:6-12).

28

113.    At least seven Internal Affairs complaints filed after the issuance of Memorandum 11-01

detailed further incidents of retaliation against civilians for recording the police:

a.      IAD 12-0359, Temesgen Girata (June 26, 2012 complaint) (*see* JointAppx 1623-25);

b.      IAD 12-0060, Alan S. Roseboro (Feb. 2, 2012 complaint) (*see* JointAppx 1619-20);

c.      IAD 11-0681, Bruce Kennedy-Clark (Nov. 23, 2011 complaint, resulting in Nov. 29,

2012 Commissioner's Memorandum) (*see* JointAppx 1590-97; JointAppx 1614);

d.      IAD 10-0315, Belton Lomax and Marie Bell (July 1, 2010 complaint, resulting in Dec.

21, 2011 Commissioner's Memorandum) (*see* JointAppx 1542-50);

e.      IAD 12-0125, Rashad Fickling (Mar. 5, 2012 complaint) (*see* JointAppx 1617-19);

f.      IAD 12-0218, Monesha Hovington and Devon Cephas (Apr. 23, 2012 complaint) (*see*

JointAppx 1616-17);

g.      IAD 12-0421, Ronald Humphrey (July 23, 2012 complaint) (*see* JointAppx 1620-21).

<u>Directive 145</u>

114.    After Commissioner Ramsey read an article about the U.S. Department of Justice issuing

guidelines on the right to record the police in connection with the *Sharp* litigation in Baltimore,

Ramsey requested that Captain Healy find the DOJ's letter and incorporate the guidelines into

the PPD's policy on recording. JointAppx 0083 (2013 Healy Dep. Tr. 19:20-20:12); *see also*

JointAppx 1648-58 (Department of Justice Letter Re: *Sharp*). He also requested that the

memorandum be elevated to a directive. JointAppx 0101 (2013 Healy Dep. Tr. 89:24-90:3).

115.    A directive and a memorandum have the same force; the rules set forth in both are

binding on police. JointAppx 0101 (2013 Healy Dep. Tr. 91:10-15).

116.    Captain Healy worked on drafting the directive from May until November 2012, as it went through various iterations and rounds of review. JointAppx 0101 (2013 Healy Dep. Tr. 89:8-91:9).

117.    In drafting the memorandum, Captain Healy did not investigate past complaints about police officers interfering with recordings. JointAppx 0112 (2013 Healy Dep. Tr. 134:11-18) ("I was operating on a direction from the commissioner. Whether we had one complaint or a hundred made no difference. He wanted a policy done.").

118.    Captain Healy drafted Directive 145, circulated it to the deputy commissioners, and the Commissioner approved the final draft. "There wasn't a lot of debate" among the deputies during this process. JointAppx 0084 (2013 Healy Dep. Tr. 21:2-21).

119.    Memorandum 11-01 was "completely rewritten and then issued as a directive" that was "more detailed" and had "a lot more information" than Memorandum 11-01. JointAppx 0083 (2013 Healy Dep. Tr. 19:17-19); JointAppx 0101 (2013 Healy Dep. Tr. 89:21-22). Directive 145 was a "great leap" from Memorandum 11-01 and "radically changed and expanded" on the Memorandum. JointAppx 0101 (2013 Healy Dep. Tr. 89:11-23). While Memorandum 11-01 was a one-and-a-half page document with five paragraphs, Directive 145 was an eight-page document with more than forty paragraphs. *Compare* JointAppx 1156-57 (Memorandum 11-01) *with* JointAppx 1158-65 (Directive 145).

<u>Training on Directive 145</u>

120.    As with Memorandum 11-01, officers were notified about Directive 145 via a teletype notice that was read to police officers during roll call. JointAppx 0098 (2013 Healy Dep. Tr. 80:9-18); JointAppx 0177 (2015 Healy Dep. Tr. 15:10-19). This roll call reading was the only

"training" officers received on Directive 145 when it was issued. JointAppx 0084 (2013 Healy Dep. Tr. 21:22-22:11).

121.    Each sergeant determined how much of the directive to read out loud during roll call, and did not necessarily read the entire directive out loud. JointAppx 0105-06 (2013 Healy Dep. Tr. 108:4-109:5); JointAppx 0177-78 (2015 Healy Dep. Tr. 15:20-16:24). Given the length of Directive 145, it is unlikely that sergeants read it out loud in its entirety. JointAppx 0179 (2015 Healy Dep. Tr. 17:11-23).

