RECOMMENDATION 2013-1

TO: Police Commissioner Charles Ramsey
    Mayor Michael Nutter
    Managing Director Richard Negrin, Esq.
    Director of Public Safety Michael Resnick, Esq.

RE: Recommendation 2013-1 Pictures, Recording and Audio Recordings of Police Officers while Performing Official Functions in Public Spaces



Dear Commissioner Ramsey:

Recent news accounts indicate that Philadelphia police officers are not adhering to Philadelphia Police Department Memorandum 11-01, the directive related to the confiscation of recording devices. Additionally, the Internal Affairs database shows at least eight citizen complaints since 2011 where people were allegedly retaliated against for videotaping police. Six of those incidents occurred AFTER the directive was issued in September 2011. One of the more serious cases involving the videotaping of police from 2012 resulted in partially sustained charges against two officers, who received training and counseling.

The established policy of the PPD is that:

"Generally, officers who have been photographed, videotaped or audibly recorded in a public space have no authority to confiscate the recording devices" and, "as such, police personnel shall not interfere with any member of the public or individuals temporarily detained from photographing, videotaping, or audibly recording police personnel while conducting official business or while acting in an official capacity in any public space." (Emphasis in the original)

The Police Advisory Commission recommends that all police personnel be reminded, in writing, of the existing recommendation and that departmental action be instituted against any member of the PPD not adhering to the recommendation.

Sincerely,

Charles F. Volz Jr.,
Secretary
Police Advisory Commission

*Copy sent to Capt. Healy 3-15-13*

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

AMANDA GERACI,             )
                                     )
               Plaintiff,     )
                                     )
      v.                     )
                                     )     Civil Action No. 2:14-cv-05264 (WY)
CITY OF PHILADELPHIA; POLICE  )
OFFICER DAWN BROWN, Badge No.  )
2454; POLICE OFFICER TERRA M.  )
BARROW, Badge No. 1147; POLICE  )
OFFICER NIKKI L. JONES, Badge No.  )
2549; POLICE OFFICER RHONDA  )
SMITH, Badge No. 1373,         )
                                     )
               Defendants.  )
_____ )

## PLAINTIFF'S FIRST SET OF INTERROGATORIES TO
## DEFENDANT CITY OF PHILADELPHIA

Plaintiff hereby requests, pursuant to the Federal Rules of Civil Procedure, that

Defendant City of Philadelphia respond to the following Interrogatories.  Response is to be made

within thirty days.

### INSTRUCTIONS AND DEFINITIONS

(a)     All discovery requests are to be regarded as concerning past and present incidents,

activities, and practices.

(b)     The singular form should be taken to include the plural, and vice versa.

(c)     The term "the incident described in the Complaint" includes, but is not limited to,

any contact between plaintiff and officers of the Philadelphia Police Department on or about

September 21, 2012 in the area of the Philadelphia Convention Center near North Broad Street in

Philadelphia, contact between officers of the Philadelphia Police Department and any other

individuals at that same location, the use of force against the plaintiff, and the restraint and detention of plaintiff.

(d)     Wherever "you," "defendant," "City of Philadelphia," "City," or similar term is used, it should be taken to include all employees, officers, co-workers, and agents of any defendant.  "Agent" is used in a broad sense to include anyone acting on behalf or in the interest of, whether directly or indirectly, openly or covertly, or with or without compensation.

(e)      These discovery requests are deemed to be continuing, and defendant has the duty to supplement the responses.  *See* Fed. R. Civ. P. 26(e).

(f)     If any form of privilege or other protection from disclosure is claimed as a ground for withholding a document or responsive information contained in a document, set forth with respect to the document, the date, title, identity of the author, subject matter (without revealing the information for which the privilege is claimed), and each and every fact or basis on which you claim your privilege with sufficient specificity to permit the Court to make a determination as to whether the claim of privilege is valid.

(g)     The term "document" shall refer to the original, drafts, and all non-identical versions or copies (whether different from originals by reason of notations made on such copies or otherwise) of all writings and material of any kind, including, but not limited to, orders, instructions, reports, directives, summaries, interviews, complaints, statements (whether signed or unsigned), transcripts, regulations, memoranda, notes, correspondence (including electronic mail correspondence), computerized data or records, diagrams, and maps.  "Document" also refers to records including, but not limited to, photographs, microfilm, videotape, audiotape, and motion pictures.

(h)     The terms "police officers" shall refer to officers, employees, or supervisors of the Philadelphia Police Department, of whatever rank or assignment.

## INTERROGATORIES

1.      State the full name, badge number, and position in the Philadelphia Police Department of all police officers who were present during the incident described in the Complaint.

2.      For each individual named in response to Interrogatory 1, detail whether that person restrained, pushed, struck, hit, kicked, handcuffed, or otherwise had physical contact of any nature with plaintiff.  In responding to this interrogatory, specifically identify each person or document that was the source of this information and what each particular source stated.

3.      For each individual named in response to Interrogatory 1, state whether that individual observed plaintiff, and if so, where plaintiff was observed, what plaintiff was doing, what plaintiff was wearing, and whether plaintiff had any visible injuries or bruises.  In responding to this interrogatory, specifically identify each person or document that was the source of this information and what each particular source stated.

4.      For each individual named in response to Interrogatory 1, provide that individual's account of the incident described in the Complaint.

5.      For each individual named in response to Interrogatory 1, state that individual's detailed explanation of why he/she went to the area of the incident described in the Complaint at the time of the incident, and what, if any, information he/she possessed or was told about to support the stop of, and use of force on, plaintiff.  Each individual, in responding to this interrogatory, is directed to state whether this information derived from personal observation or from any other source, which source is to be explicitly identified.

6.     For each individual named in response to Interrogatory 1, state whether that person was struck or injured in any way or the subject of any alleged resistance or assaultive behavior by plaintiff during the entire incident described in the Complaint.

7.     Provide the names of all civilian employees, witnesses, and any and all other individuals who were present at any time during the incident described in the Complaint.

8.     For each individual named in response to Interrogatory 7, state whether that individual visually observed plaintiff and provide a detailed description from each individual regarding his/her observations of plaintiff and plaintiff's behavior.  In responding to this Interrogatory, identify the source of that information as to each individual.

9.     Identify any and all documents that reference in any way contact by officers of the Philadelphia Police Department with plaintiff at the time of the incident described in the Complaint, including, but not limited to investigation reports, Computer Assisted Dispatch (CAD) sheets, radio tape transcripts, patrol logs, custody logs, and use of force forms.

10.     Identify by name and badge number all officers of the Philadelphia Police Department assigned to work in the area of the the incident described in the complaint at or around the time of the incident described in the Complaint.

11.     State the number of arrests, over the last five years, made of any person, where the factual predicate for the arrest involved that person's failure to cease observing or recording, in whatever manner, activity by officers of the Philadelphia Police Department when ordered to do so.  For each such arrest provide the following:

(a)     name of the person arrested;

(b)     the date, time and place of the arrest;

(c)     the formal charges filed against such person;

        (d)       the name and badge number of the arresting officer(s);

        (e)       the disposition of the charges filed against the person;

        (f)       whether any investigation was made into the circumstances of the arrest;

        (g)       the outcome of any such investigation; and

        (h)       whether and what kind of disciplinary actions were taken against the officer(s) making the arrest.

12.     Identify for all individuals named in response to Interrogatory 1 any and all incidents for which he/she has been the subject of a police department investigation for misconduct for the entire period of his/her employment with the Philadelphia Police Department. For each incident, further identify the outcome of that investigation, including both the decision rendered and any disciplinary action or other consequence that followed as a result therefrom.

13.     Identify for all individuals named in response to Interrogatory 1 by caption, court, and civil action number all civil actions filed in federal or state court in the past ten years in which that officer was named as a defendant. Further identify for each said action the outcome of such action (or the current status of said action) and state what action the Philadelphia Police Department or any official thereof took, as a result of a judgment or settlement, involving the above.

14.     Identify any complaint made to either the City of Philadelphia or the Philadelphia Police Department regarding any response by an officer of the Philadelphia Police Department to the attempts of citizen to observe or record, in whatever manner, police activity, and describe any investigation conducted into any such complaint, including the date of the investigation, the identity of the investigator(s), the outcome of the investigation, and any disciplinary or other action taken as a result of the investigation.

15.     State whether the Philadelphia Police Department and/or the City of Philadelphia has a procedure or system in place to train police officers to recognize and properly address citizens observing or recording policy activity.  If so, provide a detailed description of the nature of such a procedure or system, including the date on which the procedure or system was initiated, a description of any documents and forms and directives and memoranda which relate to or are employed in connection with such a procedure or system, and a detailed description of the manner in which the procedure or system functions.

16.     Describe any and all actions taken by the Philadelphia Police Department upon receipt of a memorandum from the Police Advisory Commission referencing incidents involving conduct of Philadelphia police officers inconsistent with Commissioner's Charles H. Ramsey's September 23, 2011 Memorandum 11-01.

17.     State whether the Philadelphia Police Department has conducted any investigation into the incident described in the Complaint, and, if so, describe the results of said investigation and identify any and all documents produced during the course of and as a result of that investigation.


DATE: November 14, 2014                    MOLLY TACK-HOOPER
                                           PA ID No. 307828
                                           MARY CATHERINE ROPER
                                           PA ID No. 71107
                                           American Civil Liberties Union
                                           of Pennsylvania
                                           P.O. Box 40008
                                           Philadelphia, PA 19106
                                           Tel: (215) 592-1513 ext. 116
                                           Fax: (215) 592-1343
                                           mtack-hooper@aclupa.org
                                           mroper@aclupa.org

                                           JOHN J. GROGAN

PA ID No. 72443
PETER LECKMAN
PA ID No. 312076
Langer, Grogan & Diver, P.C.
The Bell Atlantic Tower
1717 Arch Street, Suite 4130
Philadelphia, Pa. 19103
215.320-5662  Tel.
215.320.5703  Fax.
jgrogan@langergrogan.com

JONATHAN FEINBERG
PA ID No. 88227
Kairys, Rudovsky, Messing, & Feinberg
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
Tel: (215) 925-4400
Fax: (215) 925-5365
jfeinberg@krlawphila.com

SETH KREIMER
PA ID No. 26102
3400 Chestnut Street
Philadelphia, PA 19104
Tel: (215) 898-7447
skreimer@law.upenn.edu

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

—————————————————————

AMANDA GERACI,        )
                       )
        Plaintiff,    )
                       )
     v.            )
                       )     Civil Action No. 2:14-cv-05264 (WY)
CITY OF PHILADELPHIA; POLICE  )
OFFICER DAWN BROWN, Badge No.  )
2454; POLICE OFFICER TERRA M.  )
BARROW, Badge No. 1147; POLICE  )
OFFICER NIKKI L. JONES, Badge No.  )
2549; POLICE OFFICER RHONDA  )
SMITH, Badge No. 1373,  )
                       )
        Defendants.   )

—————————————————————  )

### PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS
### TO DEFENDANT CITY OF PHILADELPHIA

Plaintiff hereby requests, pursuant to the Federal Rules of Civil Procedure, that Defendant City of Philadelphia provide her with clear, accurate copies of the following documents.  Responses are to be served upon counsel within thirty days.

### INSTRUCTIONS AND DEFINITIONS

(a)     All discovery requests are to be regarded as concerning past and present incidents, activities, and practices.

(b)     The singular form should be taken to include the plural, and vice versa. The term "the incident described in the Complaint" includes, but is not limited to, any contact between plaintiff and officers of the Philadelphia Police Department on or about September 21, 2012 in the area of the Philadelphia Convention Center near North Broad Street in Philadelphia, contact between officers of the Philadelphia Police Department and any other individuals at that same location, the use of force against the plaintiff, and the restraint and detention of plaintiff.

(c)     Wherever "you," "defendant," "City of Philadelphia," "City," or similar term is used, it should be taken to include all employees, officers, co-workers, and agents of any defendant.  "Agent" is used in a broad sense to include anyone acting on behalf or in the interest of, whether directly or indirectly, openly or covertly, or with or without compensation.

(d)     These discovery requests are deemed to be continuing, and defendant has the duty to supplement the responses.  *See* Fed. R. Civ. P. 26(e).

(e)     If any form of privilege or other protection from disclosure is claimed as a ground for withholding a document or responsive information contained in a document, set forth with respect to the document, the date, title, identity of the author, subject matter (without revealing the information for which the privilege is claimed), and each and every fact or basis on which you claim your privilege with sufficient specificity to permit the Court to make a determination as to whether the claim of privilege is valid.

(f)     The term "document" shall refer to the original, drafts, and all non-identical versions or copies (whether different from originals by reason of notations made on such copies or otherwise) of all writings and material of any kind, including, but not limited to, orders, instructions, reports, directives, summaries, interviews, complaints, statements (whether signed or unsigned), transcripts, regulations, memoranda, notes, correspondence (including electronic mail correspondence), computerized data or records, diagrams, maps, and drafts.  "Document" also refers to records including, but not limited to, photographs, microfilm, videotape, audiotape, motion pictures, and any other originals and copies.

(g)     The terms "police officers" shall refer to officers, employees, or supervisors of the Philadelphia Police Department, of whatever rank or assignment.

# REQUESTS FOR PRODUCTION

1.      Any and all documents you used as a source of information in your responses to Plaintiff's Interrogatories to you and any and all documents referenced in said responses.

2.      Any and all documents that form any basis for or support the City of Philadelphia's defenses.

3.      Any and all documents that concern or are at all relevant to the incident described in the Complaint.

4.      Any and all documents that comprise or are part of the personnel files of the persons identified in your response to Interrogatory 1, including disciplinary records of said persons.

5.      Any and all documents that concern or are at all relevant to, to any extent or degree, the mental, psychological, or physical condition persons identified in your response to Interrogatory 1 at any and all times up to the present time.

6.      Any and all documents that concern or are at all relevant to, to any extent or degree, any formal or informal complaint made against or about the persons identified in your response to Interrogatory 1 at any and all times up to and including the present time.  Said documents shall include but not be limited to: (a) Internal Affairs Department complaint summary forms; (b) Concise Officer History forms; and (c) PBI summary forms.

7.      All Police Department and/or City policies, procedures, directives, and training materials referenced in your responses to Plaintiff's Interrogatories.

8.      Any and all documents related to any investigation into the incident described in the Complaint.

9.      Photographs of all individuals present at or near the incident described in the Complaint.

10.     Any and all documents concerning any policies, procedures, directives, or training materials regarding or related in any way to the observation or recording, by whatever means, of police activity by citizens, including any communication regarding, or drafts of, policies, procedures, directives, or training materials, whether implemented or merely considered.

11.     Any and all documents related to any investigations identified in response to Interrogatory No. 12.

12.     Any and all documents related to any complaints identified in response to Interrogatory No. 14.

13.     Any and all documents related to any actions taken by the Philadelphia Police Department in relation to or referencing a memorandum from the Police Advisory Commission concerning actions by Philadelphia police officers inconsistent with Commissioner Ramsey's September 23, 2011 Memorandum 11-01.

14.     Any and all documents that support the affirmative defenses in your Answer to Plaintiff's Complaint.


DATE: November 14, 2014                    MOLLY TACK-HOOPER
                                           PA ID No. 307828
                                           MARY CATHERINE ROPER
                                           PA ID No. 71107
                                           American Civil Liberties Union
                                           of Pennsylvania
                                           P.O. Box 40008
                                           Philadelphia, PA 19106
                                           Tel: (215) 592-1513 ext. 113
                                           Fax: (215) 592-1343
                                           mtack-hooper@aclupa.org
                                           mroper@aclupa.org

JOHN J. GROGAN
PA ID No. 72443
PETER LECKMAN
PA ID No. 312076
Langer, Grogan & Diver, P.C.
The Bell Atlantic Tower
1717 Arch Street, Suite 4130
Philadelphia, Pa. 19103
215.320-5662  Tel.
215.320.5703  Fax.
jgrogan@langergrogan.com

JONATHAN FEINBERG
PA ID No. 88227
Kairys, Rudovsky, Messing, & Feinberg
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
Tel: (215) 925-4400
Fax: (215) 925-5365
jfeinberg@krlawphila.com

SETH KREIMER
PA ID No. 26102
3400 Chestnut Street
Philadelphia, PA 19104
Tel: (215) 898-7447
skreimer@law.upenn.edu

# UNITED STATES DISTRICT COURT
## FOR THE EATERN DISTRICT OF PENNSYLVANIA

_____
                      :

**AMANDA GERACI**        :      **Civil Action No.**
        **Plaintiff,**       :
                      :      **14-5264**

      **v.**                :
                      :      **JURY TRIAL DEMANDED**

**CITY OF PHILADELPHIA, et al.**  :
        **Defendants.**     :
                      :
_____:

## DEFENDANTS RESPONSES AND OBJECTIONS TO
## PLAINTIFFS INTERROGATORIES TO THE CITY OF PHILADELPHIA

Defendant City of Philadelphia ("Answering Defendant") hereby objects and responds to

Plaintiffs' Interrogatories and Request for Production of Documents in the above captioned

cases, as follows:

## GENERAL OBJECTIONS

The following General Objections are incorporated by reference to each of the

Interrogatories:

A.  All objections as to competency, relevance, materiality, privilege and admissibility of evidence for any purpose in any subsequent proceeding or trial of this or any other action;

B. All objections to the use of any of these Responses, or the documents identified and/or produced, in any subsequent proceeding or the trial of this or any other action on any ground;

C. All objections on any ground at any time to a demand for further response to these and any other discovery requests involving or relating to the subject matter of the Responses herein; and

D. The right to supplement and/or amend these Responses based upon the discovery of additional documents and/or information.

JointAppx 1639

## RESERVATION OF RIGHTS

All responses to the following document requests are made without in any way waiving but, on the contrary, intending to reserve and reserving:

1. All questions as to the competency, relevancy, materiality, privilege and admissibility for any purpose in any subsequent proceeding or the trial of this or any other action;

2. The right to object on any grounds to the use of any of these documents, or the subject matter thereof, in any subsequent proceeding or the trial of this or any other action.

3. The right to object on any grounds at any time to a demand for further responses to these or any other document request or other discovery proceedings involving or relating to the subject matter of the document requests herein answered; and

4. The right at any time to revise, correct, supplement, clarify and/or amend the responses and objections set forth herein.

## RESPONSES AND OBJECTIONS

1. Please see attached patrol logs and assignment sheets.

2. Officer Brown used the minimum amount of force necessary to take Plaintiff into custody. An interview summary and pictures of the incident are attached herewith.

3. Please see Responses to Interrogatories by the individual Defendant officers.

4. Please see Responses to Interrogatories by the individual Defendant officers.

5. Please see Responses to Interrogatories by the individual Defendant officers.

6. Officer Brown needed to use force, see Responses to Interrogatories by Officer Brown, but was not injured during the incident.

7. Please see attached patrol logs and interviews with civilians and officers present during the incident.

8. Please see attached interviews with civilians and officers present during the incident.

9.      Please see attached.

10.     Please see attached patrol logs and interviews with civilians and officers present during the incident.

11.     Objection; this request assumes a fact at issue, i.e., that Philadelphia Police Officers arrest persons for their failure to cease observing or recording police activity. To the extent Plaintiffs seek complaints alleging the factual predicate for an arrest was the recording or observing of police activity and not any other reason, the Philadelphia Police Department uses an Internal Affairs Case Management System ("IAPro"), which was implemented in 2002, as a complement to the existing case review program to review and alert to issues. In general, IAPro provides officer "alerts," for example, with regard to complaints against a particular officer for use of force, IAD intake information, discharge of firearm investigations, statistical reports and graphs, and Police Board of Inquiry case processing (including notification to chains of command and the tracking of disciplinary case outcomes).  IAPro can display officers by name, complaint summaries and identify documents associated with an investigation. There is no category within this system for tracking or alerting to complaints regarding arrests for observation or recording of police activity.

12.     Answering Defendant objects to this Request on the basis that it is overbroad, vague, unduly burdensome and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Subject to and without waiver of

the foregoing objection, see attached concise officer history for Defendant Officers.

13. Answering Defendant objects to this Request on the basis that it is overbroad, vague, unduly burdensome and not reasonably calculated to lead to the discovery of relevant or admissible evidence. By way of further response, it seeks information that is publicly available and not solely within the possession of the Defendant Officer or the City of Philadelphia. Defendants have no obligation under the Federal Rules to provide information that is available from the Courts and easily accessible by either party.

14. Please see response to Interrogatory 11. By way of further answer, Defendants have previously provided this discovery to Plaintiff's counsel in <u>Montgomery v. the City of Philadelphia.</u>

15. The Philadelphia Police Department trained all officers to recognize and address citizens observing or recording police activity by implementing Directive 145. Directive 145 is attached here. The Directive was conceived by Police Commissioner Ramsey, and written by Captain Francis Healy with the assistance of the Research and Planning Unit. Once a Directive is issued, officers receive notice by teletype, and the Directive is provided to all officers at roll call within their respective districts. Officers of the Philadelphia Police Department have an ongoing obligation to know and familiarize themselves with all police directives. Directive 145 was conceived at the direction of Police Commissioner Charles Ramsey. Because of Commissioner Ramsey's involvement in the Police Executive Research Forum, and the Major Cities

Chiefs Association, he recognized the observation and recording of police activity to be an emerging issue in law enforcement and wanted Philadelphia to be among the first cities to develop a policy to address it. Directive 145 was based in part on a letter from the Justice Dept. in a case in Maryland, <u>Sharp</u> (previously provided). The Directive was written and reviewed by Cpt. Fran Healy with the assistance of the Research and Planning Unit as the entity which issues police directives.

16. No additional actions were taken by the Police Department in response to the letter by Charles Volz, other than the steps already described herein.

17. There have been no additional investigations other than those identified in the attached paperwork by Internal Affairs Sgt. Antoinette Eberhart, Badge 8837. The City of Philadelphia is not in possession of any documents evidencing any additional investigations by outside agencies.

<br>

*/s/ Amanda C. Shoffel*
AMANDA C. SHOFFEL
Date: March 23, 2015                         Deputy City Solicitor
City of Philadelphia Law Department
Civil Rights Unit
1515 Arch Street, 14th Floor
Philadelphia, PA  19102

# UNITED STATES DISTRICT COURT
## FOR THE EATERN DISTRICT OF PENNSYLVANIA

———————————————————————  :

**AMANDA GERACI**          :     **Civil Action No.**

       **Plaintiff,**      :

                         :     **14-5264**

       **v.**                 :

                         :     **JURY TRIAL DEMANDED**

**CITY OF PHILADELPHIA, et al.**  :

       **Defendants.**     :

                         :

———————————————————————:

## DEFENDANTS RESPONSES AND OBJECTIONS TO
## PLAINTIFFS DOCUMENT REQUESTS TO THE CITY OF PHILADELPHIA

Defendant City of Philadelphia ("Answering Defendant") hereby objects and responds to

Plaintiffs' Interrogatories and Request for Production of Documents in the above captioned case,

as follows:

## GENERAL OBJECTIONS

The following General Objections are incorporated by reference to each of the

Interrogatories:

A.  All objections as to competency, relevance, materiality, privilege and admissibility of evidence for any purpose in any subsequent proceeding or trial of this or any other action;

B. All objections to the use of any of these Responses, or the documents identified and/or produced, in any subsequent proceeding or the trial of this or any other action on any ground;

C. All objections on any ground at any time to a demand for further response to these and any other discovery requests involving or relating to the subject matter of the Responses herein; and

D. The right to supplement and/or amend these Responses based upon the discovery of additional documents and/or information.