122.    Individual officers were responsible for making sure they read the directive in its entirety and understood it on their own. JointAppx 0178 (2015 Healy Dep. Tr. 16:5-24) (roll call training involved "a mandate that the officers are responsible to read the directive in its entirety. . . . [A]t the conclusion of the message is usually [that] officer[s] have the responsibility to review or to read the directive in its entirety on their own."); JointAppx 0179-80 (2015 Healy Dep. Tr. 17:20-18:4).

123.    When Directive 145 was adopted, supervisors did not receive any additional information or training as to their role or responsibilities under the Directive; their training consisted of the same roll call teletype reading that patrol officers received. JointAppx 0084 (2013 Healy Dep. Tr. 23:7-13).

124.    Unlike Memorandum 11-01, Directive 145 requires that police officers contact a supervisor in certain situations involving recording. *Compare* JointAppx 1156-57 (Memorandum 11-01) *with* JointAppx 1158-65 (Directive 145). Directive 145 contains detailed patrol procedures requiring that police officers call for a supervisor if they block an individual from recording the police (*see* JointAppx 1160 (§ V(A)), if they take "any restrictive police action" against an individual recording the police who becomes confrontational, provoking, or otherwise

antagonistic towards the officers (*see* JointAppx 1160 (§ V(D)), if an individual recording the police violates the law or jeopardizes officer safety (*see* JointAppx 1161 (§ V(E)(4)), or if police temporarily seize a recording device to preserve evidence of a crime (*see* JointAppx 1162 (§ V(G)(1)). Directive 145 also contains sections detailing "Supervisor Procedure" (JointAppx 1163-64 (§ VI(A)-(B)) and "Detective Supervisory Responsibilities" (JointAppx 1164-65 (§ VII(A)-(C)) in these circumstances.

125.    The requirement that patrol officers call for a supervisor in various situations stems from a recognition that police officers generally do not like being recorded and may need to be "deescalated" in such situations. JointAppx 0214 (2015 Healy Dep. Tr. 52:3-7); *see also* JointAppx 0200 (2015 Healy Dep. Tr. 38:1-10) ("I recognize that fact that it's oftentimes officers need to be deescalated as well as other human beings."); JointAppx 0200 (2015 Healy Dep. Tr. 38:11-22) (acknowledging that "officers need to be deescalated. People can tape even though it's a hostile situation.").

126.    No policymaker made an affirmative decision that roll call training was sufficient to implement Directive 145 when it was issued. No one suggested that roll call training might be insufficient, so it was not discussed. *See* JointAppx 0084 (2013 Healy Dep. Tr. 22:12-17) ("Q: Who made the decision that this did not require more than roll call training? A: I don't recall if any one person said it didn't.  Nobody said that it did.  So they went as normal as all other directives go through.").

127.    Captain Healy testified that simply presenting Directive 145 to officers at roll call and holding them individually responsible for reading and understanding it was a "failing on our part" and that officers and supervisors may not have read the entire directive. JointAppx 0203-04 (2015 Healy Dep. Tr. 41:7-42:8).

128.    Captain Healy recognizes that "[h]aving training with somebody who is reading a directive to you is not training." JointAppx 0118 (2013 Healy Dep. Tr. 159:3-20).

### Oversight and Compliance with Directive 145

129.    The passage of Directive 145 triggered numerous conversations between Captain Healy and police officers about the reason for the policy and how to navigate the right to record in light of the need for officer safety. JointAppx 0213 (2015 Healy Dep. Tr. 51:5-17); JointAppx 0216 (2015 Healy Dep. Tr. 54:7-16). Officers regularly raised the issue and asked Captain Healy questions about the Department's policy. JointAppx 0211 (2015 Healy Dep. Tr. 49:5-23); JointAppx 0216 (2015 Healy Dep. Tr. 54:17-10).

130.    Through these conversations, the City was on notice that police officers did not understand Directive 145 and were not complying with it. JointAppx 0255-56 (2015 Healy Dep. Tr. 93:5-94:5) (testifying that, after the passage of Directive 145, "I believe anecdotally officers didn't understand that there was a constitutional right and that there – officers may still be seizing cameras. I don't know where I heard that, but I just – I did. I don't know whether it was from complaints in the media or the Temple University case or whatever it was, I forget.").