## RESERVATION OF RIGHTS

All responses to the following document requests are made without in any way waiving

but, on the contrary, intending to reserve and reserving:

5. All questions as to the competency, relevancy, materiality, privilege and admissibility for any purpose in any subsequent proceeding or the trial of this or any other action;

6. The right to object on any grounds to the use of any of these documents, or the subject matter thereof, in any subsequent proceeding or the trial of this or any other action.

7. The right to object on any grounds at any time to a demand for further responses to these or any other document request or other discovery proceedings involving or relating to the subject matter of the document requests herein answered; and

8. The right at any time to revise, correct, supplement, clarify and/or amend the responses and objections set forth herein.

## RESPONSES AND OBJECTIONS

1. Answering Defendant objects to this Request on the basis that it is overbroad, vague, unduly burdensome and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Subject to and without waiver of the foregoing objection, please see attached documents and those previously provided to counsel in Montgomery v. City, et al. Defendants reserve the right to supplement this response as discovery proceeds and in accordance with Federal Rule 26(a).

2. Answering Defendant objects to this Request on the basis that it is overbroad, vague, unduly burdensome and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Subject to and without waiver of the foregoing objection, please see attached documents and those previously provided to counsel in Montgomery v. City, et al. Defendants reserve the right

to supplement this response as discovery proceeds and in accordance with Federal Rule 26(a).

3.      Answering Defendant objects to this Request on the basis that it is overbroad, vague, unduly burdensome and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Subject to and without waiver of the foregoing objection, please see attached documents and those previously provided to counsel in <u>Montgomery v. City, et al</u>. Defendants reserve the right to supplement this response as discovery proceeds and in accordance with Federal Rule 26(a).

4.      Answering Defendant objects to this Request on the basis that it is overbroad, vague, unduly burdensome and requests sensitive information such as bank account information, personal information such as home and family addresses and names, and other information not reasonably calculated to lead to the discovery of relevant or admissible evidence. Subject to and without waiver of the foregoing objection, any complaints, disciplinary history, or potential adverse employment actions are attached in the concise officer history.

5.      Answering Defendant objects to this Request on the basis that it is overbroad, vague, unduly burdensome and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Defendant officers are not claiming any injuries, damages, or medical conditions as a result of the incidents described in the Complaints. By way of further response, this request seeks personal medical information protected by state and federal law.

6.      Please see attached concise officer histories.

7.      Please see previously provided Directive 145 and Memorandum 11-01.

8.      There have been no additional investigations other than those identified in the attached paperwork. The City of Philadelphia is not in possession of any documents evidencing any additional investigations by outside agencies.

9.      Please see attached.

10.      Please see previously provided Directive 145 and Memorandum 11-01.

11.      Please see attached police paperwork.

12.      Please see response to Interrogatory 11. By way of further answer, Defendants have previously provided this discovery to Plaintiff's counsel in <u>Montgomery v. the City of Philadelphia.</u>

13.      No additional actions were taken by the Police Department in response to the letter by Charles Volz, other than the steps already described herein.

14.      Please see attached as well as the expert report by Jack Ryan provided in <u>Montgomery v. City, et al</u>.

<div style="margin-left:40%">

*/s/ Amanda C. Shoffel*
AMANDA C. SHOFFEL
Deputy City Solicitor
City of Philadelphia Law Department
Civil Rights Unit
1515 Arch Street, 14th Floor
Philadelphia, PA  19102
</div>

Date: <u>March 23, 2015</u>



**U.S. Department of Justice**

Civil Rights Division

JMS:TDM:RJO
DJ 207-35-10

*Special Litigation Section - PHB*
*950 Pennsylvania Ave, NW*
*Washington DC 20530*

May 14, 2012

Mark H. Grimes
Baltimore Police Department
Office of Legal Affairs
601 E Fayette St
Baltimore, MD 21202

Mary E. Borja
Wiley Rein LLP
1776 K St NW
Washington, DC 20006

  Re: *Christopher Sharp v. Baltimore City Police Department, et. al.*

Dear Counsel:

  Judge Paul W. Grimm scheduled a settlement conference in *Christopher Sharp v. Baltimore City Police Department, et. al.* for May 30, 2012. While we take no position on Mr. Sharp's claim for damages against the individual defendants, it is the United States' position that any resolution to Mr. Sharp's claims for injunctive relief should include policy and training requirements that are consistent with the important First, Fourth and Fourteenth Amendment rights at stake when individuals record police officers in the public discharge of their duties. These rights, subject to narrowly-defined restrictions, engender public confidence in our police departments, promote public access to information necessary to hold our governmental officers accountable, and ensure public and officer safety.

  The guidance in this letter is designed to assist the parties during the upcoming settlement conference. It specifically addresses the circumstances in this case and Baltimore City Police Department's General Order J-16 ("Video Recording of Police Activity"), but also reflects the United States' position on the basic elements of a constitutionally adequate policy on individuals' right to record police activity.

## 1. Background

  In his complaint, Mr. Sharp alleged that on May 15, 2010, Baltimore City Police Department ("BPD") officers seized, searched and deleted the contents of his cell phone after he used it to record officers forcibly arresting his friend. Compl. at 9-12, ECF. No. 2. Mr. Sharp further alleged that BPD maintains a policy, practice or custom of advising officers to detain citizens who record the police while in the public discharge of their duties and to seize, search, and delete individuals' recordings. *Id*. at 7. On November 30, 2011, BPD and Frederick H.

Bealefeld, III filed a Motion to Dismiss Complaint of for Summary Judgment. According to the Motion to Dismiss, BPD promulgated a general order on recording police activity on November 8, 2011. BPD did not file this policy as an exhibit to its Motion to Dismiss. Instead, BPD filed a declaration providing a brief summary of its contents.

On January 10, 2012, the United States filed a Statement of Interest in this matter. In that statement, the United States urged the Court to find that private individuals have a First Amendment right to record police officers in the public discharge of their duties, and that officers violate individuals' Fourth and Fourteenth Amendment rights when they seize and destroy such recordings without a warrant or due process. The United States also opined that, based on the limited information on the record regarding BPD's development of new policies and training on individuals' right to record the police, BPD failed to meet its burden of establishing that it had taken sufficient action to prevent future constitutional violations. On February 10, 2012, BPD provided the Court, Mr. Sharp and the United States with a courtesy copy of General Order J-16. The same day, BPD released General Order J-16 to the public.[1] Following a hearing on February 13, 2012, Judge Legg denied BPD's motion.

Constitutionally adequate policies must be designed to effectively guide officer conduct, accurately reflect the contours of individuals' rights under the First, Fourth and Fourteenth Amendments, and diminish the likelihood of future constitutional violations. BPD's general order does not meet these requirements in some areas. In other areas, BPD's general order does adequately protect individuals' constitutional rights. We discuss those areas below, as well as others in which BPD should amend the general order to ensure that individual's constitutional rights are protected.

## 2. Guidance on the Right to Record Police Activity.

### A. Policies should affirmatively set forth the First Amendment right to record police activity.

Policies should affirmatively set forth the contours of individuals' First Amendment right to observe and record police officers engaged in the public discharge of their duties. Recording governmental officers engaged in public duties is a form of speech through which private individuals may gather and disseminate information of public concern, including the conduct of law enforcement officers.[2] *See, e.g., Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) ("[b]asic

---

[1] Peter Hermann, *Baltimore Police Told Not to Stop People Taking Photos or Video of Their Actions*, The Baltimore Sun, February 11, 2012.

[2] There is no binding precedent to the contrary. In *Szymecki v. Houck*, 353 F. App'x 852 (4th Cir. 2009), the Fourth Circuit issued a one page, unpublished per curium opinion summarily concluding – without providing legal or factual support – that the "right to record police activities on public property was not clearly established in this circuit at the time of the alleged conduct." *Id.* at 853; *see also McCormick* v. *City of Lawrence*, 130 F. App'x 987 (10th Cir. 2005). In the Fourth Circuit, "[u]npublished opinions have no precedential value." *United States v. Stewart*, 595 F.3d 197, 199 n.1 (4th Cir. 2010); *see also Glik*, 655 F.3d at 85 ("[T]he absence of substantive discussion deprives *Szymecki* of any marginal persuasive value it might otherwise have had.").

First Amendment principles" and federal case law "unambiguously" establish that private individuals possess "a constitutionally protected right to videotape police carrying out their duties."); *Smith v. Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (recognizing the "First Amendment right . . . to photograph or videotape police conduct."); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing the "First Amendment right to film matters of public interest"). The First Amendment right to record police activity is limited only by "reasonable time, place, and manner restrictions." *Glik*, 655 F.3d at 84; *Smith*, 212 F.3d at 1333.

While courts have only recently begun to refine the contours of the right to record police officers, the justification for this right is firmly rooted in long-standing First Amendment principles. The right to "[g]ather[] information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs.'" *Glik*, 655 F.3d at 82 (citing *Mills v. Alabama,* 384 U.S. 214, 218 (1966)). The application of this right to the conduct of law enforcement officers is critically important because officers are "granted substantial discretion that may be used to deprive individuals of their liberties." *Id.*; *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1035-36 (1991) ("Public awareness and criticism have even greater importance where, as here, they concern allegations of police corruption."). The "extensive public scrutiny and criticism" of police and other criminal justice system officials serves to "guard[] against the miscarriage of justice," *Nebraska Press Association v. Stuart*, 427 U.S. 539, 560 (1976) (citing *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966)), a harm that undermines public confidence in the administration of government. When police departments take affirmative steps to protect individuals' First Amendment rights, departments "not only aid[] in the uncovering of abuses . . . but also may have a salutary effect on the functioning of government more generally." *Glik*, 655 F.3d at 82-83.

Policies should explain the nature of the constitutional right at stake and provide officers with practical guidance on how they can effectively discharge their duties without violating that right. For example, policies should affirmatively state that individuals have a First Amendment right to record police officers and include examples of the places where individuals can lawfully record police activity and the types of activity that can be recorded.[3] While this area of the law

---

[3] Police duties discharged in public settings may include a range of activities, including detentions, searches, arrests or uses of force. In *Kelly v. Borough of Carlisle*, 622 F.3d 248 (3d Cir. 2010), the Third Circuit considered whether there was sufficient case law "establishing a right to videotape police officers during a traffic stop to put a reasonably competent officer on 'fair notice' that seizing a camera or arresting an individual for videotaping police conduct during the stop would violate the First Amendment." *Id*. at 262. The Court determined that, because there were no cases specifically addressing the right to record traffic stops and the relevant Third Circuit decisions were inconsistent, there was insufficient case law to support a finding that the right to record traffic stops was clearly established. *Id*. Because the right was not clearly established, the officer involved was entitled to qualified immunity. *Id.* at 262-63. The Third Circuit expressly did not reach the question of whether the First Amendment protects the recording of police activity during a traffic stop, because it did not need to reach that question to decide that the officer should receive qualified immunity. *Id.* In other contexts, the Supreme Court has noted that, when faced with a close call, "the First Amendment requires [courts] to err on the side of protecting political speech rather than suppressing it." *FEC v. Wisconsin Right to*

is still developing, existing case law is instructive. In *Glik*, an individual engaged in protected activity when he recorded officers allegedly engaging in excessive force in a public park, "the apotheosis of a public forum." *Glik*, 655 F.3d at 84. Individuals have a right to record in all traditionally public spaces, including sidewalks, streets and locations of public protests.

Courts have also extended First Amendment protection to recordings taken on private property, including an individual filming police activity from his or her home or other private property where an individual has a right to be present. *See Jean v. Massachusetts State Police*, 492 F.3d 24 (1st Cir. 2007) (activist's posting of a video of "a warrantless and potentially unlawful search of a private residence" on her website was entitled to First Amendment protection); *Pomykacz v. Borough of West Wildwood*, 438 F.Supp.2d 504, 513 (D. N.J. 2006) (individual was engaging in political activism protected by the First Amendment when she photographed police officer while officer was in police headquarters and in municipal building); *Robinson v. Fetterman*, 378 F.Supp.2d 534, 541 (E.D. Pa. 2005) (individual who videotaped state troopers from private property with the owner's permission was engaged in constitutionally protected speech). The 1991 videotaped assault of Rodney King at the hands of law enforcement officers exemplifies this principle. A private individual awakened by sirens recorded police officers assaulting King from the balcony of his apartment. This videotape provided key evidence of officer misconduct and led to widespread reform. Congress enacted 42 U.S.C. §14141 in response to this incident. Section 14141 granted the U.S. Attorney General the right to seek declaratory or injunctive relief against law enforcement agencies engaged in a pattern or practice of violating the Constitution or federal law.

BPD's General Order J-16 should affirmatively set forth that individuals have a First Amendment right to record officers in the public discharge of their duties. At numerous points throughout General Order J-16, BPD refers to "Constitutional rights" that form the basis for the policy. For example, General Order J-16 begins with a statement acknowledging that the purpose of the policy is to "to ensure the protection and preservation of every person's Constitutional rights," *id.* at 1, and later refers to bystanders' "absolute right to photograph and/or video record the enforcement actions of any Police Officer." *Id.* at 2. Yet, General Order J-16 never explicitly acknowledges that this right derives from the First Amendment. Particularly given the numerous publicized reports over the past several years alleging that BPD officers violated individuals' First Amendment rights, BPD should include a specific recitation of the First Amendment rights at issue in General Order J-16.

Other areas of General Order J-16 also require further clarification. For example, General Order J-16 states that officers may not prohibit a person's ability to observe, photograph, and/or make a video recording of police activity that occurs "in the public domain," General Order J-16 at 1, but never defines this term. BPD should clarify that the right to record public officials is not limited to streets and sidewalks – it includes areas where individuals have a legal right to be present, including an individual's home or business, and common areas of public and private facilities and buildings.

---

*Life, Inc.*, 551 U.S. 449, 457 (2007). *See also Bertot v. School Dist. No. 1, Albany County, Wyo.*, 613 F.2d 245, 252 (10th Cir. 1979) ("We prefer that governmental officials acting in sensitive First Amendment areas err, when they do err, on the side of protecting those interests.").

*B. Policies should describe the range of prohibited responses to individuals observing or recording the police.*

Because recording police officers in the public discharge of their duties is protected by the First Amendment, policies should prohibit interference with recording of police activities except in narrowly circumscribed situations. More particularly, policies should instruct officers that, except under limited circumstances, officers must not search or seize a camera or recording device without a warrant. In addition, policies should prohibit more subtle actions that may nonetheless infringe upon individuals' First Amendment rights. Officers should be advised not to threaten, intimidate, or otherwise discourage an individual from recording police officer enforcement activities or intentionally block or obstruct cameras or recording devices.

Policies should prohibit officers from destroying recording devices or cameras and deleting recordings or photographs under any circumstances. In addition to violating the First Amendment, police officers violate the core requirements of the Fourteenth Amendment procedural due process clause when they irrevocably deprived individuals of their recordings without first providing notice and an opportunity to object. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The right to be heard before being condemned to suffer grievous loss of any kind . . . is a principle basic to our society."); *Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 823 (5th Cir. 2007) (The notice defendant provided to the plaintiff "was insufficient to satisfy due process because [plaintiff] did not receive the notice until after his personal property was allegedly discarded . . . . [D]iscarding [plaintiff's] personal property in this manner violated his procedural due process rights.").

BPD's General Order J-16 addresses the search and seizure of cameras or recording devices. However, the policy does not prohibit more subtle officer actions that nonetheless may infringe upon individuals' First Amendment rights. BPD should instruct officers not to threaten, intimidate, or otherwise discourage an individual from recording police officer enforcement activities or intentionally block or obstruct cameras or other recording devices.

The order also prohibits officers from damaging or erasing the contents of a device without first obtaining a warrant, General Order J-16 at 2. This is not merely a Fourth Amendment question, however. Under the First Amendment, there are no circumstances under which the contents of a camera or recording device should be deleted or destroyed. BPD's general order should include clear language prohibiting the deletion or destruction of recordings under any circumstances.

*C. Policies should clearly describe when an individual's actions amount to interference with police duties.*

The right to record police activity is limited only by "reasonable time, place, and manner restrictions." *Glik*, 655 F.3d at 8; *Smith*, 212 F.3d at 1333. If a general order permits individuals to record the police unless their actions interfere with police activity, the order should define what it means for an individual to interfere with police activity and, when possible, provide specific examples in order to effectively guide officer conduct and prevent infringement on activities protected by the First Amendment.

A person may record public police activity unless the person engages in actions that jeopardize the safety of the officer, the suspect, or others in the vicinity, violate the law, or incite others to violate the law. *See, e.g., Chaplinsky v. New Hampshire*, 315 U.S. 568, 573 (1942) (words "likely to cause a fight" are not afforded First Amendment protection); *see also Louisiana ex rel. Gremillion v. National Ass'n for the Advancement of Colored People*, 366 U.S. 293, 297 (1961) ("criminal conduct . . . cannot have shelter in the First Amendment"). Courts have held that speech is not protected by the First Amendment if it amounts to actual obstruction of a police officer's investigation – for example, by tampering with a witness or persistently engaging an officer who is in the midst of his or her duties. *See Colten v. Commonwealth of Kentucky*, 407 U.S. 104 (1972) (individual's speech not protected by the First Amendment where individual persistently tried to engage an officer in conversation while the officer was issuing a summons to a third party on a congested roadside and refused to depart the scene after at least eight requests from officers); *King v. Ambs*, 519 F.3d 607 (6th Cir. 2008) (individual was not engaged in protected speech when he repeatedly instructed a witness being questioned by a police officer not to respond to questions).

However, an individual's recording of police activity from a safe distance without any attendant action intended to obstruct the activity or threaten the safety of others does not amount to interference. Nor does an individual's conduct amount to interference if he or she expresses criticism of the police or the police activity being observed. *See City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987) ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."); *Norwell v. City of Cincinnati, Ohio*, 414 U.S. 14, 16 (1973) ("Surely, one is not to be punished for nonprovocatively voicing his objection to what he obviously felt was a highly questionable detention by a police officer.") Even foul expressions of disapproval towards police officers are protected under the First Amendment.[4] *See, e.g.*, *Duran v. City of Douglas, Arizona*, 904 F.2d 1372, 1377-78 (9th Cir. 1990) (individual who was "making obscene gestures" and "yell[ed] profanities" at an officer engaged in conduct that "fell squarely within the protective umbrella of the First Amendment and any action to punish or deter such speech—such as stopping or hassling the speaker—is categorically prohibited by the Constitution.").

Time, place, and manner restrictions on First Amendment speech must "leave open ample alternative channels for communication of the information," *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989). BPD's general order specifically suggests that, if a bystander's actions are

---

[4] The Supreme Court has carved out an exception for "'fighting' words – those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky*, 315 U.S. at 572. However, the Court has indicated that the fighting words exception "might require a narrower application in cases involving words addressed to a police officer, because 'a properly trained officer may reasonably be expected to exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerently to 'fighting words.'" *Hill*, 482 U.S. at 462. *See also Johnson v. Campbell*, 332 F.3d 199 (3d Cir. 2003) (detainee's words "son of a bitch" to police officer were not fighting words); *Posr v. Court Officer Shield #207*, 180 F.3d 409 (2d Cir. 1999) (individual's statement to officer "one day you're gonna get yours," spoken while in retreat, were not fighting words); *Buffkins v. City of Omaha, Douglas County*, 922 F.2d 465, 472 (8th Cir. 1991) (finding no evidence that individual caused "an incitement to immediate lawless action" by calling officer "asshole").

"approaching the level of a criminal offense," supervisors should "recommend a less-intrusive location to the bystander from which he/she may continue to observe, photograph, or video record the police activity." *Id.* at 5. This is effective language to guide supervisor's conduct. However, BPD's general order does not permit or recommend that "members" – presumably officers – provide this information to bystanders before effectuating an arrest. BPD should revise its general order to provide "members" with the same authority.

General Order J-16 must set forth with specificity the narrow circumstances in which a recording individual's interference with police activity could subject the individual to arrest. Recent publicized interactions between citizen-recorders and BPD officers highlight the need for clear guidance on this issue. *See* Peter Hermann, *Police Allow Bystanders to Tape Arrest, But at What Risk?,* The Baltimore Sun, April 3, 2012 (president of the city police union stating that officers "are confused right now" about how to appropriately respond to individuals recording police conduct); *see also*, *Fox45 Top News Stories Video*, Fox45 WBFF Baltimore, March 22, 2012 (covering the suspension of a BPD officer who confiscated a cell phone from an individual recording police from a family member's property)[5]; Justin Fenton, *In Federal Hill, Citizens Allowed to Record Police – But Then There's Loitering*, The Baltimore Sun, February 11, 2012 (BPD officer instructing a citizen-recorder that he would face loitering charges if he failed to move away from the scene of an arrest).

Under "General Information," General Order J-16 at 2, the policy states that bystanders have an absolute right to record police activity as long as the bystanders' actions do not fall into one of six exceptions. One exception is that bystanders may not "Interfere with or violate any section of the law, ordinance, code, or criminal or traffic article." While bystanders clearly may not violate the law, it is less clear under what circumstances an individual's actions would "interfere" with a law or ordinance. This language encourages officers to use their discretion in inappropriate, and possibly unlawful, ways. Instead, General Order J-16 should encourage officers to provide ways in which individuals can continue to exercise their First Amendment rights as officers perform their duties, rather than encourage officers to look for potential violations of the law in order to restrict the individual's recording.

### D. Policies should provide clear guidance on supervisory review.

First line supervision is a critical component of constitutional policing. Policies should include guidance on when an officer should call a supervisor to the scene and what a supervisor's responsibilities are once he or she arrives at the scene. A supervisor's presence at the scene should be required before an officer takes any significant action involving citizen-recorders or recording devices, including a warrantless search or seizure of a camera or recording device or an arrest.[6]

---

[5] Available at: http://www.foxbaltimore.com/newsroom/top_stories/videos/wbff_vid_12767.shtml.

[6] Supervisors should be present at the scene to approve any arrest for conduct related to the use of cameras or recording devices. For example, an arrest for quality of life offenses, including "hindering" or "loitering," may be based upon the individuals' alleged interference with police duties while using a recording device. *See, e.g.,* Justin Fenton, *In Federal Hill, Citizens Allowed to Record Police – But Then There's Loitering*, The Baltimore Sun, February 11, 2012 (BPD

BPD should clarify the role of supervisors. A supervisor's presence at the scene should be required before an officer takes any significant action involving cameras or recording devices, including a warrantless search or seizure. If feasible, supervisors should be present prior to an individual's arrest related to the use of a recording device. At a minimum, supervisors must be present to approve such arrests before an individual is transported to a holding facility. BPD's general order does not include mandatory language requiring supervisors to be present during these occurrences, but rather advises supervisors to be present "if possible." General Order J-16 at 4.