131.    The Philadelphia Police Department has no system for monitoring compliance with Directive 145. JointAppx 0084 (2013 Healy Dep. Tr. 23:14-24:9); JointAppx 0180 (2015 Healy Dep. Tr. 18:18-24).

132.    As part of the settlement of a lawsuit by the NAACP in the 1990s, the Philadelphia Police Department implemented IAPro, an "early warning system for individual officers" to alert policymakers to problems with particular officers who get a certain number of complaints in a certain period of time. JointAppx 0086 (2013 Healy Dep. Tr. 29:23-30:20). There is no equivalent system for flagging particular problems, such as violations of Directive 145, that may

33

be widespread among police officers in the Department. JointAppx 0087 (2013 Healy Dep. Tr. 32:14-33:12).

133.     The Philadelphia Police Department relies on Internal Affairs officers to discern patterns in police misconduct and alert policymakers to problems. JointAppx 0291-93 (2015 Healy Dep. Tr. 129:5-131:3). Whether initial complaints are elevated further up the chain of command from Internal Affairs "depends on the nature of the incident," and "minor" incidents are generally not reported up. JointAppx 0089 (2013 Healy Dep. Tr. 41:15-42:20). Internal Affairs is most likely to elevate an issue up the chain of command if there is no policy on point. JointAppx 0293 (2015 Healy Dep. Tr. 131:4-24).

134.     As with Memorandum 11-01, there was no system for tabulating or tracking alleged violations of Directive 145. JointAppx 0085 (2013 Healy Dep. Tr. 25:18-27:11).

135.     The Philadelphia Police Department has no system for ensuring that supervisors are actually called to the scene as required by Directive 145 when a police officer seeks to take restrictive action against, or has a confrontation with, someone who is recording police. JointAppx 0118-19 (2013 Healy Dep. Tr. 160:5-164:17).

136.     There is no system for notifying a police officer's supervisor about complaints involving allegations that the officer violated Directive 145. JointAppx 0089 (2013 Healy Dep. Tr. 44:12-22).

137.     The Philadelphia Police Department has no mechanism for ensuring that a supervisor reviews citations issued on the street to people recording the police. JointAppx 0119 (2013 Healy Dep. Tr. 160:5-161:16).

138.    The Philadelphia Police Department has no system for alerting supervisors if charges

filed by a police officer against someone recording the police are withdrawn or dismissed in

court. JointAppx 0119-20 (2013 Healy Dep. Tr. 164:20-165:2).

<u>Notice of Violations of Directive 145</u>

139.    More Internal Affairs complaints filed after the issuance of Directive 145 and prior to the

arrest of Plaintiff Fields detailed allegations of retaliation for recording the police:

a.      IAD 12-0669, Tarik Hooks (Dec. 10, 2012 complaint) (*see* JointAppx 1622-23);

b.      IAD 13-0039, Ahmadu Sesay (Jan. 28, 2013 complaint) (*see* JointAppx 1615-16);

c.      IAD 13-0192, Joy Christian (Apr. 1, 2013 complaint, resulting in Aug. 19, 2013

Commissioner's Memorandum) (*see* JointAppx 1713-18).

140.    On January 16, 2013, the ACLU of Pennsylvania sued the City of Philadelphia on behalf

of Chris Montgomery, alleging that the City's deliberate indifference to the right to record the

police had resulted in violations of Mr. Montgomery's constitutional rights. The Complaint listed

other similar incidents. JointAppx 1392-1436.

141.    On March 13, 2013, the Police Advisory Commission (PAC) wrote a memorandum to

Commissioner Ramsey noting that "[r]ecent news accounts indicate that Philadelphia Police

officers are not adhering to Philadelphia Police Department Memorandum 11-01 . . . .