Moreover, BPD's general order includes inconsistent language regarding when a member should contact a supervisor. On page 4, officers are instructed to notify a supervisor *after* an individual has been arrested. Later on the same page, under the supervisor's responsibilities, the supervisor is advised to go to any scene where the actions of a bystander are "approaching the level of a criminal offense." BPD should reconcile this inconsistency and require, at a minimum, a supervisor's presence at the scene to approve all arrests or any other significant action by a member.

> ### E.   Policies should describe when it is permissible to seize recordings and recording devices.

Policies on individuals' right to record and observe police should provide officers with clear guidance on the limited circumstances under which it may be permissible to seize recordings and recording devices. An officer's response to an individual's recording often implicates both the First and Fourth Amendment, so it's particularly important that a general order is consistent with basic search and seizure principles. A general order should provide officers with guidance on how to lawfully seek an individual's consent to review photographs or recordings and the types of circumstances that do—and do not—provide exigent circumstances to seize recording devices, the permissible length of such a seizure, and the prohibition against warrantless searches once a device has been seized. Moreover, this guidance must reflect the special protection afforded to First Amendment materials.

Policies should include language to ensure that consent is not coerced, implicitly or explicitly. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973) ("[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed."). In assessing whether an individual's consent to search was freely and voluntarily given, Courts may consider "the characteristics of the accused . . . as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996). BPD's explanation of the process for obtaining consent includes clear guidelines regarding what steps an officer should take once an individual provides an officer with consent to review a recording. However, BPD's general order should include language to ensure that consent is not coerced, implicitly or explicitly.

---

officer instructing a citizen-recorder that he would face loitering charges if he failed to move away from the scene of an arrest).

Warrantless seizures are only permitted if an officer has probable cause to believe that the property "holds contraband or evidence of a crime" and "the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *United States v. Place*, 462 U.S. 696, 701 (1983). Any such seizure must be a "temporary restraint[] where needed to preserve evidence until police c[an] obtain a warrant." *Illinois v. McArthur*, 531 U.S. 326, 334 (2001). Seizures must be limited to a reasonable period of time. For example, in *Illinois v. McArthur*, the Supreme court upheld a police officer's warrantless seizure of a premises, in part, because police had good reason to fear that evidence would be destroyed and the restraint only lasted for two hours – "no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." *Id*. at 332. Once seized, officers may not search the contents of the property without first obtaining the warrant. *Place*, 462 U.S. at 701 & n.3. In the context of the seizure of recording devices, this means that officers may not search for or review an individual's recordings absent a warrant.

Police departments must also recognize that the seizure of a camera that may contain evidence of a crime is significantly different from the seizure of other evidence because such seizure implicates the First, as well as the Fourth, Amendment. The Supreme Court has afforded heightened protection to recordings containing material protected by the First Amendment. An individual's recording may contain both footage of a crime relevant to a police investigation and evidence of police misconduct. The latter falls squarely within the protection of First Amendment. *See, e.g., Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991) ("There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment."). The warrantless seizure of such material is a form of prior restraint, a long disfavored practice. *Roaden v. Kentucky*, 413 U.S. 496, 503 (1973) (when an officer "br[ings] to an abrupt halt an orderly and presumptively legitimate distribution or exhibition" of material protected by the First Amendment, such action is "plainly a form of prior restraint and is, in those circumstances, unreasonable under Fourth Amendment standards."). *See also Rossignol v. Voorhaar*, 316 F.3d 516, 522 (4th Cir. 2003) (Where sheriff's deputies suppressed newspapers critical of the sheriff "before the critical commentary ever reached the eyes of readers, their conduct met the classic definition of a prior restraint."). An officer's warrantless seizure of an individual's recording of police activity is no different. *See Robinson v. Fetterman*, 378 F.Supp.2d 534, 541 (E.D. Penn 2005) (By restraining an individual from "publicizing or publishing what he has filmed," officer's "conduct clearly amounts to an unlawful prior restraint upon [] protected speech."); *see Channel 10, Inc. v. Gunnarson*, 337 F.Supp. 634, 637 (D.Minn. 1972) ("it is clear to this court that the seizure and holding of the camera and undeveloped film was an unlawful 'prior restraint' whether or not the film was ever reviewed.").

The warrantless seizure of material protected by the First Amendment "calls for a higher hurdle in the evaluation of reasonableness" under the Fourth Amendment. *Roaden v. Kentucky*, 413 U.S. 496, 504 (1973). Police departments should limit the circumstances under which cameras and recording devices can be seized and the length of the permissible seizure. BPD's general order does not convey that the warrantless seizure of recording material is different than the warrantless seizure of many other types of evidence, in that it implicates the First, as well as the Fourth, Amendment. General Order J-16 should make it clear to officers that, in the ordinary course of events, there will not be facts justifying the seizure of cameras or recording devices. Moreover, General Order J-16 does not define "temporary" seizure. BPD should clarify how long and under what circumstances an officer may seize a recording device, even temporarily,

and how the recordings on the device must be maintained after seizure. A policy permitting officers, with supervisory approval, to seize a film for no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant if that film contains critical evidence of a felony crime would diminish the likelihood of constitutional violations.

>    *F. Police departments should not place a higher burden on individuals to exercise their right to record police activity than they place on members of the press.*

The Supreme Court has established that "the press does not have a monopoly on either the First Amendment or the ability to enlighten." *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 782 (1978). Indeed, numerous courts have held that a private individual's right to record is coextensive with that of the press. A private individual does not need "press credentials" to record police officers engaged in the public discharge of their duties. *See e.g., Glik*, 655 F.3d at 83 ("The First Amendment right to gather news is, as the Court has often noted, not one that inures solely to the benefit of the news media; rather, the public's right of access to information is coextensive with that of the press."); *Lambert v. Polk County, Iowa*, 723 F.Supp. 128, 133 (S.D. Iowa 1989) ("It is not just news organizations . . . who have First Amendment rights to make and display videotapes of events—all of us . . . have that right."). The First Amendment "attempt[s] to secure 'the widest possible dissemination of information from diverse and antagonistic sources,'" including the "promulgation of information and ideas by persons who do not themselves have access to publishing facilities-who wish to exercise their freedom of speech even though they are not members of the press." *New York Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964).

This principal is particularly important in the current age where widespread access to recording devices and online media have provided private individuals with the capacity to gather and disseminate newsworthy information with an ease that rivals that of the traditional news media. *See Glik*, 655 F.3d at 84 ("[M]any of our images of current events come from bystanders with a ready cell phone or digital camera rather than a traditional film crew, and news stories are now just as likely to be broken by a blogger at her computer as a reporter at a major newspaper.").

BPD's general order appropriately does not place a higher burden on individuals to exercise their right to record police activity than in places on members of the press. Policies should not establish different guidelines for media and non-media individuals. BPD's general order includes language that accomplishes this goal:

>    "Members of the press and members of the general public enjoy the same rights in any area accessible to the general public." *Id.* at 4.

>    "No individual is required to display 'press credentials' in order to exercise his/her right to observe, photograph, or video record police activity taking place in an area accessible to, or within view of, the general public." *Id.*

These two provisions effectively convey that officers should not place a higher burden on individuals to exercise their right to record police activity than in places on members of the press.

### 3. Conclusion

Comprehensive policies and effective training are critical to ensuring that individuals' First, Fourth and Fourteenth Amendment rights are protected when they record police officers in the public discharge of their duties. If the parties determine that settlement of this matter is feasible, we encourage the parties to reach an agreement that is consistent with the guidance provided above. Please note that this letter is a public document and will be posted on the Civil Rights Division's website. If you have any questions, please feel free to contact us.

Sincerely,

*Jonathan M. Smith*  by SLS

JONATHAN M. SMITH
Chief
Special Litigation Section

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RICHARD FIELDS, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | No. 14cv4424 |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA et al., | : | |
| Defendants. | : | |
| ————————————————— | : | |
| | : | |
| | : | |
| AMANDA GERACI, | : | CIVIL ACTION |
| Plaintiff, | : | No. 14cv5264 |
| | : | |
| v. | : | |
| | :: | |
| CITY OF PHILADELPHIA et al., | : | |
| Defendants. | : | |
| ————————————————— | : | |

## DECLARATION OF R. PAUL McCAULEY

I, R. Paul McCauley, hereby declare:

1. I authored the attached report, dated September 23, 2015.

2. If called to testify at trial in these matters, I would offer the same opinions set forth in my report.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: <u>January 7, 2016</u>

/s/ R. Paul McCauley
R. Paul McCauley

**R. PAUL McCAULEY, Ph.D., FACFE**                    Telephone:
*Criminologist*                                        724-349-9676
4620 Lucerne Road                                      Fax:
Indiana, Pennsylvania 15701                            724-349-6477

_____

September 23, 2015

Jonathan Feinberg, Esq.
Kairys, Rudovsky, Messing & Feinberg, LLP
718 Arch Street
Suite 501 South
Philadelphia, PA 19106

> RE:  Amanda Geraci v. City of Philadelphia, et al.
>      No.:  14-cv-5264
>      Richard Fields v. City of Philadelphia, et al.
>      No.:  14-cv-4424
>      United States District Court Eastern District of
>      Pennsylvania

Dear Mr. Feinberg:

Please accept this letter as my report for the above-referenced
cases.  I reserve the right to amend this report should
additional information become available.

## I.   QUALIFICATIONS

I am Emeritus Professor of Criminology and former Chairperson of
the Department of Criminology, Indiana University of
Pennsylvania (IUP).  The University is a comprehensive, doctoral
degree granting institution with an approximate enrollment of
15,000 students.  The Department of Criminology offers
bachelors, masters, and doctorate degrees and has about 1,000
criminology majors.  I taught and conducted research at all
academic/degree levels.

I am a former Pennsylvania municipal police officer and in that
capacity I engaged in the arrest, handcuffing, transportation
and processing of individuals.  I am a graduate of Her Majesty's
Home Officer Police Detective Course (Scotland Yard, England).
For more than twenty-five of my 30 plus year career, I have been
a state certified police instructor in Pennsylvania, Kentucky,
and Florida.  In my academic duties, as well as in my police
training duties, I teach the policies and procedures of police
operations.  Also, I have written or published more than 80
professional papers, books, chapters, and technical reports,
many of which address the issues concerning police
administration, operations, and policies.

For almost ten years I was a member of the faculty of the Southern Police Institute, School of Police Administration, University of Louisville.  In that position I lectured to more than 1,500 police commanders from across the United States, including command officers of the Pennsylvania State Police, in the area of police operational policy formulation, which included police use of force.  More than 300 of these student officers have become police chiefs.  Also, I have received numerous letters and commendations from police executives for my work and contributions to their agencies.

In 1987, I was a Fulbright Scholar, Australia, lecturing to university faculties of law, justice studies, business, and police commanders, and security directors.  My lecture area was the relationship/interaction between public police and private security in the prevention of crime.

I hold the designations of Fellow and Diplomate of the American College of Forensic Examiners and have been qualified as a police expert in state and federal courts in more than 30 states, including United States District Court for the Eastern District of Pennsylvania.  In 1984, I was one of two finalists interviewed for the position of Commissioner of the Pennsylvania State Police.  The Pennsylvania State House of Representatives issued a formal citation recognizing my career and contributions to law enforcement.

Additional information is provided in my curriculum vitae, which is enclosed.

## II.  INTRODUCTION

I was retained by Kairys, Rudovsky, Messing & Feinberg, LLP, to review the case materials and render a professional opinion regarding the Philadelphia Police Department operations involving Ms. Geraci on September 21, 2012 and Mr. Fields on September 13, 2013.  These police operations included the stopping, detention, arrest, and the use of force involving the above-referenced parties for observing or recording police activities.

My $3,500.00 retainer/minimum to which I bill at the rate of $350.00 per hour was paid in advance of my rendering any analysis or opinion and payment was not contingent upon my rendering a favorable opinion.

## III. METHODOLOGY

My examination and analysis of this matter are based on generally accepted qualitative methodologies commonly used in the social sciences. These techniques include comparative analysis, ethnography/description, content analysis, and case study in assessing compliance with and deviations from accepted police/law enforcement operational and managerial practices.

This report is being offered as an expert forensic report for the purpose of this litigation. It is based on the best practices of police/law enforcement management and operations and the information provided in the above-listed materials.

This report is limited only to post-academy in-service matters relevant to PPD police response to people recording police in public places, that are at issue in this litigation.

## IV. MATERIALS REVIEWED

In the preparation of this report I have reviewed the following materials, which are commonly examined in my profession and discipline in rendering professional/expert opinions:

1. Complaint Re: Amanda Geraci;
2. Complaint Re: Richard Fields;
3. Documents Bates Stamped 347-388;
4. Police Commissioner's Memorandum 11-01;
5. Frank T. Healy Deposition November 26, 2013, Re: Alexine Fleck;
6. Captain Francis Healy Deposition May 27, 2015;
7. P-17 (Healy Memorandum Re: Need for training);
8. Directive 145 *Pictures, Video, and Audio Recordings of Police Officers While Performing Official Functions in Public Places* and training notices;
9. P-18 (Enhanced training module on Dir 145);
10. P-19 (Power point on enhanced training).

## V. SUMMARY OF FACTS

Because I have been asked to address a specific time relevant issue, I shall summarize the facts as a chronology of activities related to Philadelphia Police Department (PPD) Directive 145 training and supervision prior to September 2013.

Pre-September 2011    Several news articles about PPD officers smashing and/or arresting people who are recording police

|                     | activities/conduct.  ACLU quoted in the press as saying this is a problem and having three clients preparing to sue the PPD. |
| --- | --- |
| September 2011 | Commissioner Ramsey tells Legal/Special Advisor Francis Healy (aka, Frank Healy, Captain Healy, Fran) that police smashing cameras and phones is a national problem and for the PPD to get ahead of the issue. |
| September 23, 2011 | Police Commissioner's Memorandum (11-01) was issued to the PPD generally, to address this issue.  Read or referenced at roll-calls for the next three days. |
|  | Prior to issuing this Memorandum, Capt. Healy, through his own random conversations with PPD officers, was aware that officers did not know people were permitted to record police. |
| March 22&23, 2012 | Letter/complaint from citizen to Commissioner Ramsey and Commissioner's response, respectively, with a copy of Memorandum 11-01 enclosed. This correspondence predates Directive 145. |
| May 14, 2012 | US Department of Justice letter to Baltimore Police Department with recommendations regarding recording of police. |
| **September 21, 2012** | **Amanda Geraci incident.** |
| November 9, 2012 | At Commissioner Ramsey's order, Police Commissioner's Memorandum (11-01) was upgraded to official  Directive 145 and issues to the PPD.  Directive 145 included recommendations made by the U.S. Department of Justice to the Baltimore Maryland Police Department. |
| March 15, 2013 | Capt. Healy was sent a copy of a Memorandum by Charles F. Volz, Jr., Secretary of Police Advisory Commission |

(PAC).  The Memorandum, addressed to
Commissioner Ramsey, stated in part,
"Recent news accounts indicate that
Philadelphia Police officers are not
adhering to Philadelphia Police
Department Memorandum 11-01....
Additionally, the internal affairs
database shows at least eight citizen
complaints since 2011 where people were
allegedly retaliated against for
videotaping police.  Six of those
incidents occurred AFTER the directive
was issued in September 2011.  One of
the more serious cases involving the
videotaping of police from 2012
resulted in partially sustained charges
against two officers, who received
training and counseling.

March 18, 2013 to    Directive 145 read at roll-call for
   July 2013         seven consecutive days.  This reading
   November 2013     was restarted in November 2013.

**September 13, 2013    Richard Fields incident**

November 26, 2013    Frank T. Healy is deposed in the
                     matter of Alexine Fleck.  His testimony
                     includes the following information;

- Police commanders read and use the
  press for information about
  performance and problems.
- Memorandum 11-01 was handed out
  and read at roll-call for three
  days starting on 9/23/2011.
- Prior to issuing Memorandum 11-01
  he spoke with random officers and
  discovered they were confused
  about whether citizens could
  record police.  He did not speak
  with sergeants or lieutenants.
- The PPD never followed up to see
  if officers were complying with
  Memorandum 11-01.
- The PPD has no formal process to
  collect and retrieve specific
  information/complaint category

regarding incidents involving
people recording police—sergeants
and lieutenants may have counseled
officers.  If personal property is
damaged (ex. recording device)
that likely would be in incident
report narrative.

- Not aware of any PPD internal
  investigation being initiated
  involving the recording of police
  based on a newspaper report/clip.

December 18, 2013    Francis Healy sends a Memorandum to
Nola Joyce, Deputy Commissioner in
which he states, in part, "I was
recently deposed by plaintiff's
counsel regarding several lawsuits and
it became very clear that the PPD could
have done more training when the policy
initially was implemented.  It appears
the only training that was provided was
roll-call training.  Since our policy
is so proactive, plaintiff's counsel
spun their argument towards our failure
to properly train.  The facts in each
of the lawsuits occurred after the
effective dates of both the PC
memorandum and Directive 145, so there
is some credence in the plaintiff's
argument."

"That said, I am respectfully
recommending that Advanced Training
develop and implement a training
module, presentation or video on the
duties and responsibilities associated
with the above Directive."

January 2014         Every member of the PPD began to
receive about 45 minutes of Advanced
Training at involved lecture, power
point presentation, plus class
participation discussion focused on
Directive 145.

May 27, 2015         Captain Francis Healy is deposed in
the matter of Amanda Geraci.  His
testimony includes the following

information:

- In response to the PAC Memo, the roll-call lecture on Directive 145 was read at roll-call for seven days, twice a month for six months March – July and restarted November to January 2014. Normally, directives are read at roll-call for three days, not seven.

  The January 2014 Advanced Training was the solution to get the officers convinced this is of constitutional importance. Advance Training Power Point (P-19) states, "This class will discuss 13 directives and 1 Commissioner's Memorandum, not in their entirety. It is YOUR responsibility to read and understand all department policies."
- A Directive as long as Directive 145 would not be read in full at roll-call but summarized and introduced.
- The PPD could/should have done more to convince officers to comply with Directive 145.
- He got "pushback from officers beginning in 2012 about whether people really had a right to record the police."
- Beginning January 2014 every member of the PPD received about 45 minutes of lecture plus class participation discussion focused on Directive 145.  The instructors did not generate their own scenarios, they came out of questions/discussions.
- From his observation of the officers' advanced training they had a much better appreciation and understanding that this issue is a

Constitutional/First Amendment right.

- This was a very hot topic issue and a Constitutional issue. A new Constitutional right officers not aware of, it is important.
- Because officers and supervisors often read in a directive what is pertinent to them, the advanced training included the background information that is important, too. This was PPD's failing.
- In less than a month after his November 26, 2013 deposition he got things moving on the advanced training. He realized only roll-call training was not sufficient.
- Memorandum 11-01 did not mention the Constitution but Directive 145 did.
- Recording police became a "hot button" issue with PPD officers when the Justice Department wrote a letter to the Baltimore Police Department.
- The repeated roll-call readings of Directive 145 were not sufficient and Advanced Training was developed.
- In May 2014 or earlier he saw indications officers knew recording was a Right. He did not ask Internal Affairs about complaints relevant to Directive 145.

## VI. ANALYSIS, DISCUSSION, AND OPINIONS

Question to be Addressed: Did PPD policy makers know/should they have known, prior to September 2013, that failing to provide better training and supervision would result in more people being retaliated against for recording officers?

Answers to the Question: Yes, PPD policy makers knew/should have known, prior to September 2013, that existing training and supervision regarding Directive 145 was ineffective and that failing to provide better/improved/different training

and supervision regarding Directive 145, would result in
continued officer misconduct with more people being retaliated
against for recording officers.

The ineffective training and related supervision prior to
September 2013, regarding Directive 145, created a deviant
police culture and/or practice of retaliating against people.

## A.   Definitions

Before two people can communicate effectively they must agree on
definition.  Therefore, for the purpose of this report, I shall
define the following terms as:

Communications and Information:  Communication and information
are not synonymous terms.  Communication is the process of
passing on information.

Organizational Culture:  Organizational culture is a system of
shared assumptions, attitudes, values, and beliefs, which govern
how people behave in organizations.  These shared qualities are
an invisible and powerful force unique to each organization that
influence how work is performed.

Planning:  Planning is the careful development of methods to
achieve desirable goals or conditions.  Planning includes
discovering the potential need for a plan, formulating a
statement of objectives, collecting relevant data, developing
details of the plan, and obtaining concurrence from those
affected by the plan.

Roll-Call Training:  Roll-call training is periodic training,
commonly held weekly or daily, during pre-work shift roll-
call/briefings.  Training may consist of brief lectures,
demonstrations, and discussion in sessions lasting about 15
minutes.  The time is considered part of the work day.

Skill:  An ability and capacity acquired through deliberate
systematic, and sustained effort to smoothly and adaptively
carry out complex activities or job functions involving ideas
(cognitive skills), things (technical skills), and/or people
(interpersonal skills).

Supervision:  Supervision involves, in part, training and
maintaining control of employees so that their behaviors are
consistent with organizational goals and the evaluation of
employee performance.

Training:  Training is teaching or developing and skills and knowledge that relate to specific and useful competencies. Training has specific goals of improving an individual's capability, capacity, productivity, and performance.  Training attempts to change values and beliefs.

These and other terms may be enhanced and defined in context as appropriate.

B.  **The PPD Culture:  Background and Insights**

During the past 20 years, as an expert, I have examined approximately 20 cases involving the Philadelphia Police Department.  Those cases involved numerous on-duty and off-duty use of force, vehicle and foot pursuits, firearms discharges, Emotionally Disturbed Persons (EDP), tactics, Tasers, CIT, SWAT, Internal Affairs, supervision, training, inspection, and policy/directives, as examples.

During those examinations I have reviewed more than 1,000 internal affairs investigations with the related policies, procedures, and training.  Also, in a research capacity with Professor James Fyfe, then at Temple University, I have reviewed numerous other internal affairs investigation files and related records, policies, and other documents.

The Commissioner of the Philadelphia Police Department (PPD) requested the Department of Justice (DOJ) to review the PPD's use of deadly force.  The following report was issued by the U.S. Department of Justice:

> George Fachner, Steven Carter.  *COLLABORATIVE REFORM INITIATIVE:  An Assessment of Deadly Force in the Philadelphia Police Department*.  Community Oriented Policing Services, U.S. Department of Justice (DOJ), [March 2015].

This report is not the first investigation of the PPD use of force, policies, training, supervision, enforcement activities, internal investigations, and discipline, all of which are interrelated.  These inquiries include the PPD's own Integrity and Accountability Office Philadelphia Police Department Reports:

a.  First Report 1997,
b.  Second Report 1998,
c.  Use of Force July 1999,
d.  Disciplinary System 2001 and 2003,

  e. Enforcement of Narcotics Laws July 2002,
  f. Officer-Involved Shootings February 2005.

Additionally an external report was issued titled *Philadelphia Police Department Use of Force Assessment:* Police Executive Research Forum, July 2009.

The PPD knew and should have recognized and acknowledged long before the DOJ investigation was conducted that serious use of force related problems existed and needed to be fixed. The City knew or should have known many of the issues and taken appropriate managerial actions. The DOJ report is well done but it presents no surprises to those who have been involved with the PPD. An underlying issue is the lack of internal expertise (ex. inspections, training, planning, and research) within the PPD to address the PPD itself. Further, reports presented in a variety of PPD lawsuits, by numerous experts, in the field of law enforcement, provided consistent insights and recommendations as to PPD policy, training, tactical, and operational deficiencies. I have no information the PPD systematically analyzed these readily available expert reports.