Additionally, the internal affairs database shows at least eight citizen complaints where people

were allegedly retaliated against for videotaping police. Six of those incidents occurred AFTER

the directive was issued in September 2011. One of the more serious cases involving the

videotaping of police from 2012 resulted in partially sustained charges against two officers, who

received training and counseling." JointAppx 1626 (emphasis in original). The letter stated that

the Commission "recommends that all police personnel be reminded, in writing, of the existing

recommendation and that department action be instituted against any member of the PPD not adhering to the recommendation." *Id.*

142.    It is rare for the Police Advisory Commission to bring issues to the attention of the Commissioner, and extremely unusual for the PAC to issue a written recommendation memo calling for corrective action. JointAppx 0246 (2015 Healy Dep. Tr. 84:14-24) (testifying that he has never before seen the PAC present a formal list of recommendations to the police commissioner); JointAppx 0247 (2015 Healy Dep. Tr. 85:9-20) (testifying that the commissioner received only "a handful of letters in the last several years" from the PAC).

143.    The Police Department took no action in response to the PAC memorandum. JointAppx 1632 (Interrogatory No. 16); JointAppx 1643 (City's Response to Interrogatory No. 16); *see also* JointAppx 1333-34 (Fran Healy Letter to John Coyle, Esq., Sep. 16, 2015, "RE: ACLU Videotaping Cases") ("[t]he PPD was in the process of changing the exiting culture without the PAC memo, so I can not say with any certainty that any actions were documented or taken as a direct result of this memo.").

144.    Although the Philadelphia Police Department does not accept every recommendation from the Police Advisory Commission (an entity that the Department views as an "adversarial agency"), standard operating procedure would be to respond in writing if the Commissioner disagreed with the concerns or recommendations of the PAC. JointAppx 0248-49 (2015 Healy Dep. Tr. 86:5-87:15).

145.    The Department did not issue a written response to the Police Advisory Commission's recommendations calling for more training on the right to record the police. JointAppx 0281 (2015 Healy Dep. Tr. 119:15-21); JointAppx 1637 (Pl.'s Request for Production No. 13); JointAppx 1647 (City's Response to Request for Production No. 13).

146.    Captain Healy believed that Commissioner Ramsey was not concerned about the incidents raised in the PAC memorandum because he already had a policy in place forbidding the alleged police conduct. JointAppx 0241-42 (2015 Healy Dep. Tr. 79:24-80:20).

147.    On June 5, 2013, the ACLU of Pennsylvania filed two more lawsuits, on behalf of Alexine Fleck and Coulter Loeb, alleging that the City's deliberate indifference to the right to record the police had resulted in violations of Ms. Fleck's and Mr. Loeb's constitutional rights. The Complaints listed other similar incidents. JointAppx 1376-91 (Fleck civil complaint); JointAppx 1437-50 (Loeb civil complaint). Several media outlets covered the lawsuits.

148.    On September 13, 2013, a Philadelphia police officer arrested and cited one of the plaintiffs in this case, Rick Fields, after he took an iPhone photo of a police action. *See supra* ¶¶ 28-30, 47-60. While Mr. Fields was in police custody, someone searched through his phone for recordings. *See supra* ¶¶ 61-68.

<u>November 2013 Deposition</u>

149.    On November 26, 2013, Plaintiff's counsel deposed Captain Francis Healy in connection with the *Montgomery*, *Fleck* and *Loeb* lawsuits. *See generally* JointAppx 77-162 (2013 Deposition of Captain Healy). During that deposition, Plaintiffs' counsel reviewed with Captain Healy the roll-out of Memorandum 11-01 and Directive 145 and some of the news reports and Internal Affairs complaints alleging that PPD officers had retaliated against people who recorded police activity, both before and after the adoption of Memorandum 11-01 and Directive 145.  *See generally* JointAppx 0077-162. Plaintiffs' counsel also showed Captain Healy the citation recently issued to Rick Fields and the photo Mr. Fields took that led to his arrest. JointAppx 0116 (2013 Healy Dep. Tr. 150:7-10); JointAppx 0117 (2013 Healy Dep. Tr. 154:17-155:4).

150.    In later deposition testimony in the instant cases, Captain Healy admitted that, in light of

the discussions at the November 2013 deposition, he believed that roll call training had not been

sufficient to ensure compliance with Memorandum 11-01 and Directive 145. JointAppx 0236-37

(2015 Healy Dep. Tr. 74:22-75:6) ("[W]e historically have done [roll] call training and we put it

out as being sufficient. I think in this case you brought it to my attention that it may not be

sufficient."); JointAppx 0250 (2015 Healy Dep. Tr. 88:19-23) ("I believe the department was

lacking in the training provided to its officers."); *see also* JointAppx 0181 (2015 Healy Dep. Tr.