The DOJ report (2015) is quite revealing regarding the PPD's training culture. It is undisputed that the police stand apart from all other public services in that they are lawfully empower to use deadly force. As such, police recruit (basic academy) training invests significantly in the general use of force and firearms training. However, PPD officers are to be trained annually to maintain a level of firearms proficiency (marksmanship—how to shoot) and a level of understanding of the use of force policy that provides the why/when to shoot. The DOJ report states, in part:

> As training at the academy sets the foundation for an officer's career, acquired experience and exposure to in-service training opportunities will also shape the progression of their career, and the quality of performance during their time in law enforcement. Through in-service training, officers have the opportunity to acquire new skills [such as what to do when people record the police] as well as refresh, or update, those that were initially learned during recruit academy (Chapter 6 In-Service Training, p. 76). [Added by this author]

> **Finding 1**: PPD officers do not receive regular, consistent training on the department's deadly force policy. The officers complete a 20 question multiple choice exam on use of force at the completion of their annual firearms

qualification, yet just one question pertains to deadly force.

**Finding 8:** CIT is meant to train officers on the recognition of individuals who are in crisis (due to mental health or other temporary impairments) and then to employ de-escalation strategies, including verbal de-escalation, so that when possible, encounters with persons in a state of mental crisis can be resolved without violence. ... many officers we spoke with referred to CIT training as "taser training" because they viewed obtaining the tool as the primary outcome of the training.

**Finding 9**: The PPD's ECW [ex. Taser] policy drafted in 2014 is not detailed enough regarding the circumstances in which use of the tool [Taser] should be limited.

**Finding 15**: For some PPD recruits, de-escalation training has been little more than lecture and observations. Focus group participants generally agreed that more de-escalation training was needed at the academy.

**Finding 23:**... officers do not regularly receive in-service training on threat perception, decision making, and de-escalation.

**Finding 25: [training]** The PPD lacks a comprehensive scenario playbook that includes a diverse set of scenarios relevant to policing Philadelphia.

**Finding 30:** PPD officers do not receive in-service defensive tactics training. After officers leave the academy they do not receive any additional defensive tactics training during the course of their careers. Officers who lack confidence in their ability to subdue a resistant or aggressive offender may be more likely to resort to excessive force or lethal options to gain compliance.

Recommendation 44.1. The department should establish a permanent office for organizational learning and improvement related to officer safety, tactics, and use of force.

Given the PPD's shortcomings in training officers in the most important aspect of law enforcement-use of force-it is not surprising the PPD was deficient in its timely and comprehensive training and supervision of officers regarding the public

recording (audio and/or video) of police activities in public places.

Supervision, Training, and Planning

Supervision is crucial for having officers comply with policies and the attendant training.  Historically, from my experience with the PPD, the police sergeant/first line supervisor is operationally nominalized, in that s/he is not actively involved in the roll of a supervisory trainer.

Whisenand (1976) states "Foremost, the role of the supervisor is trichotomized into the following sub-roles:  control, training, and leadership...."  Whisenand, Paul W.  *Police Supervision,: Theory and Practice*. 2ed Ed.  New Jersey:  Prentice Hall, p. vii).

Wilson and McLaren, state:

> A consistent, nagging and troublesome problem confronting police administrators-particularly in the largest departments in the country-is the difficulty in transmitting policy to personnel at the operational level because of the mechanics of communication and the breakdown of policy and procedures as a result of deficient supervision.

> To subordinates he [sergeant] must interpret the purpose of the plan [policy], explain its desirability, and instruct [train] and assist in its execution; for superiors he [sergeant] must be alert, discover evidence of the success or failure of the plan [policy], to detect weaknesses and recommend changes to meet actual needs....

> The principal supervisory [supervisors at all levels-ranks] task-the sine qua non of the job-is advising subordinates of ways in which performance can be improved. (Wilson, O.W. and McLaren, Roy.  Police Administration, 3rd  Ed.  New York:  McGraw-Hill 1972, pp. 136-137.)

Fyfe, et al. (1997) state, in part;

> ***Supervisory Training.***  Nobody is more important than the field sergeant to the success or failure of day-to-day operations.  The sergeant translates departmental directives and policies into practices  James J. Fyfe, et al. *Police Administration,*  5th Edition. Boston:  McGraw Hill (p. 322).

>    ***Training Plans.*** Recruit, in-service, career development,
>    and roll-call training should be planned, as should
>    curricula, schedules, lesson plans, and examinations.
>    (Ibid p. 234).

The roll of the supervisor, or lack thereof, regarding the
implementation of Memorandum 11-01 and Directive 145 will be
addressed later in this report.

## C.    Statement of the Problem and Responses to the Problem

In September 2011 the PPD, through professional national police
conferences/organizations and local newspaper/media reports, was
aware of the emerging problem of improper police response to the
public recording (audio and/or video) of police activities in
public places.  The misconduct included false arrests, excessive
force, destruction and confiscation of recording devices as
examples.

The PPD determined that a new policy needed to be formulated to
address police response to the technology that is available to
the general public allowing people to record (audio and/or
video) police activities in public places.  Further, it was
determined this was a "hot button" issue, and more importantly a
Constitutional issue requiring immediate action.  On September
23, 2011, the PPD issued Police Commissioner's Memorandum 11-01,
which did not mention the Constitution but did present *Purpose,
Policy, and Seizures of Any Recording Devices.*

Captain Healy got "pushback from officers beginning in 2012
about whether people really had a right to record the police."
News reports and random interviews by Captain Healy with police
officers demonstrated that officers were not complying with
Memorandum 11-01 and the PPD took no corrective actions.  For
unrelated reasons, Directive 145 was issued, superseding
Memorandum 11-01 and read at roll-call for seven consecutive
days starting March 18, 2013 to July 2013.  Since Directives are
normally read at roll-call for three days, it is clear this
Constitution-based Directive was a hot button-important-urgent
issue.

Within a month after Captain Healy's November 26, 2013
deposition where plaintiffs' counsel presented numerous news
articles of police officer misconduct regarding Directive 145,
it was apparent the PPD should have done more and gotten things
moving resulting in a formal advanced training module for
Directive 145 being presented to officers beginning in January

2014.

## D. Police Constitutional Misconduct: A Priority

It is significant that in September 2011, when Commissioner Ramsey was made aware of this emerging national problem, he issued Memorandum 11-01 within days (less than 23 days) with the Memorandum being read at roll-call for three days starting on September 23, 2011. This fast action indicates clearly that the PPD considered the improper police response to the public recording (audio and/or video) of police activities in public places and important an urgent matter to be addressed. However, this Memorandum failed to include mention of the Constitutional importance.

The PPD, with approximately 6,500 members, appropriately selected the line officers, by shift, at roll-call to receive/be read Memorandum 11-01. However, from the evidence I saw nothing to suggest the roll-call supervisors (readers) were trained and understood the meaning and importance of the Memorandum. Merely reading (communicating) the Memorandum does not mean the supervisors or the officers understood the Commissioner's intent. Without understanding the intent of the Memorandum supervisors cannot reasonably lecture/explain its meaning. Also, it is known that exposure to information does not ensure understanding of the information.

By November 9, 2012 it was known that officers were not complying with Memorandum 11-01. Nevertheless, when it was upgraded to a formal directive, Directive 145, it was communicated to officers in the same way. From March 18, 2013 to July 2013 Directive 145 was read at roll-call for seven consecutive days. Again, from the evidence, I saw nothing to suggest the roll-call supervisors (readers) were trained and understood the meaning and importance of Directive 145, however, the Directive included the Constitutional background for the Directive.

On December 18, 2013 when Captain Healy sent a Memorandum to Nola Joyce, Deputy Commissioner, it was known that Directive 145 related police misconduct occurred after the effective dates of both the Memorandum 11-01 and Directive 145. Likewise, the argument of a lack of training had some credence and it became very clear that the PPD could have done more training when the policy initially implemented. As a result, beginning January 2014 every member of the PPD received about 45 minutes of lecture plus class participation discussion focused on Directive 145. No scenarios were generated by the trainers.

Also, an Advanced Training Power Point presentation gives the general mandate,

> This class will discuss 13 directives and 1 Commissioner's Memorandum, not in their entirety.  It is YOUR responsibility to read and understand all department policies.

From a management perspective, two points are immediately apparent, What is not going to be discussed and how does an officer know s/he correctly understands a directive?  This is problematic because it shifts the responsibility to the officer and it does not hold trainers or supervisors accountable for presenting information that is correct and understandable for the officers/students.  An officer may assume s/he understands a directive, when in fact s/he does not.  Clearly, supervisors must understand correctly directives so they can help subordinates understand/learn correctly.  Supervisors are monitors and teachers/instructors for the purposes of detecting poor performance and of helping subordinates acquire and improve essential skills needed to perform the tasks assigned to them.

Captain Healy was aware that the PPD could have done more training when the policy was initially implemented.  More directly, the PPD should have done more regarding the training and supervision of officers knowing that a failure to do so would likely result in physical, economic, and Constitutional harms to citizens who record police.

**E.    Need for Immediate and Most Effective Organizational Response:  Training, Supervision, and Planning as a System**

The PPD is to be viewed as an organization system.  Miller states that "organizations are complex systems composed of subsystems essential for the existence of the organization."  See, James Grier Miller. <u>Living Systems</u> McGraw-Hill Book Company, 1978, (p. 1).  Also, Stojkovic, et al. look at criminal justice organizations, including police organizations, as "subsystems in an open and complex system operating in a dynamic environment.  Criminal justice/police leaders must understand they are not in a neat and simple closed system" (pp. 8-9).

Simply, in context, addressing the issue of proper police response to people recording police in Philadelphia, will require the systematic involvement and coordination of various components of the PPD.  These components include the Commissioner, legal advisor, training, field supervisors,

internal affairs, and the street officers (consumers).  Because
this issue was determined to be both important and urgent, it
was necessary to act quickly, but comprehensively.

I agree with the statement that the "PPD should have done more"
in September 2011.  However, what does "more" mean,
realistically?  In September 2011 the PPD took an "ivory tower"
approach to this problem with the idea of resolution being
developed at the top of the organization, without input from
internal affairs or line sergeants/lieutenants, reduced to
writing as Memorandum 11-01, and sent to the bottom of the
organization where it was read to line officers at roll-call.
The reader's (commonly sergeants/lieutenants) level of
understanding of the Memorandum's content was not determined
before the readings.

The PPD's approach was not reasonably planned.  Merely drafting
a two page memorandum and reading it numerous times at roll-call
was insufficient.  A reasonable, realistic, comprehensive, and
yet simple plan would include **more**.  Sometimes these plans are
referred to as 3x5 card plans because they are short and can be
presented on a 3x5 card.

Nevertheless the framework of a September 2011 plan would
include, as examples:

- Gather available data simply by asking Internal Affairs and
  field sergeants/lieutenants how many "recording police"
  incidents they have had and what happened—arrests,
  injuries, confiscate, or damage property
- Write Memorandum 11-01 (including the Constitutional
  imperative)
- Prepare roll-call lesson plan with one or two scenarios
  (one page)-to include demonstration/role play, and
  discussion
- Train the trainers (field sergeants) first-at sergeants
  only roll-calls or via available department technology
- Deliver roll-call training with scenarios and participation
  to the street officers
- Get feedback from (ask) officers, supervisors (compliance
  monitors), and IA periodically—using available departmental
  communications-technology  to determine effectiveness of
  training (performance)

The above plan should have been developed and implemented no
later than a month after Captain Healy, in 2012, was getting
"pushback from the officers about whether people really had a

right to record police. (If the Advanced Training was developed within a month and implemented in January 2014, the same could have been accomplished in 2012).

<u>Learning and Training Techniques</u>

Training is the organizational mechanism for translating policies and procedures into useable and effective police skills that yield expected performance.  O. W. Wilson, the former Dean of the School of Criminology at U.C. Berkeley and later Chicago Police Superintendent states;

> **Purpose of Training**. The purpose of training is to make sure the officer performs all tasks with ease and in such a way as to ensure his safety and the safety and satisfaction of the public.  This is accomplished by developing such skill....  The act is preceded by a decision; therefore training must provide a background of knowledge acquired through either actual or simulated experiences against which current situations may be related for judgment. (O.W. Wilson. *Police Administration*.  2nd Edition, McGraw-Hill, 1963, p. 161.)

Because roll-call training is a form of in-service training (post-basic academy training) officers of varying ages and years and type of service experiences are in the audience, merely reading Memorandum 11-01 likely will not be the most effective approach to learning/understanding this subject and the associated organizational procedures and expectations.

The word lecture comes from the Latin word *lectus* which translates roughly as "to read."  For those who have experienced lectures in training and/or educational settings, know lectures can be delivered to a large audience, they are one-way, passive, and not the most effective learning technique.  Better techniques include lectures that include participation and discussions that incorporate practical problems and scenarios. The DOJ report recommended as a best practice that the PPD develop scenarios for use of force training.  This best practice is applicable to "recording police" training as well, especially considering potentially wide ranging ages of the police audience.  Including scenarios at the roll-call training in September 2011 would have been **more.**  The issue of adult learning is real and has a body of knowledge called andragogy. Almost by definition, police supervisors are older and certainly adults.  As such, training the trainers (adult sergeants) in the specifics of Memorandum 11-01 and Directive 145 poses its own issues that the PPD must recognize and accommodate.

The effectiveness of the lecture/reading method of learning has both pros and cons, and although it must not be dismissed completely, research continues to encourage other teaching/learning techniques. Bajak (2014) wrote:

> *Lectures Aren't Just Boring, They're Ineffective, Too, Study Finds*
>
> The meta-analysis, published online today [May 12, 2014] in the *Proceedings of the National Academy of Sciences*, concluded that teaching approaches that turned students into active participants rather than passive listeners <u>reduced failure rates and boosted scores on exams by almost one-half a standard deviation.</u> (http://news.sciencemag.org/education/2014/05/lectures-arent-just-boring-theyre-ineffective-too-study-finds)

The Royal Canadian Mounted Police (RCMP) Training Bulletin *Methodology: Interactive Learning* (03/02/2009), states in part:

> No longer are course candidates expected to sit and absorb knowledge by listening to traditional lecture mode of instruction.
>
> Today's methods focus on adult learning. The instructor/facilitator facilitate the learning process, and while lectures as a means of training have not disappeared, they have been complimented by such methods as Problem-based Learning....

Although this RCMP bulletin is about Academy training, it recognizes the deficiencies of reading/lecturing, which are applicable to roll-call training.

From my review of the evidence, in September 2011 the PPD command staff did not have a reasonable plan to develop and implement a viable "police recording" policy with the necessary training program to address a critically important and urgent need. As a result, officers and supervisors, prior to September 2013 were not reasonably trained in the subject matter that evolved into Directive 145.

**F. Accountability, Change, and Culture: Conclusion**

Walker states,

> The basic goal of the new police accountability is

organizational change.  This represents a significant
shift from a long-standing police reform emphasis on
individual officers, or what is often called the rotten
apple theory of police misconduct.  The rotten apple theory
persists and motivates many community activists because it
has powerful emotional and political appeal.  It
personalizes misconduct and gives it a human face.
Unfortunately, it is simplistic and ineffective.  Most
important, it does not address the underlying
organizational and management causes of unjustified
shootings and persistent use of excessive force.  The new
accountability thinks instead in terms of "rotten barrels,"
and directs its energies toward fixing the barrel.  The
changes involved, however, are decidedly lacking in
emotional appeal:  complex administrative procedures that
have no human face, are difficult to implement and even
harder to maintain over the long term, and whose results
lie in the future rather than in the emotionally charged
present.  Firing a cop or a police chief has a certain
cheap appeal, and chiefs can be rather easily dismissed.
Far more difficult is the task of changing the culture of a
police department, in the sense of developing informal
norms of professional conduct and a habit of reporting and
investigating misconduct. (Walker, Samuel, *The New World of
Police Accountability*, Thousand Oaks, CA: Sage, 2005, p.
14).

The complex administrative procedures that have no human face
are fundamental to the PPD's approach to addressing the issue of
the police response to people recording police.  Clearly, in
2011 Commissioner Ramsey correctly identified the need for a
plan to train and monitor police performance related to this
issue and to hold officers accountable for misconduct.  However,
as discussed in this report, the PPD did not carefully develop
methods to achieve the desired goals that include training to
achieve officer and supervisory competencies.  Additionally,
Captain Healy did not speak with sergeants or lieutenants, and
the PPD never followed up to see if officers were complying with
Memorandum 11-01.  The PPD had no reliable performance measures
or indicators to assess the impact of the roll-call readings.

It was unreasonable for the PPD to expect merely reading a
complex Memorandum-Directive at roll-call would result in
meaningful changes in officer performance when responding to
people recording police.  This is particularly true when the
PPD's expected performance from officers is counterintuitive to
the existing police culture that exhibited "pushback" to the
idea that people really could record the police.

The PPD's failures to train and supervise regarding the instant subject matter resulted in an ineffective organizational attempt to change the values and beliefs (the PPD culture) of officers and supervisors regarding the importance of this new Constitutional mandate.  The PPD culture includes all levels of the organization including command and staff.  The command and staff culture, did not give high priority to planning policy formulation and implementation, regarding in-service training generally.  This is evidenced by numerous studies/reports within and external to the PPD, including the March 2015 DOJ report regarding the Use of Deadly Force.

**VII.  OPINIONS WITH RELEVANT COMMENTS**

Based on my review of the above-listed materials, my experience and professional qualifications in criminology, criminal justice organizations, operations, and procedures, I offer, in addition to or with all opinions expressed above, the following opinion(s) within a reasonable degree of professional certainty.

1.    PPD policy makers knew/should have known, prior to September 2013, that existing training regarding people recording police, generally and Directive 145 specifically, was ineffective and that failing to provide better/improved/ different training and supervision regarding Directive 145, would result in continued officer misconduct with more people being retaliated against for recording officers.

Sincerely,

*/s/ R. Paul McCauley*
R. Paul McCauley, Ph.D., FACFE

Attachments

Copy of Curriculum Vitae – R. Paul McCauley, Ph.D., FACFE
Summary of Expert Experience
List of cases in which testimony was given the last four years.

<u>CURRICULUM VITAE</u>

RANDALL PAUL MCCAULEY, PH.D., FACFE

4620 Lucerne Road
Indiana, Pennsylvania    15701
(724) 349-9676
rpaulmccauley@gmail.com

<u>PERSONAL DATA</u>

| | |
|---|---|
| Address and Telephone: | 4620 Lucerne Road<br>Indiana, Pennsylvania 15701 |
| Date of Birth: | 13 January 1943 |
| Place of Birth: | Highspire, Pennsylvania |
| Marital Status: | Married Gail Lee Gummo<br>30 January 1965 |
| Children: | Brent Clayton McCauley<br>Born 28 December 1980 |
| Military: | United States Marine Corps<br>2 January 1962 - 29 April 1966<br>Honorable Discharge |

<u>EDUCATION AND TRAINING</u>

1980      Research Accepted for M.Phil. as Post Doctorate,
          Cambridge University (England), Clare College.

1973      Doctor of Philosophy (Fellow), Sam Houston State
          University.  Criminal Justice Administration.

1971      Master of Science (Fellow), Eastern Kentucky University
          Higher Education - Criminal Justice.

1969      Bachelor of Science, Virginia Commonwealth University
          Administration of Justice/Sociology.

1968      Associate of Science, Harrisburg Area Community College
          Public and Police Administration.

1967        Her Majesty's Police College and Home Office
            Detective Course, Bramshill and Liverpool, England
            (12 weeks - Certificate).

PROFESSIONAL CERTIFICATIONS AND DESIGNATIONS

1995-1996   Board Certified Forensic Examiner* and Life Fellow
            American College of Forensic Examiners. (*Not a
            state certification or license)

PROFESSIONAL EXPERIENCE

Present                      Professor Emeritus and practicing
                             criminologist
1 June 1987 - June 2010      Professor of Criminology (tenured 15
                             August 87).

July - September 1987        Fulbright Senior Scholar -Sociology/
                             Social Work.  Visiting Fellow (See
                             Fulbright, Summary.) School of
                             Business, Phillip Institute of
                             Technology, Australia.

December 1982 -              Chairman, Department of Criminology.
1 June 1987.                 Professor of Criminology, Indiana
                             University of Pennsylvania.
                             Responsible for a department of 650
                             undergraduate and graduate students
                             and fourteen faculty members and
                             staff.  Duties included departmental
                             budget, personnel management and
                             supervision, curricular review, and
                             representing the academic discipline
                             for the University on and off campus.
                             The department's extraordinary
                             accomplishments in a relatively short
                             period of time reflects my philosophy
                             of management and administration,
                             i.e., provide opportunities for
                             everyone to seek excellence in their
                             own contributions to the goals of the
                             organization.  Participation (real
                             participation) risk taking, non-
                             conformity, developing strengths and
                             accepting weaknesses are the essence

of success.  My role is one of being a facilitator of success, a leader rather than a manager.

| | |
|---|---|
| 1 July 1981 –<br>31 December 1982 | Professor (Tenured), Director of Graduate Studies, Associate of the Southern Police Institute and the National Crime Prevention Institute, School of Justice Administration, University of Louisville, Louisville, Kentucky.  Member of the Graduate Faculty and Graduate Council.  Active in Planning University Sponsored Programs (NIH-NIMH-LEAA-HEW-NEH). |
| June 1976 - June 1981 | Associate Professor (Same as above) Develop, implement, and maintain graduate programs at the Master's and Interdisciplinary Doctoral levels. Acquire and direct grants ($100,000 plus) in support of graduate programs. Prepare and evaluate curriculum and graduate faculty recruiting plans. Coordinate all graduate programs with the various academic bodies of the University and the State Council on Higher Education.  Teach, conduct and supervise research. |
| June 1973 - June 1976 | Assistant Professor |
| June 1969 –<br>September 1970 | Administrator, Burns International Security Services Inc., Richmond, Virginia.  The second executive position in the Richmond office. Responsible for monitoring $5-million budget, plus a $1 million electronic alarm center.  Develop and implement sales and maintenance policy for management and operation duties.  The office employed 700 personnel plus an office staff of 20.  Reported directly to manager.  Just prior to leaving this position to return to graduate school, I |

was offered a position as assistant regional manager in Philadelphia, Pennsylvania, and later assistant to the President.

1961-62, April 1966 –
September l969*       Highspire Borough Police, Highspire, Pennsylvania.  1961 Special and Aux. police captain.  General patrol and Training Captain (1968) area police personnel and assigned to state training grant. Commander/coordinator of special police and Aux. units. NRA certified police pistol, rifle, shotgun instructor.  Qualified Distinguished Police Marksmanship (NRA). Life-Saving and First-Aid certified. Air observer- NCSHP.  BIG-M Security

January 1962 –
April l966            Ordnance NCO, United States Marine Corps.  Maintain ordnance ready status and security of Marine Air Station. Also, maintain and supply ordnance components to line units from Air Station Ordnance Center.  Leader of eight man ordnance team.  Training NCO/Coordinator for NBC warfare. (Awarded Good Conduct and National Defense Medals—honorable discharge.)