19:11-15) ("I realized there was a weakness that needed to be addressed."); JointAppx 0208

(2015 Healy Dep. Tr. 46:15-17) ("[A]fter we had met, I saw a failing.  I said yes, this is a very

complicated issue that needs more training than we would do normally."); JointAppx 0210-11

(2015 Healy Dep. Tr. 48:23-49:3) ("The last deposition, I left there, I did have issues. I mean, I

saw where we should have done more. So we've taken action. I think in less than a month after I

saw you, I got things moving."); JointAppx 0221-22 (2015 Healy Dep. Tr. 59:18-60:14) ("I was

unhappy that I couldn't tell you I did more training. So I saw that as a failing and we went back

and fixed it."); JointAppx 0233 (2015 Healy Dep. Tr. 71:9-24) ("Q: Explain to me why you were

unhappy when you left the deposition. A: After the deposition, I realized that we should, or we

could have done more for the training. A: And what was it in the deposition that gave you that

feeling? A: Quite frankly, you harped on the fact that all you did was [roll] call training, multiple

times."); JointAppx 0237 (2015 Healy Dep. Tr. 75:7-17) (the "intensity" of Directive 145 and

the announcement of a constitutional right "should deserve more attention than what I do believe

a [roll] call training normally gives.").

151.    As a result, on December 18, 2013, Captain Healy wrote a memorandum to Captain Nola

Joyce in which he conceded that as a result of the questioning at his deposition, he believed that

38

"there is some credence" to the Plaintiffs' failure-to-train legal theory, and that the Department "could have done more training" on both Memorandum 11-01 and Directive 145. JointAppx 1351 (Healy letter to Joyce, Dec. 18, 2013).

152.    In his memorandum, Captain Healy recommended advanced training for all police officers on Directive 145. JointAppx 1351. This recommendation was part of an "effort to fix anything we hadn't done right." JointAppx 0182-83 (2015 Healy Dep. Tr. 20:18-21:12).

153.    After the deposition, Captain Healy also raised the need for training on Directive 145 at a meeting with Commissioner Ramsey and Deputy Commissioner Joyce. JointAppx 0218-19 (2015 Healy Dep. Tr. 56:23-57:13) ("I meet with the commissioner and the deputy every morning at 8:10 with a briefing. After the briefing on crime issues, we discuss all types of issues. I do recall bringing this subject matter up after our deposition. And that we needed to do something more.").

<u>2014 Advanced Training</u>

154.    Captain Healy requested that the 2014 advanced training address the seizure of recording devices and make very clear that officers do not have a right to destroy any images, referring to that practice as something he was "concerned" about, and "childish nonsense that had to be stopped immediately." JointAppx 0193-94 (2015 Healy Dep. Tr. 31:5-32:22).

155.    The 2014 advanced training on Directive 145 provided an opportunity for police officers to ask questions about Directive 45, *see supra* ¶ 27, which further illuminated the extent to which police officers had been confused by Directive 145 prior to the advanced training. *See* JointAppx 0203-04 (2015 Healy Dep. Tr. 41:23-42:23) ("a lot of officers from what I gather did not understand how this is a connection to the First Amendment" because "this was a little confusing for the average police officer to understand that it's a true Constitutional right because they just

don't see it in the typical forum of First Amendment."); JointAppx 0188 (2015 Healy Dep. Tr. 26:12-23) ("Obviously, there is a lot – there was some confusion" about the point at which a civilian recording the police becomes "interference" with police operations that police are allowed to intervene in).

156.    It was not until 2014 that Philadelphia police officers generally seemed to understand that there is a constitutional right to record the police. JointAppx 0274 (2015 Healy Dep. Tr. 112:8-19); *see also* JointAppx 0275-77 (2015 Healy Dep. Tr. 113:22-115:1).

157.    The 2014 advanced training on Directive 145 gave officers "a much better" understanding and acceptance of Directive 145 once they understood that there was a First Amendment right to record the police. JointAppx 0201-03 (2015 Healy Dep. Tr. 39:22-41:2); *see also* JointAppx 0210 (2015 Healy Dep. Tr. 48:18-22) ("that notion is permeating down. I think it's ingrained in us much better now as a result of the MPO training than it was when we just did the policy out so.").