*Related Notation-1984   Nominated by command officers of the Pennsylvania State Police for position of Commissioner/Colonel of the Pennsylvania State Police (one of two finalists)

<u>PRINCIPAL MEMBERSHIPS</u>

- Police Executive Research Forum, 2007-.
- Inducted Phi Kappa Phi, National Honor Society, March 2002.
- Fellow, American College of Forensic Examiners (Life) as Board Certified Forensic Examiner, Diplomate American Board of Law Enforcement Experts, and Certified in Homeland Security III.
- Fulbright Association, 1992-Life (Australia 87).
- Academy of Criminal Justice Sciences, l972 – 1987, Member of the Executive Board and Trustee, 1980 – 1982 (Three National Committee Chairmanships) l978, 1979, 1980 President, 1985-1986.

(Life member)  Charter member Police Section, 1990.  Charter member Security Section 1991.  Member, section on Women, 1991.
- International Association of Chiefs of Police, 1988 - Present.
- American Correctional Association, l973 - l979.
- American Society for Industrial Security, 1970 - l980; 1988 - Present.
- American Society of Criminology, Life member.
- American Society for Public Administration, l976 - 1983.
- Criminal Justice Research Society, (Life)
- Alpha Phi Sigma, National Criminal Justice Honor Society (National Faculty Advisor l980-8l), 1969 - (Life).
- Kentucky Association of Criminal Justice Educators, l973 - 1982,  Vice President, 1977-l978, Trustee, 1979-1980.
- Northeastern Association of Criminal Justice Educators, l983 - Present.
- Pi Gamma Mu, National Social Science Honor Society, Life
- Virginia Commonwealth University Alumni Association, 1969 - Present.
- Fraternal Order of Police (Active) 1966 - 1991 (Life membership awarded 1991).
- National Rifle Association Life 1965-Patron Member 2012.
- Eastern Kentucky University Alumni Association, l970 - Present.
- Sam Houston State University Alumni Association, l973 – Present.

## PRINCIPAL LECTURES (INVITED)

- Fulbright Lectureship (Senior Scholar) Crime in the Workplace: Security and Police Interactions to Reduce Crime, Liability and Negligence.  l987 Australia.  (See Fulbright, Summary).

- Her Majesty's Police College The Police Establishment:  Over Managed and Under Led, Bramshill, England.  March 1987.

- Yale University Silliman College, l984. "Criminology in the Complex Mosaic of Higher Education."

- Harvard University, Institute of Politics, Kennedy School of Government, Cambridge, Massachusetts, l976.  Topic "Human Behavior and Crime Prevention Policy."

- Massachusetts Institute of Technology, Innovative Resource Project, Cambridge, Massachusetts, l973.  Topic "The Levels of Analysis-Reported Crime."

- Oxford University, England, l967.  "Socialization and Legitima-tization of the Police Service."

- Her Majesty's Police College, Bramshill, England, 1967. "The Juvenile Offender."

- IBM Corporate Security Executives, 1976. "Measuring Crime and Loss in the Workplace."

- George Washington University, 1977.  "Flexible Management Styles Need Not Be Weakness."

- FBI Academy, Quantico, Virginia, 1979,1981. "The Geriatric Delinquent."  1992 Police/Sheriff/Elderly Triad for safe streets.

## PRINCIPAL MEDIA ENGAGEMENTS

- 100 plus local, regional, national media engagements 1995-2005.

- Co-Interviewer of Sir Leon Radzinowicz, Pilot for Series Criminology:  Conversations with the Masters, WQED-TV Pittsburgh, March 1985.

- National Public Radio Network Program, Great Decisions, March 30, 1979. "International Terrorism:  For Fun and Profit," with Dr. Israel Naamani.

- Moderator--Terrorism, hostages, clandestine threats:  An Inter-national Social-Political Perspective.  First Annual Crime Prevention Conference, National Crime Prevention Institute, Louisville, Kentucky, November 17, 1978 (KETN).

- Appeared on Granada Television, England "The American Police and Civil Disobedience(contracted), 1967.

- Appeared on British Broadcasting Corp. television (BBC-TV) England (contracted), 1967.

- (See Fulbright Summary for additional media presentations.

## DIRECTORSHIPS/TRUSTEESHIPS/EDITORSHIPS/OFFICES

- Member, Board of Directors, Chevy Chase Community Center. Member Law Enforcement-Community Committee. 2000-present.
- Member, Advisory Board, The American Board of Forensic Law Enforcement Experts, The American College of Forensic Examiners, 1998.
- Associate editor, Criminal Justice Policy Review, 1986-present.
- Editor, Criminal Justice Policy Review, 1984-1986.

- President, Academy of Criminal Justice Sciences, l985-l986.
- Member, Advisory Board, Southwestern Law Enforcement Institute, Southwestern Legal Foundation. Dallas, Texas 1985.
- Member, Board of Directors--CMS Corporation, Atlanta, Georgia, 1977-1980.
- Trustee, Kentucky Association of Criminal Justice Educators, 1978-1980.
- Trustee-at-Large, Member of the Executive Board, Academy of Criminal Justice Sciences, 1980-1983.
- National Advisor--Alpha Phi Sigma, National Criminal Justice Honor Society, 1980-198l.
- Member, Editorial Advisory Panel - World Police Forces. George Kurian, ed., 1980.
- Referee/Reviewer, Justice Quarterly, Journal of Criminal Justice, Journal of Police Science and Administration. John Wiley & Sons Inc. Publishers, Prentice Hall, Inc. Publishers, HBJ Publishers. 1979-
- Explorer Scout Post (Law Enforcement) Advisory Committee, Louisville, Kentucky, 1979-1982.

## GOVERNMENTAL COMMISSIONS AND BOARDS

- Advisor to "Communities Organized for Fair Treatment of Municipalities." An organization of Pennsylvania Township Managers, 2000.
- U.S. Attorney's Law Enforcement Coordinating Counsel, Western District of Pennsylvania, 1991-present.
- Mayor's Management Task Force, Louisville, Kentucky, l982
- Appointed Advisor Reagan Presidential Congressional Task Force on Criminal Justice, 1980.
- Commissioner Lower Swatara Township--Police Civil Service Commission (an appointed office), 1968-1970.
- U.S. Congressional Study on the Uniform Emergency Call System "911," 1967.
- Greater Harrisburg Movement, Commission on Law Enforcement, 1967.
- Police Civil Service Commission--Ad hoc examining board, l967-1970, Lower Swatara Township, Pennsylvania.

## PROFESSIONAL/ACADEMIC CONSULTATIONS AND ACTIVITIES

- Instructor, Federal Bureau of Investigation (FBI) 40 hours training course, July 20-24, 2009
- Qualified & testified in Supreme Court of British Columbia, Canada.

- Police Executive Research Forum (PERF) and Community Oriented Policing Services (COPS) U. S. Department of Justice executive session (Invited) *Conducted Energy Devices: Guidelines for Policy and Practice*. Philadelphia, PA August 3, 2010.
- Department of Homeland Security/CSR Preparedness Directorate, Office of Grants and Training Peer Review Project, 2006.
- Fulbright Senior Scholar Specialist (Criminology) and General Reviewer 1999-2002.
- External Faculty Tenure review--University of Pittsburgh, July 2000.
- 40 plus police and security consultations 1993 to March 1995.
- Chair, Academic Review Committee, Department of Criminal Justice, University of Nebraska, Kearney, 1992.
- National Crime Prevention Council. Member, Advisory Committee, National Law Enforcement Executive Crime Prevention Survey, 1988-89.
- 40 plus Consultations in l985-93. Including Indiana Borough Pennsylvania-Police Pursuit Policy (Public Service Non-remunerated.)
- Criminal Justice advisor to Nova Technologies, Inc. Austin, TX XR-5000n (stun gun) testified before Pennsylvania Senate Judiciary Committee; U.S. Senator Ted Stevens' (Alaska) meeting on less than lethal "electronic weapons/stun guns, Washington, DC.; New Jersey Attorney General's community meeting(1989—90 est.)
- Senator Patrick Moynihan, U.S. Senate. Senate Bill 555, Consultant, l984.
- Metropolitan Child Abuse Study, Louisville, Kentucky, l979-1982.
- Central Virginia Criminal Justice Training Center--Consultant, l976, l977, l978.
- West Piedmont Criminal Justice Training Academy--Consultant, 1976.
- International Business Machines--Consultant, l976.
- Seiman's (West Germany)--Consultant, New York, l977.
- Florida Institute Law Enforcement--Consultant, 1976-1984.
- U.S. Park Police--Consultant, l977.
- U.S. Corps of Engineers, 1977 (Consultant/Lecturer).
- South Bend Indiana Civil Service Commission--Consultant, l976.
- St. Petersburg Community College--Consultant, 1978, 1980, 1983.
- Indiana State Police-Crime Analysis--Consultant, l979.
- State of Ohio-Minority Recruitment Project--Consultant, 1978.
- Howard County Maryland Police--Consultant, l976.
- National Retired Teachers Association/American Association of Retired Persons-Crime Prevention Volunteers with the Federal Bureau of Investigation (FBI)--Consultant, 1976, l978, 1983.
- Kentucky State Police Commanders--Labor Relations Consultant,

1977.
- Florida Atlantic University, Tenure Committee--Consultant, 1978.
- University of Detroit; Ph.D. Program in Criminal Justice--Consultant, l976.
- Southwestern Legal Foundation, Law Enforcement Institute, University of Texas Dallas, l978-l984-Academic Programs Liaison University of Texas.

<u>ACADEMIC COMMITTEES AND UNIVERSITY SERVICES</u>

I have been exposed to a broad spectrum of University affairs. This exposure has been achieved by service on committees (appointed and elected).  During my ten years at the University of Louisville, I served on more than thirty committees.  Those committees include:

- Search Committee for Dean of the Graduate School (University)
- Tenure and Promotion Committee (School)
- Academic Long-Range Planning Committee (School/University)
- Public Service Occupations Professional Development (State)
- Private Security Training Committee (School)
- Grievance Committee (School)
- Curriculum and Planning Committee (School)
- Special Funds Committee (School)
- University Library Committee (University)
- Faculty Senate (University)
- University Computer Use Committee (University)
- Faculty Advisor--Alpha Phi Sigma--National Criminal Justice Honor Society (School)
- Undergraduate Curriculum Committee (School)
- Personnel Policies and Procedures Committee (School)
- Library Committee (School)
- Southern Police Institute Selection Board (School)
- Advisory Committee Interdisciplinary Master of Science Degree in the Administration of Justice (School)
- Advisory Committee Interdisciplinary Doctor of Philosophy Degree in the Administration of Justice (School)
- Industrial Security Task Force (School)
- School of Education Service Occupations Planning Committee (School)
- Criminal Justice Professional for Urban Studies Center (University)
- Various Master of Science and Doctor of Philosophy Degree Thesis Committes (School)
- Student Grievance Committee (University)
- Faculty Search Committees (4)

- Science II Computer Planning Committee
- Interdisciplinary Ph.D. Advisory Committee (Graduate School)
- Interdisciplinary Ph.D. Grant Awards Committee (Graduate School)
- Student Appeals Board, Alternate (University)

- Presidential Search, Faculty Advisory Committee, Alternate (University)
- Graduate Council (University)
- University Comprehensive Landscape Planning Committee

Committees at Indiana University of Pennsylvania include:

- Chair, Department of Criminology Security Committee.
- Chair, Security Survey/Audit and Plan Committee; Wilson Hall-Department of Criminology.
- University Building Security Model Template--Campus Security --
- Survey/Audit Project with Director of Public Safety (65 building complex).
- Chair, Criminology College Change Committee (C4) 2004.
- Department Executive Committee-1997-current.
- Chair, Dean Search Committee--University (appointed by Provost), 1983-1984.
- Chair, University Council of Chairs--University (elected by University Chairs), 1983-1984.
- Chair, Endowment in Criminology $850,000--Department, 1983-1991.
- Member, College Foundation Committee, 1984.
- Member, College Council of Chairs 1982-1987, Chair 1983-84.
- Department representative to APSCUF and Chair Standing Committee on Constitution and Bylaws, 1988-1990.
- Member, Senate and Senate Academic Procedures Committee, 1987-1989.
- Member or Chair, Department Promotion, Evaluation and Tenure Committees, 1989, 1990, 1993, 1994, 1995.
- Chair, Faculty Search Committee - 3 Positions, 1989.
- Member, Public Safety Advisory Committee, 1983-1990.
- Member/Chair Department of Criminology, Executive Committee 1992-Present.
- Member, Department of Criminology, Ph.D. Committee 1992-
- Chair, Department of Criminology Commencement Committee, 1994.

## AWARDS AND ACHIEVEMENTS

Academic

- Distinguished Alumnus 2001, Eastern Kentucky University, College of Justice and Safety.

- Distinguished Alumnus 1988, Harrisburg Area Community College.
- Gold Medal Educator of the l980's. (International) Project
  Innovation of the journal _Education_.  Fall l987. Endorsed by
  Dr. Margaret Meade and Lord C.P. Snow.  Nominated by Dr. Robert
  Hoye.
- Honored Yale University - Silliman College "Distinguished
  Career and Academic Leader" (March 84).
- Graduate Fellowship, Eastern Kentucky University--Master of
  Science Degree.
- Accepted Post Doctoral Research - Cambridge University England
  1980.
- Doctoral Fellowship, Sam Houston State University--Doctoral
  Degree in Criminal Justice Administration, l97l.
- Invited to join "Systems Group" at the University of Louisville
  by University President, James Grier Miller l976.
- Named in Who's Who Among Students in American Junior Colleges,
  1968.
- High School, American Legion Award for Scholastic Achievement,
  1956.

Professional

- Outstanding People of the 20th Century, International
  Biographical Centre, Cambridge, England 2000. Presented by
  my students.
- Board Certified Forensic Examiner and Diplomat American Board
  of Forensic Examiners and Fellow American College of Forensic
  Examiners, 1995.
- Elected President of the Academy of Criminal Justice Sciences
  1985, the primary international organization of criminal
  justice research, policy and education.  Chaired 3 national
  Academy committees.
- Marquis Who's Who in America--39th Edition.
- Marquis Who's Who in the World--10th Edition.
- Marquis Who's Who in American Education--6th Edition
- Who's Who in the East, l984-l985.
- Who's Who in American Law Enforcement, l98l.
- Who's Who in Law Enforcement, 1990.
- Boy Scouts of America Certificate of Appreciation - Explorer
  Scouts, l980.
- Who's Who in the South and Southwest, l977.
- Personalities in the South, l976.
- Men of Achievement, Cambridge, England, l976 and 1991.
- Certificate of Appreciation, Louisville Civil Service
  Commission l975.
- Lions Club Certificate for Public Service, l974.
- Navy League Award for Distinguished Community Service, l968.

- Certificate of Appreciation, National Crime Prevention Institute (2).
- Resolution of Appreciation, Southern Police Institute Alumni Associations (2).
- Commissioned, Kentucky Colonel--Member Honorable Order of Kentucky Colonels.

- Certificate of Appreciation, Mayor of Chesapeake, Virginia, Minority Recruitment Project.
- Certificate of Appreciation, Alpha Phi Sigma, for serving as National Faculty Advisor, 1980.
- Mayor's Citation of Merit, Louisville, Kentucky, 1982.
- Paul Harris Fellow, Rotary International Foundation (non-member), November 1997.

## GRANTS RECEIVED AND DIRECTED

Co-Investigator with Principal Investigator R. Gido. Police Effectiveness and Alternatives in the Commonwealth of Pennsylvania. Local Government Commission, Local Law enforcement Task Force, 1997-1998

National Crime Prevention Council. Assessment and Plan for National McGruff House Program, Washington, D.C., 1989, Principal Investigator, ($5,000).

Fulbright & Phillip Institute of Technology combined grants $6459 Aus. Summer 87.

Developmental Grant for M.S. Degree Program in the Administration of Justice, University of Louisville. Kentucky Department of Justice. $50,000, 1973.

Implementation Grant (same as above) $30,000, 1974. Supplemental grant $10,000 1974.

Developmental Grant for Interdisciplinary Ph.D. in the Administration of Justice, University of Louisville. $25,000, 1976

Chesapeake Minority Recruitment and Manpower Development Project. U.S. Department of Justice LEAA Discretionary Pilot "O" Funds #73-DF-03-0012. $15,000. Awarded to R.P. McCauley and Richard Snarr.

Minority Recruitment Manual for Ohio Peace Officers. Attorney General of Ohio. Grant #76-1C-A02-0006 $15,000. Awarded to

Richard Snarr and Paul McCauley.

Creative Teaching Grant, Indiana University of Pennsylvania. $3,000. 1984.


Development Grant <u>Criminal Justice Policy Review</u> from the Imprint Series.  $50,000.  Five year award in diminishing amounts 1984.

<u>GRANT EVALUATIONS</u>

Fulbright Senior Fellow, Specialist Reviewer, Criminology-Police-Security and Crime Prevention, 1999-present.

National Institute of Justice, United States Department of Justice, <u>Peer Review Panel: Police Use of Force</u> (ten grant applications) August 1995.

U.S. Department of Justice/LEAA, Evaluator of <u>all</u> Crime Analysis Projects/Grants 1974-1975.

<u>1979 Crime Analysis Project/Report</u> -Commonwealth of Kentucky, R. Paul McCauley, Technical Evaluator.

National Crime Prevention Institute Representative to Law Enforcement Assistance Administration, U.S. Department of Justice on <u>all</u> Crime Prevention/Analysis Grants/Evaluations 1974-76.

<u>STUDENT RESEARCH SUPERVISION</u>

<u>Undergraduate Scholarship Mentoring</u>

McNair Scholar mentor for Jerrod W. Foster. <u>Crime, Sins, or Virtues:  A Content Analysis of the Movie *Animal House.*</u> (June 2009)  Presented by invitation to Fourth Annual Undergraduate Scholars Forum, 1 April 2010.

<u>Graduate Research Supervision</u>

Burke, Alison S. <u>Criminal Justice Training and Education in Pennsylvania: A budgetary Report</u>. May 8, 2006. (R. P. McCauley faculty supervisor).

<u>Doctor of Philosophy Degree - Dissertations</u>

  George Coroian, MS, J.D.  <u>Law Enforcement Use of Deadly Force and Civil Liability:  A Test of the Compliance of Section 508 of</u>

the Pennsylvania Crimes Code to the Tennessee V. Garner Standard. June 2009. (Chair)

Philip Matthew Stinson, MS, J.D. August 2008 title "Police Crime: A Newsmaking Criminological Study of Sworn Law Enforcement Officers Arrested, 2005-2008. (Member)

Kathrine Johnson – "Just Say No" and Young Adults: A Study of the Relationship Between Understanding, Acceptance and Saying No. Chair, December 1994.

Glenn Zurn, Mandatory Drug Induced Sobriety and the Social Lives of Criminal Alcoholics: Personal Accounts of Disulfiram Recipients. Member 1994.

Kevin Courtwright, Member 1995-Completed

Chidchai Vanasatidya – A Study of Factors Related to Arrest Performance in the Case of Thai Police Patrolmen. Robert Durig, Sociology, Chairman. Completed May l976. –Member.

Bradley Garrett – Administration of Bail in Jefferson County, Kentucky: A Prediction of Pre-Trial Crimin- ality. Completed December 1982. –Chairman.

Stephen Krawiec – Self-Reported Naturally Occurring Regression. Clinical Psychology. James Driscoll, Ph.D., Chairman. Completed January l984. –Member

Connie Bondi – Chair, 1991-1992. Research terminated.

Interdisciplinary Ph.D. Program Development Committees (Graduate School)

Aubrey Briggs – R. Paul McCauley, Chairman.
J. Vanderpool – R. Paul McCauley, Chairman.
Gretchen Johnson – R. Paul McCauley, Member.
John Ryan – R. Paul McCauley, Member.
Thomas Atkins – R. Paul McCauley, Chairman.
Pam Leone – R. Paul McCauley, Member (Psychology).

Master of Science Degree – Professional Papers

Dennis Goss – College Education and Kentucky State Police Personnel Performance. R. Paul McCauley, Chairman, Completed August, 1976.

Thomas Egan - <u>Juvenile Attitudes Toward Property Offenses.</u>
Robert Durig, Sociology, Chairman.  Completed
December, l977.


## Master of Engineering Degree

Masri, Bassam Chafic - <u>The Behavior of Glazing Materials to
Impact Loading.</u>  M.Eng. R. Paul
McCauley, Co-Chairman with M. Cassara,
l982.

Andari, Tamer Salim - <u>Recommended Standard for Testing Glazing
Materials Subjected to Impact Loadings.</u>
M.Eng. R. Paul McCauley Co-Chairman,
l982.

## Bachelor of Science Degree - Senior Corrections Papers(Honors)

Darrel D. Gordon, Jr. - <u>A Comparison Study of Pretrial Diver-
sion and Formal Court Probation.</u>
April 1975.
L. Diane Pollei - <u>A Survey of Correctional Employment Opportun-
ities and Recommendations.</u>  September 1975.

Fred S. Hollenbeck - <u>The Louisville-Jefferson County Volunteer
Probation Officer Program:  A Follow-Up
Study.</u>  July l976.

## Highest Honors Paper

Sherry McConnell - <u>Factors Relating to Applicant Selection
Within the Kentucky State Police.</u>  R. Paul
McCauley -Chairman.  December l979.

## Research In Progress (2010-)

McCauley, R. Paul and Bieger, George.  <u>Can People be Trained to
Collectively Attack a Mass Killer</u>: A National Initiative.  Fiscal
Year 2010 Appropriations through the John C. Murtha Institute of
Homeland Security, September 2009.

## RESEARCH AND PUBLICATIONS

McCauley, R. Paul, Barker, William F., Ph.D., Boatman, James VMD,
Goel, Vineet, Ph.D., M.D., Short, Thomas H., Ph.D., Zhou, Feng ,

Ph.D. <u>The Police Canine Bite:  Force, Injury, and Liability</u>.
*Criminal Law Bulletin,* Volume 46, Number 1. (2010)

_____, <u>Police Vehicle Pursuits of Fleeing Pedestrian Suspects</u>.
Accepted *Police Forum:*: Academy of Criminal Justice Sciences,
Police Section, Volume 19, Number 3, August 2010.
_____, Cawley, John P., Johnson, Thomas G. Sutton, William C. <u>A
Model Policy and Best Practice-Search Warrant Alert Procedure
(SWAMP): Police and Emergency Department Joint Response.</u> Illinois
Law Enforcement Training and Standards Board--Police Best
Practices Vol. 9, No. 4 October 2009. pp. 1-16.

_____. <u>When Security Fails Can People be Trained to Collectively
Attack a Mass Killer: A Question Raised by Flight 93 and Virginia
Tech</u>. Submitted to *Security Management*: American Society for
Industrial Security, July 2008.

_____,and Lawrence Claus.  <u>Police Use of Force: States
Inconsistent with Established Constitutional Law.</u>  Criminal Law
Bulletin, Volume 43, No. 5, Winter, 2007.

_____. <u>Police Custody as a System and Unified Policy: Best
Practices for Reducing Officer and Prisoner Risks of Injury and
Death. Law Enforcement Executive Forum</u>.  Illinois Law Enforcement
Training and Standards Board. Vol. 7, No. 1, January 2007. pp.
103-117.