<u>Expert Testimony Regarding the City's Failure of Training and Supervision</u>

158.    Plaintiffs' expert, R. Paul McCauley, Ph.D., has more than 25 years of experience as a police instructor, including almost 10 years teaching police operational policy formulation. JointAppx 1660-61 (McCauley Report at 1-2).

159.    The purpose of police training is to ensure that officers can "perform[] all tasks with ease and in such a way as to ensure his safety and the safety and satisfaction of the public." To be effective, training "must provide a background of knowledge acquired through either actual or simulated experiences against which current situations may be related for judgment." JointAppx 1677 (McCauley Report at 18).

160.    The PPD's roll-out of Memorandum 11-01 and Directive 145 did not include any training to build officer and supervisor competencies. JointAppx 1678 (McCauley Report at 19).

161.    Because roll call readings are "one-way, passive" lectures typically given to large groups that include officers of many different ages and years and types of service experience, roll call readings were unlikely to be the most effective way for line officers to understand Memorandum 11-01 and Directive 145. JointAppx 1677 (McCauley Report at 18).

162.    Merely reading Memorandum 11-01 and Directive 145 to supervisors was insufficient to ensure that supervisors understood the policies and could explain their meaning to the officers under their supervision. JointAppx 1674 (McCauley Report at 15). Supervisors need to have a correct understanding of the policies so they can help subordinates understand and learn correctly. JointAppx 1675 (McCauley Report at 16).

163.    It was "unreasonable" for the PPD to expect that merely reading a complex policy at roll call would result in "meaningful changes in officer performance when responding to people recording police." This expectation was particularly unreasonable in light of the evidence of an "existing police culture that exhibited 'pushback' to the idea that people really could record the police." JointAppx 1679 (McCauley Report at 20).

164.    Supervision is crucial to ensuring that officers comply with policies. JointAppx 1672 (McCauley Report at 13). A field sergeant "translates departmental directives and policies into practices." *Id.* "[D]efficient supervision" often causes a "breakdown of policy and procedures." *Id.*

165.    Shifting responsibility to police officers to read and understand a written policy, and failing to hold trainers and supervisors accountable for presenting information that is correct and

understandable, is "problematic" from a management perspective because an officer may assume

he understands the policy when in fact he does not. JointAppx 1675 (McCauley Report at 16).

166.    The PPD had no reliable performance measures or indicators to assess the impact of the

roll call readings. JointAppx 1679 (McCauley Report at 20).

167.    The PPD's failures to train and supervise its officers with respect to the right to record the

police resulted in a failure to change "the values and beliefs (the PPD culture) of officers and

supervisors regarding the importance of this new Constitutional mandate." JointAppx 1680

(McCauley Report at 21).

168.    "PPD policy makers knew/should have known, prior to September 2013, that existing

training regarding people recording police, generally and Directive 145 specifically, was

ineffective and that failing to provide better/improved/different training and supervision

regarding Directive 145, would result in continued officer misconduct with more people being

retaliated against for recording officers." JointAppx 1680 (McCauley Report at 21).


Dated:  January 7, 2016

Respectfully submitted,

*/s/ Mary Catherine Roper*
MARY CATHERINE ROPER                    JONATHAN H. FEINBERG
MOLLY TACK-HOOPER                        Kairys, Rudovsky, Messing, & Feinberg
American Civil Liberties Union of        718 Arch Street, Suite 501 South
Pennsylvania                             Philadelphia, PA 19106
P.O. Box 60173                           Tel: (215) 925-4400
Philadelphia, PA 19102                   Fax: (215) 925-5365
Tel: (215) 592-1513 ext. 113             jfeinberg@krlawphila.com
Fax: (215) 592-1343
mtack-hooper@aclupa.org
mroper@aclupa.org

42

JOHN J. GROGAN
PETER LECKMAN
Langer & Grogan, P.C.
The Bell Atlantic Tower
1717 Arch Street, Suite 4130
Philadelphia, Pa. 19103
215.320-5662  Tel.
215.320.5703  Fax.
jgrogan@langergrogan.com
pleckman@langergrogan.com

SETH KREIMER
PA ID No. 26102
3400 Chestnut Street
Philadelphia, PA 19104
Tel: (215) 898-7447
skreimer@law.upenn.edu

*Counsel for Plaintiff*