  Research Consultant to National Institute of Justice Grant,
<u>Identifying Correlates of Police Deviance:  An Empirical Study of
Police Corruption and Brutality in New York 1975-1996</u>.  Principal
Investigators James J. Fyfe and Jack Greene, Temple University.
1997-2004. Final report to United States Department of Justice,
National Institute of Justice as, Fyfe, James and Kane, Robert.
<u>Bad Cops: A Study of Career-Ending Misconduct Among New York City
Police Officers.</u> 2005.

  Evaluation/Assessment, National McGruff House Program.  Salt
Lake City Utah.  1989.

  Biographic research on Sir Leon Radzinowicz 1935-1985 for
series produced by WQED-TV Pittsburgh.  $4,000 pilot for proposed
$250,000 project. 1985.

  Cited Congressional Record #153.  Senator Patrick Daniel
Moynihan, Subcommittee on Crime, 98th Congress, 2nd Session,
"Armor Piercing Ammunition and Criminal Misuse of Machine Guns
and Silencers, May 17, 1984, p. 15.

University of Cambridge England, Clare College, England. Research proposal in General/Specific Deterrence. Accepted research agenda for M.Phil. degree, 1980 for advanced post doctoral degree.

McCauley, R. Paul, "A Four Year Study of Correlation Between the School and College Ability Test (SCAT) and Student Grades for the Southern Police Institute, Administrative Officers Course (AOC) August 20, 1973-November 19, 1976." Unpublished research report, University of Louisville, 1977.

Snarr, Richard W. and R. Paul McCauley, <u>Minority Recruitment Manual for Ohio Officers</u>, Ohio Peace Officers Training Academy, London, Ohio, 1978 (monograph). Sponsored by Administration of Justice, Department of Economic and Community Development, Grant #76-IC-A02-0006.

McCauley, R. Paul, "A Plan for the Implementation of a Statewide Regional Police System," unpublished dissertation for the Doctor of Philosophy Degree in Criminal Justice Administration, Sam Houston State University, 1973.

_____, Co-author, <u>Chesapeake Minority Recruitment and Manpower Development Project: An Evaluative Report,</u> Chesapeake Virginia Division of Police, 1975 (monograph). LEAA, Discretionary Pilot "O" Funds Grant #73-DF-03-0012.

_____, "Public Hostility Directed Toward the Police Uniform in the Investigation of a Domestic Disturbance," unpublished thesis for the Master of Science Degree, Eastern Kentucky University, 1971.

_____, <u>Police Evaluation in the Commonwealth of Pennsylvania,</u> monograph, Governor's Crime Commission, Commonwealth of Pennsylvania, 1967.

1970-71. Research Assistant to Dean Robert Posey: 1973-82 consultant and advisor (Southern Police Institute representative) to IACP Task Force on national minimum police standards and police accreditation which resulted in the Commission on Accreditation of Law Enforcement Agencies (James V. Cotter, Ex. Dir.)

1966-69. Highspire Police Training Officer/Captain assigned to Police Research Grant coordinated by Dr. Vern Foley and Lt. Col. John Grosnick, Pennsylvania State Police:

1973-1974 Consultant/Advisor Pennsylvania State Minimum Police
Training Standards Task Force which was responsible for Act 120,
June 18, 1974.  (PA. Became the 36th state to enact such
standards).

## Technical & Research Reports

McCauley, R. Paul.  Police Custody as a System and Unified
Policy:  Best Practices for Reducing Officer and Prisoner Risks
of Injury and Death.  Center for Research in Criminology, Indiana
University of Pennsylvania.  Concepts and Issues, 10-06.

_____ and Lawrence Claus.  "Police Use of Force: The Pennsylvania
Statute is Contrary to Established Constitutional
Law."  Criminology Research Center, Indiana, University of
Pennsylvania, November 2004.  See, also, *Criminal Law Bulletin*,
Volume 43, Winter, 2007.

_____, Memorandum of Inquiry Regarding the Resignation of Police
Chief Ogden and Related Issues.  Printed, distributed and
presented to public in open Council, Indiana, Borough, May 2000.

_____, contributor Science, Technology, and the Constitution in
the Age of Information:  New Technologies for Criminal Justice.
Congress of the United States, Office of Technology Assessment.
OTA-CIT 336, May 1987.

  Cassaro, Michael A., R. Paul McCauley.  A Test of Selected Riot
Helmets for the Jefferson County Police Department.  SEMPAS,
January 1981, Technical Report.

  Cassaro, Michael A., R. Paul McCauley, et al.  Building Fire
Inspector Training Manual, Commonwealth of Kentucky, September
1980.

  Cassaro, Michael A., Harry Keeney, R. Paul McCauley.  Strengths
of Security Glass Panels for Jefferson County:  Report of Glass
Analysis and Recommendations for Improved Jail Security.
Louisville, Kentucky.  SEMPAS, November 1979 (technical report).

  McCauley, R. Paul, Crime Analysis, The National Crime
Prevention Institute, Louisville, Kentucky, 1975 (monograph).

## Professional and Media Publications

IUP Talks with Host Dr. Mary Beth Leidman.  "Virginia Tech and

Workplace Security," May 3, 2007.  WIUP-TV Davis Hall, Indiana University of Pennsylvania.

McCauley, R. Paul.  "The Use of Force and High Intensity Tactical Police Flashlights (HITPF: Policy Concerns."  FBI Law Enforcement Bulletin, November 2005.

_____.  "High Intensity Tactical Police Flashlights (HITPF) and the Use of Force: Policy Concerns."  Pennsylvania Chiefs of Police Association. Bulletin, Vol. 104 - Issue 2, Summer 2004, pp. 26-28.

_____, Lawrence Claus.  "Police Use of Force: The Pennsylvania Statute is Contrary to Established Constitutional Law."  Under review.

_____, Police Vehicular Pursuits of Pedestrians (PVPOP): A Pursuit, Emergency Operation, and Use of Force Issue. Law Enforcement News, Vol. XXVI, Nos. 525, 526, Jan.2000.

_____, Crime in Your Parking Lot. Western Pennsylvania Retail Merchants' Association. September 1993. (Published in one or more newspapers and retail trade publications).

_____, " A Funeral Director or an Appropriately Attired Carjacker?," Pennsylvania Chiefs of Police Association. Bulletin, Vol. LXIII, No. 2, Summer 1993, p-26. (Omitted in Table of Contents.)

_____, "Operational Control of Ninja Cops", Law Enforcement News. April, 1992.

_____, Steven M. Edwards.  "More Bullets - More Risks?  Concerns with the Adoption of a High Capacity Handgun for Law Enforcement Officers."  Pennsylvania Chiefs of Police Association.  Bulletin, Vol. LVIV., No. 2, Spring/Summer 1990.  Reprinted California Peace Officers' Association, Journal of California Law Enforcement, Vol. 24 No. 2, August 1990.

_____, "The Need for a Written Philosophy of Higher Education, Education, Vol. 108 No. 1 Fall 1987.

_____, Crime and the Careful Vacationer.  Pittsburgh Post Gazette.  June 6, 1984.

_____, in George Gallop.  America Wants to Know, New York, A & W Publishers, Inc. 1983.  (Invited by Dr. George Gallop).

_____, J. Chalmers. "Urban Crime Density Analysis for Productive Resource Response." Vol. 9, No. 3, <u>Journal of Police Science and Administration.</u> September 1981.

Cassaro, Michael A., Harry Kenney, R. Paul McCauley. "Criteria for Correctional Managers in Selecting Security Glass: Architectural, Legal, and Procedural Implications," <u>Corrections Today,</u> Vol. 42 No. 2, August 1980.

McCauley, R. Paul, "Adapting Contemporary Business Concepts to Security," <u>Security Management,</u> Vol. 22, No. 1, January, 1978.

_____, "Crime Analysis: The Important First Step," NCPI <u>Hotline,</u> February-March 1978.

_____, "Zero-Based Security (ZBS): An Extension of Security by Objectives," <u>Security World,</u> Vol. 14, No. 7, July 1977, pp. 40-41.

_____, Donald T. Shanahan, "Scientific Inquiry for Police Administrators," Vol. XLIV, No. 8, <u>Police Chief,</u> August 1977.

_____, "Improving Bank Security Administration: A Question of Training," <u>Bank Security Report,</u> Bankers' Magazine, 870 Seventh Avenue, New York, New York, 1976.

_____, Data Analysis Aids in Crime Detection, "<u>Newsletter,</u> Vol. IV, No. 4, October 1976, LEAA, Washington, D.C. 20531.

_____, et al., "Application of Computer-Assisted Instruction to a Police Administration Curriculum, "Vol. XLII, No. 10, <u>The Police Chief,</u> October 1975, pp. 44-48.

_____, "The Man Behind the Badge," weekly series published by <u>The Middletown Press and Journal,</u> Middletown, Pennsylvania. Discussed contemporary police problems, 1967-69.

_____, "An American View of the British Police," <u>The Police Journal,</u> Vol. XL, No. 12, December 1967, Butterworth Publishers, London, England, pp. 567-570.

### Books and Chapters in Books

Johnson, Kathrine, Brian Payne, R. Paul McCauley, <u>Policy Dimensions of Criminal Justice,</u> Cincinnati, Ohio, Anderson

Publishers.  Contracted/terminated.

   Co-author with Waldron et al, <u>The Criminal Justice System:  An
Overview,</u> Boston, Massachusetts, Houghton-Mifflin, 1976. 2nd ed.
l980; 3rd ed. 1984; 4th ed. l989 New York.  Harper & Row
Publisher.
   McCauley, R. Paul, "The Role of Crime Analysis in Developing
Rural Crime Prevention Programs" in <u>Sociology of Rural Crime.</u>
Osman Publishing Company.  1980.

   ____, "A Conceptual Paradigm for Systemic Criminal Justice
Higher Education," in <u>Criminal Justice Education,</u> U.S. Office of
Education. 1980.  (not verified)

   ____, "On Community-Based Corrections," in <u>The Administration
of Justice System,</u> Holbrook Press, Inc., 1977.

                  <u>Journal, Book, and Manuscript Reviews</u>

   ____, Review, *American Policing: Critical Thinking for a New
Age.  Propo*sal for Wiley-Blackwell Publishing.  To be Written by
Jack R. Greene, Ph.D., former Dean, Northeastern University.

   _____,Review, L. Edward Wells and David Falcone.
"<u>Organizational Variations in Vehicle Pursuits by Police: The
impact of Policy on Practice</u>."  February 1994 for the <u>Criminal
Justice Policy Review</u>. To be published in Vol. 6, No. 4.

   _____, Review, L. Edward Wells and David Falcone.
"Organizational Variations in Vehicle Pursuits by Police: The
Impact of Policy on Practice."  February 1994.  <u>The Criminal
Justice Policy Review.</u>

   ____,Review, Diane Fishbein <u>Nutrition and Anti-Social Behavior,</u>
Rand Corporation, Santa Monica, CA Fall 1987.

   ____, Review, Charles D. Hale, <u>Police Patrol:  Operations and
Management,</u> New York, John Wiley & Sons, Inc., 1980.

   ____, Review Alan A. Malincheck, <u>Crime and Gerontology,</u>
Englewood Cliffs, N.J., Prentice-Hall, 1980.  Review presented to
"Bookviews," Spaulding College Library, 2l October 1980.

   ____, Review, Cassidy R. Gordon, Ronald E. Turner, "Criminal
Justice System Behavior," May l0, 1977 for <u>Journal of Behavioral
Sciences.</u>

_____, Review, Keve, Paul, <u>Corrections Today,</u> New York, John Wiley& Sons, Inc., 1979.

(plus 200 additional reviews of books, chapters, and professional papers 1995-2010).

## Papers to Professional and Learned Societies

McCauley, R. Paul. <u>The Future of Policing in a Changing World.</u> Lecture to Faculty and students of the College of Social Sciences, Kyonggi University, Gyeonggi-do, Korea, October 5, 2007.

_____, <u>Issues in Canadian Policing</u> (Public Police and Private Security.) Pennsylvania Studies Consortium Annual Meeting, Indiana University of Pennsylvania, March 24, 2007.

_____, <u>Police Custody as a System and Unified Policy: Best Practices for Reducing Officer and Prisoner Risks of Injury and Death. Law Enforcement Executive Forum</u>. Academy of Criminal Justice Sciences, Seattle, WA, March 15, 2007. Invited and delivered to Asian Association of Police Studies, Seoul, Korea, October 2, 2007

_____, Chair, <u>Decision Making and Discretion in Law Enforcement.</u> Panel/Event #134 Academy of Criminal Justice Sciences, Seattle, WA, March 15, 2007.

_____, Lawrence Claus. <u>Police Use of Force: The Pennsylvania Statute is Contrary to Established Constitutional Law.</u> Academy of Criminal Justice Sciences, Baltimore, MD. March 2, 2006. (Delivered by R. Paul McCauley)

_____, Lawrence Claus. <u>Police Use of Force: The Pennsylvania Statute is Contrary to Established Constitutional Law.</u> Academy of Criminal Justice Sciences, Baltimore, MD, March 2, 2006.

_____, <u>The Daubert Response</u>. American College of Forensic Examiners--Waldorf Astoria, Ny, NY, November 1999.

_____, <u>The Pittsburgh, Pennsylvania-United States Department of Justice Consent Decree:  The Role of Auditor.</u> Academy of Criminal Justice Sciences, Albuquerque, NM, March 1998.

_____, <u>Preventing Violent Crime in Open Commercial Areas:  The Role of Visible Security Presence at Parking Lot Perimeter</u>

<u>Boundaries</u>.  Academy of Criminal Justice Sciences, Boston, MA. March 1995.

_____, <u>As the Police Go, So Goes Security: Concerns About High Capacity Handguns for Security.</u>  Academy of Criminal Justice Sciences, Nashville, TN.  March 1991.

_____, Steven M. Edwards, <u>Concerns with the Adoption of a High Capacity Handgun for Law Enforcement Officers:  More Bullets - More Risk?</u>  American Society of Criminology, Baltimore, Maryland, November 1990.

_____, <u>National McGruff House Program:  Preventing Crime and Facing Civil Litigation</u>.  Academy of Criminal Justice Sciences, Denver, Colorado, March 1990.

_____, <u>Pussy Machines, Cashboxes and Other Money Changers: Argots of the Criminal Ecology of Placing and Supervising the Automatic Teller Machine (ATM) Users Against Violet Crimes</u>. Academy of Criminal Justice Sciences.  Washington, D.C., March 28, 1989.

_____, <u>Security and Police Negligence Litigation:  The Australian Experience</u>.  Academy of Criminal Justice Sciences, San Francisco. April 1988.

_____, <u>The Duty to Protect:  The ATM</u>.  Pittsburgh Chapter, American Society for Industrial Security.  September 1987.

_____, <u>Women in Policing.</u>  Panel Chair, Annual Meeting Academy of Criminal Justice Sciences, Las Vegas, Nevada.  April 1985.

_____, <u>Crime and Third Party (Management) Liability Criminological Considerations.</u>  Paper presented to the Academy of Criminal Justice Sciences, Chicago, March, 1984.

_____, <u>The Police Corps:  Criminological Considerations</u>. Round table.  Academy of Criminal Justice Sciences, Chicago, March, 1984.

_____, <u>The Police Corps:  A Response to the Police Problem or to the Crime Problem.</u>  Paper presented to the American Society of Criminology.  Denver, November 1983.

_____, <u>The Art of Helping:  The Mentor-Protege Model as a Humanistic Management Approach for Reducing Employee Theft.</u> Paper to the Association for Humanistic Sociology, Louisville, Kentucky, 9-12 October 1980.

_____, "The Scientific Method" in <u>Law Enforcement Management Skills for the 80's": Scientific, Humanistic, or Political.</u> Southern Police Institute, University of Louisville, pp. 28-46. (monograph). 1980.

_____, J. Chalmers. <u>Urban Crime Density Analysis for Productive Resource Response.</u> A paper delivered to the Academy of Criminal Justice Sciences, (dated) September 3, 1979.

_____, Equitable Crime Insurance: An Issue in Administering Justice," a paper delivered at the Academy of Criminal Justice Sciences (annual international assembly) New Orleans, Louisiana, March 1978.

_____, "Data: The Essence of Loss Prevention and Profit Retention," a paper presented at the International Business Machine Loss Prevention Workshop, National Crime Prevention Institute, May 23-26, 1977.

_____, <u>Scientific Inquiry for Police Administrators,</u> Southern Police Institute, University of Louisville, Louisville, Kentucky, 1976.

_____, "Police Planning in Contemporary Society," a paper presented to the Louisville-Jefferson County Crime Council, February 1974.

## Community Services and Presentations

More than 100 presentations and consultations to community service organizations including, Rotary, Lions Club, AARP, Kiwanis, Retail Merchants, Pennsylvania Association of Retired State Employees, Fraternal Order of Police, NAACP, Central Pennsylvania Council of Credit Unions and others.

## Media Productions and Consultations

Advisor/Researcher - ABC News 20/20 segment, "Insert Card But Beware" (ATM related violent crime) broadcast August 12, 1988.

McCauley, R. Paul, Robert Mutchnick. Video Publications. <u>Criminology: Conversations with the Masters.</u> Sir Leon Radzinowicz March 85. (Pilot for proposed $250,000 NEH grant proposal). Produced by WQED Pittsburgh.

## Instructional Learning Aid Developed

JointAppx 1704

McCauley, R. Paul, "Relative Structural Depth: The Organizational Dimension," a paper presented to the Southern Police Institute, Administrative Officers Course, 1975.

Developed the Organizational Third Dimension Instructional Aid. Internal funding $1,500.00 (Built by the University Physics workshop U. of Louisville).

## Patents

Patent Board University of Louisville presented with detailed specifications for a device designed, built, and tested by M.A. Cassaro and R. Paul McCauley.  The device is designed to deliver a precise force to a precise point on a piece of glazing material with the degradation of the material recorded-charted.  The device was tested before a committee of ASTM.

Patent #5,123,137 awarded by United States Patent Office, 1992 for Universally Adjustable Cleaning Device for Opposing Surfaces. Registered Trademark received.

## Expert Testimony in Courts of Law

I have provided expert testimony or depositions in civil and/or criminal litigation in more than 30 states and Canada and provided expert consultation to courts in chambers, in the States of Ohio, Illinois, Virginia, Texas, Indiana and the U.S. District Courts in Virginia and Ohio.

Amicus Curiae Brief and as Letter to Supreme Court of the United States, March 2007.  In the matter of Timothy Scott v. Victor Harris, No.05-1631.  Police use of force by vehicle during high speed pursuit.

## FULBRIGHT LECTURESHIP SUMMARY:  AUSTRALIA 1987

## Presentations to Faculty and Learned Societies

McCauley, R. Paul, The Academic Criminologist as an Expert Witness, Legal Studies and Criminology Faculty - Latrobe University, 24 July 1987.

_____, Police Negligence:  U.S. 42, 1983 Civil Rights Litigation, Criminology Faculty - Melbourne University, 27 July 1987.

_____, <u>Industrial Criminology:  Its Place in Higher Education,</u> School of Business Faculty - Phillip Institute of Technology, 29 July 1987.

_____, <u>Crime in the Workplace:  The Role of the Criminal Justice System as Medium for Making and Promoting Corporations as Socially Responsible Citizens,</u> School of Community Studies - Phillip Institute of Technology, 19 August 1987.

_____, <u>2,000 More Police for Victoria:  Criminological and Managerial Implications:  Facts & Myths (Special Addition to Program),</u> The Australian and New Zealand Society of Criminology, 26 August 1987.

_____, <u>The Philosophy of Labor - Cost or Investment - As Foundation of Corporate Criminality and Loss,</u> Canberra Institute of Criminology Faculty/Student Colloquium, 12 & 13 August 1987.

<u>Professional and Industrial Presentations</u>

McCauley, R. Paul, <u>Security Component Manufacturers Do Not Make a Security Industry:  The Challenge and the Opportunity,</u> ASIAL - The Australian Security Industry Association - Trade Fair Keynote Session, 22 July 1987.

_____, <u>Excessive and Deadly Force Issues for the Users of Security Services,</u> Victoria Security Institute, 5 August 1987.

_____, <u>The Crime Problem and the Police Problem:  Police Executives Must Manage Both.  (After discussion address Media Panel discussion),</u> Victoria Police Club, 6 August 1987.

_____, <u>The CPP:  A Certification to Perpetual Mediocrity,</u> American Society of Industrial Security, Australian Chapter, 11 August 1987.

_____, <u>Topic not announced, closed to public,</u> Victorian Chief Commissioner of Police and Command Officers Conference, 17 August 1987.

_____, <u>The Personnel Managers Role in Corporate Crime,</u> Australian Association of Personnel Officers - Dorchester Hotel, 19 August 1987.

_____, <u>The Criminal Justice Education Experience in the United States,</u> Australian Association of Criminal Justice Education:

Paper and Panel Discussion, 27 August 1987.

_____, <u>Security Malpractice:  Issues of Liability and Negligence,</u> Institute of Security Management, 27 August 1987.

<u>Consultations</u>

_____, <u>Christopher Thomas, Egon Zehnder International,</u> Search Organization for Victoria Police Chief Commissioner, 6-7 August 1987.

_____, The National Police Research Institute, Adelaide, 12-14 August 1987.

<u>Student Lectures, Colloquium</u>

  McCauley, R. Paul, <u>Systems Theory and the Police,</u> Series Lecture I Criminal Justice Administration, 22 July 1987.

_____, <u>Crime in the Workplace:  The Personnel Function,</u> Personnel Management - First Year, 27 July 1987.

_____, <u>Quantitative and Qualitative Discussions of Security in Search of Philosophy,</u> Security Management - Diploma, 28 July 1987.

_____, <u>Leadership not Management as Key to Corporate Crime Reduction,</u> Business Administration - First Year, 29 July 1987.

_____, <u>The Criminal Justice System is Unprepared for Corporate Crime,</u> Criminal Justice Administration Community Studies - Degree Program, 3 August 1987.

_____, <u>Social and Legal Responsibilities of Corporations in the Control of Street Crime and in the Advancement of the Crime Control Model:  Does the Convenience Store Need to be Ft. Knox or Just a Source of Financial Compensation,</u> Legal Studies - Latrobe University, 4 August 1987.

_____, <u>The Courts: Fulcrum of Dysfunction,</u> Series Lecture II Criminal Justice Administration, 5 August 1987.

_____, <u>Police in Private Sector Crime,</u> Criminal Justice Administration Community Studies - Degree Program, 8/10/87.

_____, <u>Crime in the Workplace:  The Personnel Function,</u>

JointAppx 1707

Industrial Relations:  Post Graduate, ll August 1987.

_____, Crime in the Workplace:  The Personnel Function, Industrial Relations:  Post Graduate, 17 August 1987.


_____, Crime in the Workplace:  The Personnel Function, Industrial Relations:  Post Graduate, 18 August 1987.

_____, Police Negligence:  Third Party Litigation - Tort Law as Influence of Police Behavior and Operational Policies, Legal Studies, 20 August 1987.

_____, Leadership not Management as Key to Corporate Crime Reduction, Business Administration - First Year, 20 August 1987.

_____, Corrections:  The Product of Judicial Sentencing and its Conflict with Social Values, Series Lecture III - Criminal Justice Administration, 26 August 1987.

Media Interviews

| | | |
|---|---|---|
| 21 July | 3DB Radio | Pre-Recorded |
| 21 July (Live) | 3AW Radio | Murray Nichols Show |
| 22 July | Associated Press | Debra Stone |
| 22 July | Herald | Vicki Kyriakopoulos |
| 24 July | Sun | Paul Conroy |
| 27 July | Canberra Times | John Townsley |
| 28 July | Photographic Sessions for National Media, Arranged by | John French The Age Peter Mayoh Canberra Times |
| 30 July | Radio New Zealand-Wellington | Paddy O'Donnell |
| 5 August | National Television Coverage & Press Conference, | Media Services, Phillip Institute of Technology Bundoora. |

 (Revised: January 2015)

<u>ADDENDUM</u>

Attended <u>Public Violence - Active Shooter Training</u> (Police, Security, Schools, and Workplace) Health and Human Services Subcommittee--LTC Dave Grossman, April 11, 2012.

McCauley, R. Paul. *When Police Shoot and Miss: The Empire State Shooting.* August 27, 2012. (Wire Service)

Publisher's Proposal Review of Greene, Jack R. and Cordner, Gary W. *Handbook on Policing and Social Control: Modern and International Perspectives:* Wiley-Blackwell, September 2012.

Member SPC.2 Standards Technical Committee (Developing *ANSI/ASIS Auditing Management Systems for Risk, Resilience, Security and Continuity)* October 4, 2012.

McCauley, R. Paul. *Campus Law Enforcement: Role Conflict and Ambiguity as Foundations for Mismanagement, Ineffective Leadership, Deviant Culture, and Liability; Finding Solutions in the Basics. A* White Paper to the Pennsylvania State System of Higher Education, January 2013.

Recipient, American Society for Industrial Security *Quarter Century of Service* certificate, February 2013.

Completed Utah and Arizona states' Concealed Carry Weapons training course, Dubois, PA, February 23, 2013.

Presentation *Police (security) Practices* to Chester County, PA Bar Association, Civil Rights Committee, February 28, 2013.

The BBC. Escapes from Police and Prisons. March 18, 2013. Interviewed by Tara McKelvey.

Guest speaker, Pittsburgh Chapter, American Society for Industrial Security (ASIS) *Returning to the Basics for Answers to Security Problems* April 19, 2013.

July 2013, Milton Hershey School (MHS). Private Security-Safety and Public Law Enforcement Consultant (On-going agreement).

The MHS is a residential multi-campus, Pre K-12, coeducational, tuition free school with approximately 1,800 students and 1,200 employees covering approximately 10,000 acres/14 square miles. Founded in 1905, its trust/endowment is approaching $12 billion.

Attended <u>School Shooter Training</u> and Human Services Subcommittee—Homeland Security, Homer Center H.S., August 7, 2013.

More than 15 media interviews including News 4, WIVB, Buffalo by Rose Ciotta, police excessive force vide o reviewed, April 28, 2014.

National Criminal Justice Reference Service (NCJRS) granted Electronic Publications rights (2014) for McCauley, R.P. and J. Chalmers. "Urban Crime Density Analysis for Productive Resource Response." Vol. 9, No. 3, <u>Journal of Police Science and Administration.</u> September 1981.

Prevention Point Pittsburgh (PPP) Overdose Prevention Program (OPP) <u>First Responder Opiate Overdose-Narcan Training</u>, January 10, 2015, Blairsville, PA

Presentation/Speaker, January 19, 2015, Indiana Rotary Club. Emotionally disturbed persons, use of force, training, and less Lethal weapons. Proposed Rotary sponsored county-wide law enforcement training and ECW procurement

Panelist, Indiana County NAACP. *Fostering Improved Relationships Between Law Enforcement and Minority Communities: A Community Police Forum with Chief William Sutton and Friends,* February 18, 2015.

McCauley, R. Paul. Past President Academy of Criminal Justice Sciences. Submitted Written testimony to the *President's Task Force on 21st Century Policing.* Draft Report published March 2015.

McCauley, R. Paul. *Unambiguous Policies/Directives are Basic and Prerequisite to Effective Use of Force Training Content and Methods.* Submitted to Police Executive Research Forum (PERF) For <u>Re-Engineering Use of Force Training</u>; Washington DC Conference May 7, 2015

## ERRATA

### Deposition of Amanda Geraci
### June 1, 2015

*Geraci v. City of Philadelphia et al.*, No. 14-cv-5264 (WY)

| PAGE | LINES | CHANGE | REASON |
|---|---|---|---|
| 25 | 18 | Replace "Shell" with "Shale" | Transcription error |
| 27 | 19 | Replace "Jodi" with "Jody" | Spelling error |
| 27 | 20 | Replace "Jodi" with "Jody" | Spelling error |
| 28 | 14 | Replace "PAPA" with "PAFA" | Transcription error |
| 28 | 15 | Replace "PAPA" with "PAFA" | Transcription error |
| 31 | 18 | Replace "proper test" with "protest" | Transcription error |
| 32 | 9 | Replace "obstruction" with "demonstration" | Transcription error |
| 36 | 23 | Replace "want" with "wear" | Transcription error |
| 37 | 8 | Insert "at" after "screaming" | Transcription error |
| 38 | 7 | Replace "then her legs" with "then her leg" | Transcription error |
| 47 | 23 | Replace "Tack-Cooper and John" with "Tack-Hooper and Jon" | Transcription and spelling error |

ACKNOWLEDGEMENT OF DEPONENT

I, Amanda Geraci, do hereby certify that I have read the foregoing pages of the deposition dated June 1, 2015, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

7.7.15
_____
Date

Amanda Geraci

*MEMORANDUM*

**POLICE**
**CITY OF PHILADELPHIA**
**DATE: 08-19-13**

TO : Police Commissioner

FROM : Commanding Officer, Internal Affairs Division

SUBJECT : <u>COMPLAINT OF JOY CHRISTIAN, IAD #13-192</u>

### ALLEGATIONS:

On 04-01-13, at 11:30 AM, Sergeant Frazier #543, Internal Affairs Division, was notified of complaint against police. IAD Control #13-192 was issued.

The complainant, Joy Christian, 22/B/F, 5215 Schuyler Street, Apartment C-411, Philadelphia, PA 19144, Ph#267-334-5193, stated that she was treated unprofessionally and verbally abused by Police Officer Walls #5421, 39th Police District.

According to Joy Christian, on 03-24-13, at 11:59 PM, while she was driving on the 400 block of Hansberry Street, Police Officer Walls and Police Officer Berg stopped her for failing to use her turn signal. Joy Christian stated that she was recording the vehicle investigation, when Police Officer Walls grabbed her cellular phone, turned the cellular phone off and then placed it on the hood of her vehicle. When Joy Christian asked Police Officer Walls why he took her cellular phone, his response was, "Because I fucking can." Joy Christian also stated that Police Officer Walls was very belligerent and disrespectful towards her.

*A check of the Department records indicates the following:*

**Police Officer Andrew Walls #5421, PR #264570, was appointed to the Philadelphia Police Department on 03-24-08 and was assigned to the 39th Police District on 12-14-10.**

On 04-03-13, Lieutenant Ernest Ransom #357, Internal Affairs Division, was assigned to this investigation.

### INVESTIGATIVE ANALYSIS:

In accordance to Executive Order #7-11, all interested parties have been notified that this investigation has exceeded the mandatory 75-day investigation time limit. This delay was due to the complainant not cooperating and the need for additional information to complete this investigation.

*A review of the police documentation reveals the following:*

▪ On 03-25-13, at 12:07 AM, Police Officer Walls and Police Officer Berg prepared a Philadelphia Police Department Vehicle or Pedestrian Investigation Report (75-48A – DC #13-39-019213) in reference to the vehicle investigation of Joy Christian. As a result of this vehicle investigation, Joy Christian was issued one (1) Traffic Citation for Failure to Signal on Turn (I0058606-2).

▪ The following attempts were made by the assigned to contact Joy Christian:

- US Mail Cert #7010 2780 0002 5560 6018 – Signed by Joy Christian on 04-08-13.
- On 04-04-13, at 12 PM, the assigned contacted Joy Christian via telephone number provided and scheduled an interview for 04-10-13. Joy Christian failed to appear.
- On 06-03-13, the assigned e-mailed Joy Christian requesting a formal interview. There was no response to the e-mail.
- On 06-19-13, the assigned called Joy Christian and left message on her answering machine.
- On 06-19-13, the assigned requested the 39th District to (DC #13-39-042490, Gen #8152) deliver a message to Joy Christian's home (Message left in door).

********** 

**Joy Christian, 22/B/F, 5215 Schuyler Street, Apartment C-411, Philadelphia, PA 19144, Ph#267-334-5193, failed to cooperate with this investigation.**

Attempts by the assigned investigator to contact Joy Christian yielded negative results. The investigational questions were formulated based on Joy Christian's Citizen's Complaint Form (75-561).

**Sergeant Matthew Gillespie #325, SWDD, was interviewed on 07-18-13 by the assigned at IAD headquarters.**

On 03-25-13, Sergeant Gillespie was assigned to the 39th District as the Operation Room Supervisor. At approximately 12:00 PM, Joy Christian requested a Citizen Complaint Form in reference to a vehicle investigation conducted by Officer Walls and Officer Berg, which occurred on 03-24-13, at 11:59 PM, on the 400 block of Hansberry Street.

Sergeant Gillespie was informed by the operation room staff that Joy Christian was there to make a complaint against police. Joy Christian explained to the sergeant the reason why she was there and that she felt she was treated inappropriately during a vehicle investigation, and that she had an audio of the vehicle investigation on her cellular phone. Joy Christian allowed Sergeant Gillespie to listen to the audio recording. The recording was only ten (10) to fifteen (15) seconds in duration. Sergeant Gillespie did recognize the voice on the recording as being Officer Walls. Sergeant Gillespie did not remember the exact conversation he heard on the recording, but recalled that there was no profanity or inappropriate language from either Officer Walls or Joy Christian. Sergeant Gillespie did hear Officer Walls tell Joy Christian to hang up her cellular phone or turn it off.

Sergeant Gillespie did not hear anything else on the recording; he was unsure if the recording had ended or if Joy Christian was only allowing him the opportunity to hear only a portion of the recording. Sergeant Gillespie told Joy Christian that he did not see an issue with Officer Walls asking her to hang up the cellular phone due to officer safety reasons during the vehicle investigation, and informed Joy Christian of her right to file a citizen complaint.

JointAppx 1714

Sergeant Gillespie did inform Joy Christian that if there is more to the audio that she was not allowing him to hear, then she needed to go to Internal Affairs.

Sergeant Gillespie was not Officer Walls' immediate supervisor but he spoke to the officer in reference to the allegation by Joy Christian. Sergeant Gillespie asked Officer Walls about the circumstances of the vehicle investigation. Officer Walls' version of the events corresponded with the audio that Sergeant Gillespie heard on Joy Christian's audio recording. Sergeant Gillespie also informed Officer Walls of the importance of complying with Philadelphia Police Directive #145. Officer Walls stated to Sergeant Gillespie that he only removed the cellular phone from inside the vehicle for officer safety purposes.

Joy Christian did not provide Sergeant Gillespie with a copy of the recording. Sergeant Gillespie did not hear any profanity, yelling, or unprofessional language on the recording that Joy Christian allowed him to hear.

**Police Officer Kollin M. Berg #4518, 39th Police District, was interviewed on 06-17-13, by the assigned at IAD headquarters.**

On 03-25-13, Officer Berg was assigned to RPC 39P1 with his partner, Officer Walls #5421, and at 12:07 AM, they initiated a vehicle investigation at 400 Hansberry Street.

Officer Berg observed a vehicle turn without signaling onto the 400 block of Hansberry Street from Morris Street. The officers activated their emergency lights and sirens to stop the vehicle. The vehicle immediately pulled over on to the right side of the road. Officer Walls approached the driver side while Officer Berg approached the passenger side of the vehicle. Officer Berg could not hear what his partner was saying to Joy Christian, because her vehicle's window on the passenger side was up. After approximately thirty seconds to a minute, Officer Berg observed Officer Walls reach into Joy Christian's vehicle and take her cellular phone from out of her hand and he placed it on the roof of her vehicle. The officers then returned to their patrol vehicle and continued their investigation of Joy Christian and her vehicle via NCIC/PCIC. According to Officer Berg, Officer Walls removed Joy Christian's cellular phone because he [Officer Walls] requested her vehicle information several times but she did not respond because she was using the cellular phone.

After Officer Walls prepared the traffic citation and presented it to Joy Christian, she began yelling about a family member that was in some position of authority. The vehicle investigation took seven to ten minutes to complete. Afterwards, the officers resumed patrol. During the vehicle investigation, Officer Berg did not use any profanity nor did he hear Officer Walls use any profanity.

**Police Officer Andrew Walls #5421, 39th District was interviewed on 06-17-13 by the assigned at IAD headquarters.**

On 03-25-13, Officer Walls was assigned to RPC 39P1 with his partner, Officer Berg #4518 and at 12:07 AM, they initiated a vehicle investigation at 400 Hansberry Street.

JointAppx 1715

Officer Walls observed a vehicle going southbound on Morris Street then turned westbound onto the 400 block of Hansberry Street without using the signal. Officer Walls activated the emergency lights and sirens to pull the vehicle over for investigation. Officer Walls approached the driver side of the vehicle. Joy Christian who was operating the vehicle asked Officer Walls the reason for the stop. Officer Walls explained to Joy Christian the infraction he had observed then requested her driver's license, registration, and insurance card. Joy Christian began to use her cellular phone instead of complying with the request of Officer Walls. Officer Walls removed the cellular phone, which he believed was a distraction for Joy Christian, preventing her from complying with his request. Officer Walls placed the cellular phone on the sunroof of the vehicle so that Joy Christian could see it the entire time during the vehicle investigation. Officer Walls did see a microphone symbol on Joy Christian's cellular phone when he placed it on the sunroof of the vehicle. Joy Christian produced all the paperwork and handed it to Officer Walls. Officer Walls and Officer Berg then returned to their RPC and ran Joy Christian and her vehicle through NCIC/PCIC. Officer Walls prepared a traffic citation (TC #10058606-2), for Failure to Use the Turn Signal. Officer Walls proceeded back to the car and asked Joy Christian to sign the traffic citation at which time she refused. Joy Christian asked Officer Walls for his badge number and name, which he provided to her and the officer also informed her [Joy Christian] that his name and badge number was also on the traffic citation. At that time, Joy Christian began screaming at the officers that her two aunts are council members. The entire vehicle investigation lasted approximately 8 minutes.

Later, Sergeant Gillespie informed Officer Walls that Joy Christian had come into the police district to request a complaint form, at which time Joy Christian alleged that she had recorded the vehicle investigation on her cellular device.

4

JointAppx 1716

- On 03-25-13, Judge Christine Solomon, Traffic Court, found Joy Christian guilty for Failure to Signal Turn (Traffic Citation #I0058606-2).

Submitted by:

Ernest L. Ransom
Lieutenant                     #357
Internal Affairs Division

Approved by:

Robert D. Heinzeroth
Captain                        #06
Internal Affairs Division

5

**CONCLUSION:**

The investigation into Joy Christian's allegation of **VERBAL ABUSE** against Police Officer Andrew Walls #5421, PR #264570 is **NOT SUSTAINED**.

Joy Christian has failed to cooperate with this investigation. This investigation cannot prove or disprove Joy Christian's allegation of verbal abuse by Police Officer Walls after being stopped for a Motor Vehicle code violation at 400 Hansberry Street. Police Officer Walls denied using any profanity during the vehicle investigation and his partner, Police Officer Berg was unable to hear any conversation between Police Officer Walls and Joy Christian. Sergeant Gillespie did have an opportunity to listen to the audio recording of the vehicle investigation conducted by Police Officer Walls and Police Officer Berg but he [Sergeant Gillespie] did not hear any profanity or any other conversation that the sergeant deemed unprofessional.

This investigation has **SUSTAINED DEPARTMENTAL VIOLATIONS** against Police Officer Andrew Walls #5421, PR #264570 for violation of Philadelphia Police Directive #145, Subject: Pictures, video, and audio recordings of police officers while performing official functions in public spaces.

Although Joy Christian failed to cooperate with this investigation, Police Officer Walls admitted to removing Joy Christian's cellular phone while it was recording and placing it on the top of her vehicle's sunroof. Sergeant Gillespie statement supports Joy Christian's claim that she was recording the encounter with Police Officer Walls, when Police Officer Walls removed the phone from her vehicle. Police Officer Walls could not provide reasonable explanation as to why he removed the cellular phone from Joy Christian.

H. Robert Snyder
Inspector
Internal Affairs Division

6

JointAppx 1718

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| CHRISTOPHER SHARP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil No. 1:11-cv-02888-BEL |
| | ) | |
| BALTIMORE CITY POLICE | ) | |
| DEPARTMENT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**STATEMENT OF INTEREST OF THE UNITED STATES**

This litigation presents constitutional questions of great moment in this digital age:  whether private citizens have a First Amendment right to record police officers in the public discharge of their duties, and whether officers violate citizens' Fourth and Fourteenth Amendment rights when they seize and destroy such recordings without a warrant or due process.  The United States urges this Court to answer both of those questions in the affirmative.  The right to record police officers while performing duties in a public place, as well as the right to be protected from the warrantless seizure and destruction of those recordings, are not only required by the Constitution.  They are consistent with our fundamental notions of liberty, promote the accountability of our governmental officers, and instill public confidence in the police officers who serve us daily.

The United States is charged with enforcing three civil federal civil rights statutes that prohibit state and local law enforcement agencies from engaging in conduct that deprives persons of their rights under the Constitution and laws of the United States.  One of the provisions that the United States enforces is the police misconduct provision of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, which authorizes the Attorney General to file lawsuits seeking court orders to

reform police departments engaging in a pattern or practice of violating citizens' federal rights.  The United States also enforces the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1968 and Title VI of the Civil Rights Act of 1964.  Together, these three provisions prohibit discrimination on the basis of race, color, sex, or national origin by police departments receiving federal funds.  Because of these enforcement responsibilities, the United States has a strong interest in ensuring that citizens' rights under the First, Fourth, and Fourteenth Amendments are not diminished when they record police carrying out their duties in a public setting.  Accordingly, the United States files this Statement of Interest pursuant to 28 U.S.C. § 517.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 15, 2010, while in the Clubhouse at the Pimlico Race Course, Plaintiff Christopher Sharp observed Baltimore City Police Department ("BPD") officers forcibly arresting his friend.[1] Compl. at 9, ECF. No. 2.  Mr. Sharp used his cell phone camera to video and audio record the officers' conduct.  *Id*. at 2.  Several officers, in succession, approached Mr. Sharp and ordered him to surrender his camera phone.  *Id*. at 10.  After twice refusing to comply with officers' demands, Mr. Sharp surrendered his phone to an officer who indicated that he needed to review and possibly copy Mr. Sharp's recording as evidence.  *Id*.  This officer left the Clubhouse with Mr. Sharp's phone.  *Id*. at

---

[1] The United States assumes the facts presented in the Plaintiff's Complaint are true for the purposes of this Statement of Interest.  *See Ashcroft v. Iqbal*, 556 U.S. 662, ---, 129 S. Ct. 1937, 1950 (2009).  Although not included in the Complaint, Defendants' Motion to Dismiss Complaint or for Summary Judgment indicates that Mr. Sharp's friend was arrested for "striking a citizen in the presence of a police officer, resisting arrest, [and] assault second degree-law enforcement."  *See* Def. Motion to Dismiss Complaint or for Summary Judgment at 2 & n.1, ECF. No. 20.

11.  When the officer returned with Mr. Sharp's cell phone, he ordered Mr. Sharp to leave the premises. *Id.* As Mr. Sharp left the Clubhouse, he discovered that officers had deleted all of the recordings on his cell phone, including the two recordings of his friend's arrest and at least twenty personal videos.  *Id.* at 12.  The personal videos included recordings of his young son at sports events and parties and other videos of great sentimental value.  *Id.*  Mr. Sharp's cell phone had also been reset so that it only permitted emergency calls.  *Id.*

BPD initiated a roll call training on August 17, 2011, that informed BPD officers that "[i]t is lawful for a person to videotape activities by a law enforcement officer in a public place and in the course of a law enforcement officer's regular duty."  *See* Def. Motion to Dismiss Complaint or for Summary Judgment ("Def. MTD") at 12, ECF. No. 20.[2]  The training does not reference the First, Fourth, or Fourteenth Amendments.  *See id.* at 12-15.  In addition, BPD transmitted an electronic message department-wide regarding the Maryland Wiretapping Act;  provided an additional training to sergeants; and promulgated a new General Order that "instructs all sworn members on the Departments' protocol for addressing the video recording police activity and/or the video recording of a suspected crime." Def. MTD Ex. 2 at 2.

On August 31, 2011, Mr. Sharp filed a Complaint in the Circuit Court for Baltimore City against BPD, Frederick H. Bealefeld, III, Commissioner of the Baltimore City Police Department, and Unknown Police Officers Nos. 1, 2, and 3, alleging violations of state law and rights protected by the First, Fourth, and Fourteenth Amendments to the U.S. Constitution.  On October 11, 2011, the case was removed to the United States District Court for the District of Maryland.  On November 30, 2011, BPD

---

[2] Although the parties have yet to engage in discovery to test the factual averments in Defendants' Motion to Dismiss Complaint or for Summary Judgment, the United States assumes the truth of Defendants' factual allegations for the purposes of this Statement of Interest.  As explained infra, even assuming Defendants' factual averments are correct, this Court should not grant summary judgment.

and Frederick H. Bealefeld, III ("Defendants") filed a Motion to Dismiss Complaint or for Summary

Judgment pursuant to Rules 12 and 56 of the Federal Rules of Civil Procedure.

## ARGUMENT

The First, Fourth, and Fourteenth Amendments protect Mr. Sharp from the actions taken by BPD

officers in response to Mr. Sharp's recording of their actions, at least on the facts alleged in the

Complaint.  Indeed, Defendants recognize that the First Amendment is implicated when a private citizen

records officers in the public discharge of their duties, and they have begun to take steps to ensure that

the First Amendment is upheld.  Unfortunately, Defendants' remedial actions to date are insufficient to

ensure that a violation of the First Amendment does not recur, nor have Defendants taken any remedial

actions regarding the alleged violations of the Fourth and Fourteenth Amendments.  Accordingly,

Defendants' request for partial summary judgment should be denied.[3]

**1.     The First Amendment Protects the Recording of Police Officers Performing Their Duties in Public**

**a.   Defendants Concede That Private Citizens May Record Public Police Activities**

The First Amendment protects the rights of private citizens to record police officers during the

public discharge of their duties.  Mr. Sharp's recording of his friend's arrest by BPD officers is

---

[3] In their Motion to Dismiss, Defendants make two arguments:  (1) Plaintiff failed to state a claim against BPD or the Commissioner because the Complaint does not include sufficient facts to establish municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); and (2) Plaintiff's claims are moot because there is no reasonable expectation that the violations alleged by Plaintiff will reoccur. Defendants' first argument is based on alleged factual and pleading deficiencies that do not implicate the United States' interests.  Defendants's second argument, however, assumes *arguendo* that Defendants could be held liable for the actions of the individual police officers and asserts that Plaintiff's claims are nevertheless moot because of the remedial actions Defendants have taken.  In addressing Defendants' second argument, the United States also assumes *arguendo* that Defendants could be held liable under *Monell*.  As argued below, Defendants' remedial actions actions are insufficient to moot Plaintiffs' claims.

unquestionably protected by the First Amendment, and Defendants concede this point.  *See* Def. MTD at

12-15.  Federal courts have recognized that recording devices are a form of speech through which

private citizens may gather and disseminate information of public concern, including the conduct of law

enforcement officers.  The First Circuit recently held in *Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011),

that "[b]asic First Amendment principles" and federal case law "unambiguously" establish that private

citizens possess "a constitutionally protected right to videotape police carrying out their duties."  *Id.* at

82.  *See Smith v. Cumming*, 212 F.3d 1332,  1333 (11th Cir. 2000) (recognizing the "First Amendment

right, subject to reasonable time, manner and place restrictions, to photograph or videotape police

conduct."); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing the "First

Amendment right to film matters of public interest"); *Robinson v. Fetterman*, 378 F. Supp. 2d 534, 542

(E.D. Pa. 2005) (finding "no doubt that the free speech clause of the Constitution protected" plaintiff

who videotaped officers because  "[v]ideotaping is a legitimate means of gathering information for

public dissemination and can often provide cogent evidence").  The right to record police activity is

limited only by "reasonable time, place, and manner restrictions."  *Glik*, 655 F.3d at 84; *see Kelly v.

Borough of Carlisle*, 622 F.3d 248, 262 (3d Cir. 2010) (noting "even insofar as it *is* clearly established,

the right to record matters of public concern is not absolute; it is subject to reasonable time, place, and

manner restrictions," and finding "insufficient case law to establish a right to videotape police officers

during a traffic stop," an "inherently dangerous situation[ ]").

There is no binding precedent to the contrary.  In *Szymecki v. Houck*, 353 F. App'x 852 (4th Cir.

2009), the Fourth Circuit issued a one page, unpublished per curium opinion summarily concluding –

without providing legal or factual support – that the "right to record police activities on public property

was not clearly established in this circuit at the time of the alleged conduct."  *Id.* at 853.  The Fourth

Circuit's opinion in *Szymecki* is not a barrier to this Court making a reasoned judgment based on established constitutional principles. *See United States v. Stewart*, 595 F.3d 197, 199 n.1 (4th Cir. 2010) ("Unpublished opinions have no precedential value in our Circuit."); *see also Glik*, 655 F.3d at 85 ("[T]he absence of substantive discussion deprives *Szymecki* of any marginal persuasive value it might otherwise have had.").

Furthermore, the facts alleged here indicate that BPD officers confronted Mr. Sharp because he was taking video and audio recordings of his friend's arrest, ordered him to surrender his camera phone, and ultimately destroyed the recordings on Mr. Sharp's phone because the BPD officers did not want the recordings to be used to impugn their actions. "There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991). The reach of the First Amendment's protection extends beyond the right to gather such information – it also prohibits government officials from "punish[ing] the dissemination of information relating to alleged governmental misconduct." *Id.* at 1035; *see Butterworth v. Smith,* 494 U.S. 624, 632 (1990) (speech relating to alleged governmental misconduct "has traditionally been recognized as lying at the core of the First Amendment").

The right to engage in and disseminate speech relating to government misconduct is not diminished when the government actors are police officers. *See City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987) ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."); *Norwell v. City of Cincinnati, Ohio*, 414 U.S. 14, 16 (1973) ("Surely, one is not to be punished for nonprovocatively voicing his objection to what he obviously felt was a highly questionable detention by a police officer."); *see also Jean v. Mass. State Police*, 492 F.3d 24, 30 (1st Cir. 2007) (finding that activist's recording of police officers' "warrantless and potentially

unlawful search of a private residence is a matter of public concern"); *Wilson v. Kittoe*, 337 F.3d 392, 399 n.3 (4th Cir. 2003) ("Peaceful verbal criticism of an officer who is making an arrest cannot be targeted under a general obstruction of justice statute such as Virginia's without running afoul of the First Amendment . . . .").

The Fourth Circuit has explicitly held that suppressing information critical of the police violates the First Amendment.  In *Rossignol v. Voorhaar*, 316 F.3d 516, 521 (4th Cir. 2003), the Fourth Circuit considered whether sheriff's deputies violated the First, Fourth, and Fourteenth Amendments when they suppressed the distribution of a newspaper critical of the Sheriff and his deputies.  The Court held that "the seizure clearly contravened the most elemental tenets of First Amendment law." *Id.* at  521.  When law enforcement officers target materials "for suppression and retaliation because they disagree[] with its viewpoint and intend[] to prevent its message from being disseminated," "[t]his by itself [i]s sufficient to violate the Constitution." *Id*.  Moreover, by suppressing constitutionally protected speech, law enforcement officers violated "*both* a speaker's right to communicate information and ideas to a broad audience *and* the intended recipients' right to receive that information and those ideas." *Id.* at 522.  The same principles apply here.  If, as Mr. Sharp alleges, BPD officers suppressed the dissemination of his recording of his friend's arrest, such an action would clearly violate the First Amendment.

### b.  Defendants' Remedial Actions Are Not Sufficient To Prevent Future Constitutional Violations

Defendants do not dispute that the First Amendment protects Mr. Sharp's recording of his friend's arrest.  *See* Def. MTD at 12-15.  Nor do Defendants address, and presumably therefore do not dispute, Mr. Sharp's First Amendment right to disseminate this recording.  Instead, Defendants argue

that they have taken sufficient steps to address the alleged violation of the First Amendment, rendering Mr. Sharp's claims moot. *See id.*

Specifically, Defendants allege that, BPD has voluntarily developed training protocols for its officers and sergeants and promulgated a new policy in order to clarify the rights of individuals who engage in protected First Amendment activities. *See* Def. MTD at 12-13. Defendants contend that these steps are sufficient to establish that Mr. Sharp's First Amendment claims for injunctive relief are now moot.[4] While the United States appreciates that Defendants now recognize that measures should be taken to address the alleged First Amendment violations, the remedial actions taken thus far – BPD's promulgation of a new General Order and provision of training – are not sufficient to prevent future constitutional violations.

Federal courts have a "duty . . . to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952). Under such circumstances, "[a] controversy may remain to be settled" yet "[t]he defendant is free to return to his old ways." *United States v. W. T. Grant Co.*, 345 U.S. 629, 632-33 (1953). Consistent with this principle, "[a] defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000); *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001) (This "general rule . . . traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior."). In order to overcome the general rule, a

---

[4] Defendants also appear to claim that Mr. Sharp's Fourth and Fourteenth Amendment claims are now moot, *see* Def. MTD at 13, although they do not address either of these claims substantively in their Motion. *See* infra Note 6.

defendant must establish that – due to his voluntary cessation of the challenged conduct – "there is no reasonable expectation that the wrong will be repeated." *W. T. Grant Co.*, 345 U.S. at 632-33.

Although Defendants have taken some remedial actions, these measures do not adequately ensure that violations will not recur. *See Friends of the Earth, Inc.*, 528 U.S. at 193 (Defendants have the "formidable burden" of establishing that it's "absolutely clear" that their voluntary actions can reasonably be expected to prevent future constitutional violations."). In the months following the initiation of Mr. Sharp's civil suit, Defendants developed and implemented a roll call training, transmitted an electronic message on the same topic, and provided an additional training to sergeants. Def. MTD at 5-6. These training documents, however, do not explicitly acknowledge that private citizens' right to record the police derives from the First Amendment, nor do they provide clear and effective guidance to officers about the important First Amendment principles involved.[5] *See* Def. MTD at 12 (referring to roll call training on "Wire Tapping Law," an electronic message "on the same topic," training for sergeants on "the scope of the Maryland Wiretapping Act" and "an explanation of the right of citizens to record public police activities"); Def. MTD, Ex. 2-4. Defendants also place great emphasis on their recently promulgated General Order as evidence supporting their Motion to Dismiss, but the General Order was not attached to their Motion. Instead, Defendants ask this Court to conclude that BPD's General Order is sufficient to prevent future constitutional violations based on Defendants' assurances alone. As it currently stands, "nothing in the record indicates that Defendants' actions have resulted in permanent changes," prohibiting a finding that Mr. Sharp's claims for injunctive relief are

---

[5] Significantly, the training materials also make no reference to the Fourth or Fourteenth Amendments, so it is unclear how these materials could possibly moot Mr. Sharp's claims on these issues.

moot.  *Feldman v. Pro Football, Inc.*, 579 F. Supp. 2d 697, 706 (D. Md. 2008) (finding Plaintiff's claims

not moot because "there is nothing to prevent Defendants from returning to their prior practices").

In short, the First Amendment issues presented in this case are significant and are not adequately

addressed by training that does not specifically describe officers' duties under the First Amendment.  If

BPD maintains a policy, practice or custom of advising officers to detain citizens who record the police

while in the public discharge of their duties and to seize, search, and delete citizens' recordings as

Plaintiff's contend, Compl. at 7, the remedial measures taken by the Defendants are not sufficient to

prevent future constitutional violations.  At minimum, Defendants should develop a comprehensive

policy that specifically addresses individual's First Amendment right to observe and record officer

conduct.  This policy should be implemented through periodic training, and the effectiveness of the

policy and training should be tested routinely through quality assurance mechanisms.  Moreover, BPD

should track allegations that an officer has interfered with a citizen's First Amendment right to observe

and/or record the public performance of police duties.  While Defendants have taken some measures to

address Plaintiff's allegations, those measures do not demonstrate that First Amendment violations

could not recur, and therefore summary judgment is inappropriate.

2.    **The Fourth Amendment Protects Private Property From Seizure or Search Without a Warrant or Probable Cause**

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses,

papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.[6]  The Fourth

---

[6] While Defendants purport to have resolved Mr. Sharp's First Amendment claims through the provision of training and the development of a new General Order, Defendants' position on Mr. Sharp's Fourth and Fourteenth Amendment claims is less clear.  To the extent the Defendants argue that their voluntary actions to prevent officers from retaliating against persons engaged in activity protected by the First Amendment also moots Mr. Sharp's Fourth and Fourteenth Amendment claims, Defendants fail to recognize the independent import of these claims.  The Supreme Court "has never held that one specific

Amendment "traditionally has been deemed to protect" private citizens' "personal effect[s]."  *Soldal*,

506 U.S. at 65 (*citing Cardwell v. Lewis*, 417 U.S. 583, 591 (1974)); *Altman v. City of High Point, N.C.*,

330 F.3d 194, 202 (4th Cir. 2003)  ("[T]he [Supreme] Court has treated the term 'effects' as being

synonymous with personal property.").  The interests animating the Fourth Amendment's prohibition

against unreasonable searches and seizures are heightened when the property at issue is also protected

by the First Amendment.  The Supreme Court has held that Fourth Amendment limitations on law

enforcement officers' authority to seize individuals' property must be "scrupulously observed" when the

item seized contains information protected by the First Amendment and "the basis for the seizure is

disapproval of the message contained therein."  *Walter v. United States*, 447 U.S. 649, 655 (1980).  This

requirement that government officials closely adhere to the strictures of the warrant requirement when

the item to be seized is protected by the First Amendment recognizes that the "[t]he Bill of Rights was

fashioned against the background of knowledge that unrestricted power of search and seizure could also

be an instrument for stifling liberty of expression."  *Walter*, 447 U.S. at 655 n.6; *see also New York v.*

*P.J. Video, Inc.*, 475 U.S. 868, 873 (1986)  ("We have long recognized that the seizure of films or books

on the basis of their content implicates First Amendment concerns not raised by other kinds of

seizures.").

  Indeed, the seizure of material protected by the First Amendment is a form of prior restraint – a

long disfavored practice only permitted in limited circumstances not present here.  The Supreme Court

has recognized that "seizing films to destroy them or to block their distribution or exhibition is a very

constitutional clause gives way to another equally specific clause when their domains overlap."  *Presley v. City of Charlottesville*, 464 F.3d 480, 485 (4th Cir. 2006); *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 70 (1992) ("Certain wrongs affect more than a single right . . . [w]here such multiple violations are alleged, we are not in the habit of identifying as a preliminary matter the claim's 'dominant' character.  Rather, we examine each constitutional provision in turn.").

different matter from seizing a single copy of a film for the bona fide purpose of preserving it as evidence in a criminal proceeding." *Heller v. New York*, 413 U.S. 483, 490 (1973). When material falls "arguably within First Amendment protection," and officers' warrantless seizure of that material "br[ings] to an abrupt halt an orderly and presumptively legitimate distribution or exhibition" of that material, the Fourth Amendment is violated. *Roaden v. Kentucky*, 413 U.S. 496, 503 (1973) ("Such precipitate action by a police officer, without the authority of a constitutionally sufficient warrant, is plainly a form of prior restraint and is, in those circumstances, unreasonable under Fourth Amendment standards."). Such a seizure, which prohibits the dissemination of constitutionally protected information "presents essentially the same restraint on expression as the seizure of all the books in a bookstore." *Id.* at 504. As described above, Defendants' seizure and destruction of Mr. Sharp's videos appears to have been based on the content of those videos and prevented their dissemination. These First Amendment concerns "require[] that the Fourth Amendment be applied with 'scrupulous exactitude.'" *Maryland v. Macon*, 472 U.S. 463, 468 (1985).

In this case, Mr. Sharp alleges that Defendants seized his cell phone and searched it without a warrant. An officer's warrantless search or seizure of a private citizen's personal property is per se unreasonable unless the search or seizure "falls within 'certain carefully defined classes of cases' that permit warrantless searches." *United States v. Perez*, 393 F.3d 457, 460 (4th Cir. 2004) (*citing Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 528-29 (1967)); *Altman*, 330 F.3d at 205 ("A seizure of personal property conducted without a warrant is presumptively unreasonable."). Warrantless seizures are only permitted if an officer has probable cause to believe that the property "holds contraband or evidence of a crime" and "the exigencies of the circumstances demand it or some other

recognized exception to the warrant requirement is present."[7]  *United States v. Place*, 462 U.S. 696, 701

(1983).  Even then, officers may not search the property without first obtaining a warrant.  *Id.* at 701 &

n.3.  In determining whether the seizure and search were reasonable under the circumstances, courts

"balance the nature and quality of the intrusion on the individual's Fourth Amendment interest against

the importance of the governmental interests alleged to justify the intrusion," to determine if an officer's

conduct violated the Fourth Amendment.  *Perez*, 393 F.3d at 460 (*citing Place*, 462 U.S. at 703).

It is well established that individuals have a property interest in their cell phones that is protected

by the Fourth Amendment.  A government official's intrusion into a private citizen's personal effects

constitutes a Fourth Amendment seizure if the individual has a "possessory interest" in the property and

the official engages in "some meaningful interference" with that interest.  *United States v. Jacobsen*, 466

U.S. 109, 113 (1984).  Similarly, a government official's search of property violates the Fourth

Amendment if officials infringe upon an "an expectation of privacy that society is prepared to consider

reasonable."  *Id.*  Private citizens have both a possessory interest in their cell phones and a recognized

expectation of privacy in the contents of their cell phones.  *See United States v. Finley*, 477 F.3d 250,

259-60 (5th Cir. 2007) (recognizing defendants' possessory interest in seized cell phone and privacy

interest in text messages and call records, but finding search permissible as search incident to arrest);

---

[7] The exception for warrantless searches incident to an arrest does not apply in this case.  Courts have
recognized that it may be necessary for a law enforcement officer to conduct a warrantless search of the
contents of a suspect's cell phone incident to a lawful arrest if the phone contains evidence that may
otherwise be destroyed.  *See, e.g.*, *United States v. Murphy*, 552 F.3d 405, 411 (4th Cir. 2009)
("[O]fficers may retrieve text messages and other information from cell phones and pagers seized
incident to an arrest" where there is a "manifest need . . . to preserve evidence.").  The "search incident
to arrest" exception to the warrant requirement "has been traditionally justified by the need to search for
weapons, instruments of escape, and evidence of crime."  *United States v. Reid*, 929 F.2d 990, 994 (4th
Cir. 1991); *see also Knowles v. Iowa*, 525 U.S. 113, 116 (1998).  The parties agree that Mr. Sharp was
not arrested and that officers destroyed Mr. Sharp's recordings instead of copying them as evidence for a
criminal prosecution.

*United States v. Young*, 278 F. App'x 242, 245-46 (4th Cir. 2008) (per curiam) (recognizing defendant's "[p]rivacy rights in the phone" from which officer retrieved text messages); *United States v. Wurie*, 612 F. Supp. 2d 104, 109 (D. Mass. 2009) ("It seems indisputable that a person has a subjective expectation of privacy in the contents of his or her cell phone.").  An individual's personal cell phone "contain[s] a wealth of private information, including emails, text messages, call histories, address books, and subscriber numbers" and is akin to "a personal computer that is carried on one's person."  *United States v. Zavala*, 541 F.3d 562, 577 (5th Cir. 2008) (finding that defendant "had a reasonable expectation of privacy regarding this information").  Accordingly, Mr. Sharp has a protectable interest in his cell phone and its contents under the Fourth Amendment.

In this case, the Complaint does not include any allegations indicating that exigent circumstances existed that would permit the BPD officers to seize Mr. Sharp's phone without a warrant, and Defendants have not suggested that any existed in their Motion.  *See Place*, 462 U.S. at 701. Moreoever, it is unclear whether, when Mr. Sharp surrendered his phone to officers, he did so "voluntarily" and not as "the result of duress or coercion, express or implied."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973); *United States v. Hylton*, 349 F.3d 781, 785 (4th Cir. 2003) (An individual's "valid consent" is "[o]ne well-recognized exception" to the warrant requirement).  *See* Def. MTD at 5.  Nor is it clear whether Mr. Sharp voluntarily consented to a search of his phone's contents. These ambiguities alone suggest that this case is inappropriate for summary judgment.

Even if Mr. Sharp did consent to the surrender of his phone and some type of search of its contents, "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable searches.'"  *Jacobsen*, 466 U.S. at 124.  Law enforcement officers violate

the Fourth Amendment if their search exceeds the scope of a person's consent.  *See United States v. Neely*, 564 F.3d 346, 353 (4th Cir. 2009) ("Because Officer Tran's search exceeded the scope of Neely's consent and cannot be justified under *Terry,* we find that the search of the interior of Neely's car was in violation of his Fourth Amendment rights.").  Federal courts have recognized the uncontroversial principle that, by consenting to an initial search of private property, private citizens do not thereby consent to the destruction of that property.  *See, e.g.*, *United States v. Strickland*, 902 F.2d 937, 941-42 (11th Cir. 1990) (explaining that the scope of a search pursuant to a general statement of consent "is not limitless" and that "a police officer could not reasonably interpret a general statement of consent to search an individual's vehicle to include the intentional infliction of damage to the vehicle or the property contained within it").  Here, Defendants deleted Mr. Sharp's videos from his cell phone, allegedly without consent.  If these allegations are true, Defendants violated Mr. Sharp's Fourth Amendment rights.

3.     **The Fourteenth Amendment Prohibits the Seizure and Destruction of Property Without Due Process**

The Fourteenth Amendment prohibits state and local officials from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.  Here, Mr. Sharp alleges that Defendants seized and destroyed his cell phone videos without notice or an opportunity to be heard and that this was pursuant to a policy, practice, or custom of Defendants.  Compl. at 18.  If these allegations are accurate, BPD officers violated the Fourteenth Amendment when they deprived Mr. Sharp of personal property without providing him with notice or an opportunity to object to the deletion of the recordings in his cell phone, and Defendants have not put forward any evidence that they have taken remedial measures to address this violation.

A private citizen's "constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decisionmaking when it acts to deprive a person of his possessions." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972).  By mandating that individuals be afforded an opportunity to be heard, the due process clause "operates to protect the 'use and possession of property from arbitrary encroachment – to minimize substantively unfair or mistaken deprivations of property.'"  *See Helton v. Hunt*, 330 F.3d 242, 247 (4th Cir. 2003) (finding that statute permitting law enforcement officers to seize and destroy video gaming machines "with no process at all" violated due process) (*citing Fuentes*, 407 U.S. 67 at 81); *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) ("Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause . . . .").

Mr. Sharp has alleged sufficient facts in his Complaint to suggest a violation of the Fourteenth Amendment.  A plaintiff alleging a due process violation must establish that "(1) they had property or a property interest (2) of which the defendant deprived them (3) without due process of law." *Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach*, 420 F.3d 322, 328 (4th Cir. 2005); *see also Zinermon v. Burch*, 494 U.S. 113, 126 (1990) ("[T]o determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate."). Private citizens have property interests in their personal effects, including cell phones and the contents of their cell phones.  *See* supra Part 2; *see also Matthias v. Bingley*, 906 F.2d 1047, 1051 (5th Cir. 1990) ("Of course, the plaintiffs' personal belongings disposed by the City in this case fall[] under the rubric 'property' governed by the Due Process Clause.").  Mr. Sharp alleges, and Defendant does not dispute, that officers permanently deleted the recordings on Mr. Sharp's cell phone – including numerous videos of his young son at sports events and other personal videos – without first providing him with "notice

reasonably calculated" to apprise him of "the pendency of the action" and "afford [him] an opportunity to present [his] objections."[8] *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Such notice is "an elementary and fundamental requirement of due process in any proceeding which is to be accorded finality." *Id*.

"The right to be heard before being condemned to suffer grievous loss of any kind . . . is a principle basic to our society." *Mathews*, 424 U.S. at 333 (internal citations omitted).  BPD officers appear to have violated the core requirements of procedural due process when – without providing notice or an opportunity to be heard – they allegedly – and irrevocably – deprived Mr. Sharp of the recordings on his cell phone.  *See also Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 823 (5th Cir. 2007) (The notice defendant provided to the plaintiff "was insufficient to satisfy due process because [plaintiff] did not receive the notice until after his personal property was allegedly discarded . . . . [D]iscarding [plaintiff's] personal property in this manner violated his procedural due process rights.").  If the facts alleged in Mr. Sharp's Complaint are true, they make out a violation of the Fourteenth Amendment.  Defendants have not submitted any evidence suggesting that they have remedied the alleged violations, so summary judgment on this claim should be denied.

---

[8] The facts, as alleged, indicate that – *after* Plaintiff had unwittingly surrendered his phone to an officer – another officer informed him that "they'll probably just erase it and give it back."  Compl. at 11.

**CONCLUSION**

For the reasons set forth herein, the Court should deny Defendants' request for summary

judgment in their Motion to Dismiss or for Summary Judgment.

Respectfully submitted,

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

JONATHAN M. SMITH
Chief
Special Litigation Section

TIMOTHY D. MYGATT
Special Counsel
Special Litigation Section

*/s/ Joshua C. Delaney*
JOSHUA C. DELANEY (Bar #024664)
RASHIDA J. OGLETREE (DC Bar #974441)
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530
Telephone:  (202) 616-2446
Facsimile:  (202) 514-0212
Email:joshua.delaney@usdoj.gov

Attorneys for the United States of America